## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| 100 F Street, N.E. | : |
| Washington, DC 20549, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | :  Civil No.11-cv-02132 (RMC) |
| | : |
| THE MILAN GROUP, INC., a/k/a THE MILAN | : |
| TRADING GROUP, INC. | :  **FIRST AMENDED** |
| 113 Upland Terrace, Clarks Summit, PA 18411 | :  **COMPLAINT** |
| | :  **SECURITIES** |
| FRANK L. PAVLICO III, a/k/a FRANK LORENZO | :  **FRAUD** |
| 113 Upland Terrace, Clarks Summit, PA 18411, | : |
| | :  <u>**JURY TRIAL DEMANDED**</u> |
| BRYNEE K. BAYLOR | : |
| 13121 Riviera Terrace, Silver Spring, MD 20904, and | : |
| | : |
| BAYLOR & JACKSON, P.L.L.C. | : |
| 2607 24th Street, Suite 1, N.W., Washington, DC 20008 | : |
| | : |
| **Defendants,** | : |
| | : |
| **and** | : |
| | : |
| MIA C. BALDASSARI | : |
| 522 Shirley Lane, Dunmore PA 18512, | : |
| | : |
| BRETT A. COOPER | : |
| 229 Carriage Hill Drive, Moorestown, | : |
| New Jersey 08057, | : |
| | : |
| GLOBAL FUNDING SYSTEMS LLC | : |
| 12 Debrosses Street, New York, NY 10013, | : |
| | : |
| GPH HOLDINGS, LLC | : |
| 211 North Main Street, Lewiston, Utah 84320, | : |
| | : |

| | |
|---|---|
| **DAWN R. JACKSON** | : |
| **5705 Hillmeade Road, Bowie, MD 20720,** | : |
| | : |
| **PATRICK T. LEWIS** | : |
| **570 South 250 East, Richmond, Utah 84333,** | : |
| | : |
| **THE JULIAN ESTATE** | : |
| **113 Upland Terrace, Clarks Summit, PA 18411** | : |
| | : |
| **Relief Defendants.** | : |
| _____ | : |

## FIRST AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows for its First Amended Complaint:

## SUMMARY

1.      From at least August 2010 and continuing to the date of the filing of this Complaint, defendants Frank L. Pavlico, III, a/k/a Frank Lorenzo, ("Pavlico") and Brynee K. Baylor ("Baylor") and entities they control, including defendants The Milan Group, Inc., a/k/a The Milan Trading Group, Inc., ("Milan") and Baylor & Jackson, P.L.L.C. ("B&J"), conducted a "Prime Bank" scheme that defrauded at least thirteen investors out of approximately $2.1 million.

2.      Pavlico and Baylor lured investors into the scheme by offering them extraordinary returns.  In at least one instance, Pavlico offered returns of up to twenty times the original investment within forty-five days.  Investors were told that the investment involved no risk and that their principal would be returned if a successful bank instrument transaction was not completed.  Baylor cloaked these offers in legitimacy by acting through her capacity as a licensed attorney and by identifying herself and her Washington, D.C. law firm, B&J, as counsel for Milan and engaging in the scheme through B&J.

3.     Pavlico and Baylor told investors both orally and in writing that Milan would use investor funds to "lease," "leverage," and "trade" foreign bank instruments, including "standby letters of credit" and "bank guarantees."  The Milan investment, however, was entirely fictitious. Pavlico and Baylor provided investors with investment contracts and other documents that described the investment in vague and complex terms.  These documents were only legal-sounding gibberish dotted with meaningless legal and financial terms that were designed to deceive investors into believing they were participants in a legitimate investment.  Contrary to their representations, Pavlico and Baylor never used investor funds to lease, leverage, or trade any purported foreign bank instruments.  Instead, Pavlico and Baylor used investor money to purchase luxury cars such as a Range Rover and a Jaguar, make purchases at expensive restaurants and retailers including Jimmy Choo, pay for a trip to the Bahamas, pay other personal expenses, pay B&J business expenses, and make payments to the relief defendants.

4.     Pavlico and Baylor made numerous material misrepresentations to investors in furtherance of the scheme.  Most importantly, Pavlico and Baylor lied to investors about the existence of the supposed investment and the use of investor funds.  Baylor falsely claimed that she had been involved in prior successful transactions with Milan and that she had personally witnessed prior investors receive large returns through B&J's attorney trust ("IOLTA") account consistent with Pavlico's representations.  B&J participated in and aided and abetted the scheme by acting as escrow agent for Milan pursuant to written agreements between B&J and investors that Baylor executed as B&J's managing partner.  At least seven investors deposited at least $1.65 million into B&J's IOLTA account.   In addition, agreements with investors provided that investment profits would be shared among investors, Milan, and B&J.

5.    Pavlico and Baylor are continuing to deceive investors about the status of their purported investments.  Pavlico and Baylor have sent investors dozens of emails describing the progress of the supposed transaction, and Baylor has sent investors notarized "Attorney Attestation" letters on B&J letterhead assuring them that the investment is legitimate and will be consummated soon.  Pavlico and Baylor have also sent investors fictitious computer generated "screen shots" and copies of purported foreign bank instruments to deceive them into believing that Milan has acquired bank instruments.

6.    No transactions in securities offered or sold by or for the defendants have been registered with the Commission, or are eligible for an exemption from registration.

7.    None of the defendants were registered as broker-dealers, as is required for offering securities to investors in these circumstances.

8.    By virtue of their conduct, the defendants have engaged, and unless enjoined will continue to engage, in violations of, or aid and abet violations of Sections 5(a), 5(c) and  17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and  77q(a)], Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## JURISDICTION AND VENUE

9.   The Commission brings this action, and this Court has jurisdiction over this action, pursuant to authority conferred by Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

10.    This Court has personal jurisdiction over the defendants and venue is

proper in the District of Columbia pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because each defendant engaged in transactions, acts, practices, and courses of business constituting the violations alleged herein within this District and two of the defendants can be found and do business in this District.

11.     The defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, and the means and instruments of transportation and communication in interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

## DEFENDANTS

11.     **Frank L. Pavlico, III**, a/k/a Frank Lorenzo, age 41, is a resident of Clarks Summit, Pennsylvania and is the president of Milan.  On February 8, 2007, Pavlico pled guilty to felony conspiracy to conduct financial transactions involving the proceeds of drug trafficking. On January 16, 2008, he was sentenced to ten months in prison, supervised release of three years, and fined $15,000.  See *USA v. Pavlico*, No. 3:07-cr-00052-JMM-1, (M.D. Pa. Jan. 16, 2008). While on supervised release he was prohibited from engaging in criminal conduct and associating with persons engaged in criminal activity.  His supervised release ended on November 5, 2011.

12.     **Brynee K. Baylor**, age 37, is an attorney licensed in the District of Columbia, Maryland, and New Jersey.  She is a resident of Silver Spring, Maryland and the co-founder and managing partner of B&J in Washington, D.C.

13.     **The Milan Group, Inc.,** a/k/a The Milan Trading Group, Inc., is a Pennsylvania corporation with its principal place of business at Pavlico's home address.

14.     **Baylor & Jackson, P.L.L.C.** is a Washington, DC law firm with its principal place of business in Washington, D.C.

<u>**RELIEF DEFENDANTS**</u>

15.     **GPH Holding, LLC ("GPH")** is an Idaho limited liability company with its principal place of business in Lewiston, Utah.  GPH received at least $375,000 from the B&J IOLTA account.

16.     **Global Funding Systems, LLC** ("**Global Funding**") is a Wyoming limited liability company with its principal place of business in New York, New York.  Global Funding received at least $225,000 from Milan.

17.     **Dawn R. Jackson ("Jackson")**, age 41, is an attorney licensed in the District of Columbia and New Jersey.  She is a resident of Bowie, Maryland and a co-founder and partner of B&J.  Jackson received at least $153,000 from B&J's IOLTA and operating accounts.

18.     **Mia C. Baldassari ("Baldassari")**, age 46, is a resident of Dunmore, Pennsylvania.  Baldassari is the vice president of Milan.  Baldassari received at least $24,500 from Milan.

19.     **Patrick T. Lewis ("Lewis")**, age 41, is a resident of Lewiston, Utah.  Lewis is the managing member of GPH.  Investor funds received by GPH were transferred to other accounts believed to be owned or controlled by Lewis.

20.     **Brett A. Cooper ("Cooper")**, age 35, is a resident of Moorestown, New Jersey.  Cooper is a managing member of Global Funding.  Investor funds received by Global Funding were transferred to other accounts, including Cooper's personal accounts.

21.     **The Julian Estate, Inc.** is a Pennsylvania corporation with its principal place of business at 113 Upland Terrace, Clarks Summit, PA 18411.  It was incorporated in November

2011 with one incorporator, defendant Pavlico.   It appears to have been formed to hold title to the 113 Upland Terrace property.

## FACTS

### A.   The Defendants' Scheme to Defraud Investors

22.    Beginning in at least August 2010 and continuing to the present, Pavlico and Baylor used the mail and wires to defraud at least 13 investors out of $2.1 million by offering them a fictitious investment that supposedly involved "leasing," "leveraging," and "trading" bank instruments.  Several government agencies, including the Commission, the U.S. Department of the Treasury, and the Federal Bureau of Investigation, have posted investor alerts and warnings about fictitious "prime bank" investments on their publicly available websites.

23.    The investors are located in several states, including California, Florida, New York, and Colorado.  They generally have limited investment experience.

24.    The defendants promised investors extraordinary returns of up to twenty times the principal amount invested with little or no risk.  To deceive them into believing the purported investment was legitimate, the defendants provided investors with documents containing meaningless legal-sounding terms and references to non-existent financial instruments and institutions.  To fend off further inquiries, which might have provided information investors could have checked for themselves and found out about the fraud, investors were told that confidentiality and secrecy requirements prevented the defendants from providing details of the investments.

25.    In furtherance of the scheme, Baylor used her position as an attorney and a partner in Washington, D.C. law firm B&J to deceive investors into believing that the Milan investment was legitimate and that investors' funds would be safe.  She identified herself and her

law firm as "counsel" for Milan and, acting through B&J, she provided "Attorney Attestation" letters to certain investors. B&J acted as escrow agent in connection with the scheme pursuant to written agreements between B&J and investors which Baylor executed as B&J's managing partner. She told investors that she had personally witnessed millions of dollars paid to investors through B&J's trust account, consistent with Pavlico's representations. In addition, Pavlico and Baylor directed at least seven investors to deposit approximately $1.65 million into B&J's IOLTA account.

26. Pavlico deceived investors by using the name "Frank Lorenzo" and by failing to disclose that he pled guilty to a felony, served 10 months in prison, and was on supervised release at the time he was soliciting their investments.

27. Pavlico and Baylor communicated frequently with investors by telephone, text message and email to provide them with updates about the status of the purported investment. Baylor used her B&J e-mail address for nearly all of her written communications with investors, and forwarded investors dozens of emails from Pavlico through her B&J email account. Pavlico and Baylor used vague and complex terms in these communications to confuse investors, and claimed that confidentiality concerns prevented them from providing more fulsome details regarding the status of the investment. Pavlico and Baylor also provided investors with bogus excuses attempting to explain the delay in providing the promised returns including, among other things, feigned illnesses, false representations that the European bankers supposedly involved in the transaction were on extended vacation, or that there were unspecified problems with processing the transactions through "Euroclear," a supposed necessary step in the transaction. As of the date of the filing of this Complaint, Pavlico and Baylor are continuing to mislead investors regarding the status of their supposed investment.

28.     In furtherance of the scheme, Pavlico and Baylor on several occasions provided investors with digitally created computer "screen shots" and copies of fictitious foreign bank instruments, which they tried to pass off as proof of the ongoing success of the transactions. Baylor sent these fictitious documents to investors using her B&J e-mail address.

29.     In reality, Pavlico, Baylor, Milan, and B&J never invested any of the money they received from investors, and instead misappropriated it for their own use and to make payments to the relief defendants.

### B.     Pavlico's and Baylor's Material Misstatements and Omissions

30.     The defendants made numerous material omissions and omitted to state material facts in furtherance of the scheme.  They solicited unsophisticated investors and promised them returns of up to twenty times the principal amount invested within as little as 45-60 days with no risk of loss.  After receiving investors' funds, they continued to make material misstatements and omissions to investors about the status of their supposed investments to lull them into accepting long delays in realizing the promised returns.

31.     Pavlico represented to potential investors, both orally and in writing, that Milan would use investor funds to "lease" bank instruments, including standby letters of credit, bank guarantees, and medium term notes.  These instruments would then be "leveraged" to acquire even larger instruments, which would be "monetized."  The proceeds from this "monetization" would then be put into a foreign "private trading platform."

32.     Certain investors executed investment contracts with Pavlico on behalf of Milan. These contracts state that investor funds would be used to facilitate the leasing of bank instruments (standby letters of credit and bank guarantees) in connection with a "private

placement investment." Certain contracts guaranteed that investors' principal would be returned in the event an instrument was not procured.

33. Some investors also received "Irrevocable Profit Participation Agreements," which purported to apportion the profits from the non-existent bank instrument investment between and among Milan, B&J, and investors.

34. Pavlico and Baylor promised investors exceptional returns, typically many multiples of the initial investment over a timeframe of just a few months. In at least one instance, Pavlico offered to lease a $10 million instrument in exchange for a $75,000 investment. Pavlico told the investor that the $10 million instrument would be leveraged into a $100 million instrument and that the proceeds from the larger instrument would be traded on a "private trading platform." He told the investor that this investment would return $1.5 million within 45-60 days.

35. Pavlico promised another investor that the Milan investment would generate a return of $250,000 every two weeks for forty weeks in exchange for an investment of $325,000. This represents a 1438% investment return purporting to produce total profits of $4,675,000.

36. Pavlico promised another investor that the Milan investment would generate a return of $130,000 every week for forty weeks in exchange for an investment of $130,000. This represents a 4000% investment return purporting to produce total profits of $5,070,000.

37. Baylor identified herself and her Washington, D.C. law firm as "counsel" for Milan. In her capacities as a licensed attorney and managing partner in B&J, Baylor assured investors that the Milan investment was legitimate and that their funds would be safe. For example, in an email to investors dated October 11, 2010 sent from B&J's email account, Baylor stated falsely:

> I am writing to confirm the validity of the transaction that your client, [REDACTED] is involved in. First, I have observed this company successfully complete transactions of

this nature whereby participants received their funds as agreed.  Second, I have
personally been involved in this transaction and can validate it as well as confirm the fact
that the transaction is moving along very well.  Although there was a delay in the initial
upstart, this process is moving full speed again and I am most confident that you as well
as your client will be pleased with the result.

38.     Certain investors executed escrow agreements with B&J, which Baylor executed

on behalf of B&J as its managing partner.  Baylor also provided notarized "Attorney Attestation"

letters on B&J letterhead verifying the legitimacy of the transaction.  Baylor also represented that

she had conducted a thorough background check on Pavlico, including consultation with the

Chief of Police of Washington, D.C., and that she had found nothing of concern.

39.     Pavlico, who identified himself to investors as "Frank Lorenzo," never disclosed

his real name to investors, or that he pled guilty in 2007 to felony conspiracy to conduct

transactions involving the proceeds of drug trafficking, served ten months in prison, and was on

supervised release when he was soliciting their investments.

40.     Contrary to their representations to investors, the defendants never used investor

funds to lease any purported bank instruments or participate in any "private trading platform."

The defendants never paid or intended to pay investors any money back or provide any returns

on their investments.

41.     Pavlico and Baylor, and through them, Milan and B&J, each knew or was reckless

in not knowing that the investment offered was fictitious, and that each of the statements made in

paragraphs 32 to 42 was materially false  or misleading or omitted to state material facts which

would make the statements they made not materially misleading.

C.     **Pavlico's and Baylor's Misappropriation Of Investor Funds**

42.     Contrary to their representations to investors that their funds would be used to

lease purported bank instruments and to facilitate their participation in a foreign "private trading

platform," Pavlico and Baylor misappropriated investors' funds to pay personal expenses. For example, Pavlico used investor funds to pay for luxury cars such as a Range Rover and a Jaguar, and Baylor used investor funds to make purchases at expensive restaurants and retailers including Jimmy Choo, and to pay for a trip to the Bahamas in September 2010. Pavlico and Baylor also used investor funds to make payments to relief defendants.

43.     Between August 31, 2010 and January 19, 2011, at least seven investors deposited $1.73 million into B&J's bank accounts, $1.65 million of which was deposited into the law firm's IOLTA account. At least $1.1 million of those funds was used to pay Baylor's personal expenses, B&J business expenses, withdrawn as cash or transferred to Baylor's personal account, and transferred to relief defendants and other third parties. The remaining $631,000 paid by investors was transferred to Milan, predominantly from banking centers located in Washington, D.C.

44.     Milan received at least $991,000 of investor funds, either directly from investors or from B&J's IOLTA account. That money was used to pay Pavlico's personal expenses and transferred to the relief defendants.

45.     None of the investors' money was used to "lease," "leverage," or trade any purported bank instruments.

**D.     Pavlico and Baylor Continue to Deceive Investors about the Status of Their Purported Investments**

46.     Since at least November 2010 and continuing through the date that this Complaint was filed, Pavlico and Baylor have deceived investors about the status of their purported investments.

47.     Pavlico and Baylor have each sent dozens of emails to investors that purported to describe the progress of the supposed investment.  Many of Pavlico's email updates were sent to Baylor, who then disseminated them to investors using B&J's email account.  These emails typically offered bogus reasons for the delay in providing the promised returns and/or the inability to return the principal amount invested.

48.     For example, in an email to investors dated January 10, 2011, Pavlico stated [punctuation as per original]:

> I will have a full update later on today.   I have spoken to Platform and the Director handling this file is flying into Heathrow today at 3pm, when the Bond issuance was signed the Platform in return needs to have HSBC sign the Undertaking letter witch in turns guarantees the 26Million in return Platform would not sign until all paperwork is done, it is and we need the undertaking letter signed today, hopefully by banker, this is why the Platform Director is flying in to London to give permission on next steps, I have told everyone that the Platform and Bankers do not return from Holiday until the 15th but the Platform asked for there Banker to come back this week, he also has agreed to.  So bottom line we need undertaking contract back and then they will swift over MT-760 and then in a 24 hour period we receive the instrument, I will confirm once Platform has done a call with the Lessor and myself at some point today. This is great news and I will update soon.

49.     In another email to investors, dated February 3, 2011, Pavlico stated [punctuation as per original]:

> Please be advised that because the two sides are not agreeing on procedures to send and receive the 200M instrument, both sides have agreed to do a test run on a smaller instrument of 10M USD Letter of Credit. This was given to us last evening from the owner, we are in receipt of the original copy signed by two bank officers and we all agreed on how this instrument will be authenticated and moved from National Australian Bank to Santander Bank.  This procedure will be replicated in getting our instrument into the Platforms bank. I was also advised because of the time difference that both are ready and willing to send and receive the RWA from this point on.  I will be notified when the instrument is received by Platform. When this happens, all will be identified to move forward in duplicating the procedures to send the 200M Instrument over to Platform.  This is the quickest mode of operation because both sides are willing to compromise through this method.  [] I will update you as soon as I receive confirmation that the instrument

has been received by the platform.  Things are now ready to move forward and close this transaction out.

50.     Pavlico knew, or was reckless in not knowing, that the "updates" he provided investors materially misrepresented the status of the investment activities and omitted the material fact that none of the investor's monies were used in connection with leasing, leveraging, or trading bank instruments as represented.

51.     Baylor also sent numerous emails to investors from her B&J email account purporting to report the status of the transactions.  For example, in an email to investors August 30, 2011, Baylor stated:

> Please find attached the documents that relate to the bonds in this transaction. The bonds are listed with the National bank in Brazil and have been verified through the Brazilian government.  Because the bonds have not matured yet, the valuation has to be determined by the attorneys through due diligence.  We are waiting for this information.  David is flying to Paris and we are scheduled for a conference call this evening at 7pm EST.  Please be judicious in who you send this to.  As attorneys, I ask that you keep it confidential in order to protect the owners while this transaction is being completed.  These documents can confirm the validity of this transaction that is set to close upon ascertainment of the value of the remaining instruments.

52.     Baylor executed numerous "Attorney Attestation Letters" to certain investors on B&J letterhead assuring them of the legitimacy of their investments and to provide them with an update regarding the status of the investments.  For example, in a letter to an investor dated January 20, 2011, Baylor stated: "This letter is to confirm that I am in receipt of a bank undertaking letter for funding.  Our firm is expected to receive said funds by early to middle of next week.  Upon receipt of the funds, all money will be placed in an escrow account and then dispersed to [the investor] as quickly as possible."

53.     Baylor also emailed investors copies of documents, certificates, and computer generated "screen shots" purporting to evidence instruments available for the investors.  Baylor sent these emails using her B&J email address.

54.     At the time of writing such emails, forwarding Pavlico's updates, and transmitting documents purporting to evidence bank instruments and non-U.S. bonds, Baylor knew, or was reckless in not knowing, that the "updates" she provided materially misrepresented the status of the investment activities and omitted the material fact that none of the investor's deposits were being used to secure the investments or the returns which had been represented to them by the defendants.

## E.     Pavlico and Baylor Continue to Solicit New Investors.

55.     Pavlico and Baylor continue to actively solicit new investors and continue to communicate with existing investors with the intent of lulling them into believing their investments are proceeding as represented to them.  As recently as September 2011, an individual wired $250,000 into the B&J escrow account which was forwarded, in part, to Milan.  Also, in late September 2011 Milan paid $10,000 to its attorney's trust account by a check which appears to have been signed by Pavlico and states in the memo line, "Churchill/10M Euro SBLC."  "SBLC" is an abbreviation for "standby letter of credit," a type of fictitious bank instrument similar to those offered to the investors alleged in this Complaint.

## F.     Allegations Relating to Relief Defendants

56.     From at least August 2010 through January 2011, the defendants transferred over $1.2 million of investors' funds to the relief defendants.

57.     The defendants transferred at least $375,000 of investor funds to relief defendant GPH .  GPH subsequently transferred these funds to accounts that are believed to be owned or controlled by relief defendant Lewis.  Neither GPH nor Lewis provided any lawful services or

products to any defendant or for the benefit of investors in the defendants' fraudulent scheme in return for these funds.

58.     The defendants transferred at least $225,000 of investor funds to relief defendant Global Funding.  Global Funding subsequently transferred the investor funds to accounts that are believed to be owned or controlled by relief defendant Cooper and/or his wife.  Neither Global Funding nor Cooper provided any lawful services or products to any defendant or for the benefit of investors in the defendants' fraudulent scheme in return for these funds.

59.     The defendants transferred at least $409,482 to Pavlico's counsel which was then used to purchase Pavlico's home (and Milan's office) at 113 Upland Terrace, Clarks Summit, Pennsylvania.  The property was purchased in the name of The Julian Estate only two days after The Julian Estate was incorporated.  Pavlico is the only incorporator of The Julian Estate.  The proceeds to purchase the property all came from investors in the defendants' fraudulent scheme.

60.     The defendants transferred at least $153,000 to relief defendant Dawn Jackson. Jackson did not provide any lawful services or products to any defendant or for the benefit of investors in the defendants' fraudulent scheme in return for these funds.

61.     The defendants transferred at least $24,500 to relief defendant Mia Baldassari. Baldassari did not provide any lawful services or products to any defendant or for the benefit of investors in the defendants' fraudulent scheme in return for these funds.

## FIRST CLAIM

### Each Defendant Violated Exchange Act Section 10(b) and Rule 10b-5

62.     The Commission realleges paragraphs 1 through 61 above.

63.     Each defendant, directly and indirectly, with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, employed devices, schemes or artifices to defraud;  made untrue statements of material fact or omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of business which have been and are operating as a fraud or deceit upon the purchasers or sellers of securities.

64.     As a part of and in furtherance of their scheme, defendants directly and indirectly, prepared, disseminated, or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, but not limited to, those set forth in Paragraphs 1 through 64 above.

65.     By reason of the foregoing, each defendant has violated and, unless restrained and enjoined, will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Pavlico, Baylor and B&J Aided and Abetted Milan's Violations of Exchange Act Section 10(b) and Rule 10b-5

66.     The Commission realleges paragraphs 1 through 65  above.

67.     Pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], Pavlico, Baylor and B&J knowingly provided substantial assistance to Milan, and, unless restrained and enjoined, will continue to aid and abet Milan's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM

### Each Defendant Violated Securities Act Section 17(a)

68.     The Commission realleges paragraphs 1 through 67 above.

69.     Each defendant, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails:  (a) has employed, is employing, or is about to employ devices, schemes or artifices to defraud; (b) has obtained, is obtaining or is about to obtain money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) has engaged, is engaged, or is about to engage in transactions, acts, practices and courses of business that operated or would operate as a fraud upon purchasers of securities.

70.     By reason of the foregoing, each defendant has violated and, unless restrained and enjoined, will continue to violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## FOURTH CLAIM

### Pavlico, Baylor and B&J Aided and Abetted
### Milan's Violations of Securities Act Section 17(a)

71.     The Commission realleges paragraphs 1 through 70  above.

72.     Pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)], Pavlico, Baylor and B&J knowingly or recklessly provided substantial assistance to the fraudulent conduct of Milan and, unless restrained and enjoined, will continue to aid and abet Milan's violations of Securities Act Sections 17(a) [15 U.S.C. § 77q(a)].

## FIFTH CLAIM

### Each Defendant Violated Securities Act Sections 5(a) and 5(c)

73.     The Commission realleges paragraphs 1 through 72 above.

74.     The purported instruments, interests in trading platform proceeds, and investment letters and agreements are securities.

75.     Each defendant, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities in the form of oral agreements, purchase agreements and promissory notes through the use or medium of a prospectus or otherwise, and carried or caused to be carried through the mails, or in interstate commerce, by means or instruments of transportation, such securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and no legally recognized exemption from registration applied.

76.     By reason of the foregoing, each defendant violated and unless restrained and enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

### SIXTH CLAIM

### Baylor and B&J
### Aided and Abetted Violations of Securities Act 5(a) and (c)

77.     The Commission realleges paragraphs 1 through 76  above.

78.     Pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)], Baylor and B&J knowingly or recklessly provided substantial assistance to the fraudulent conduct of Pavlico and Milan and, unless restrained and enjoined, will continue to aid and abet Pavlico's and Milan's violations of Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a) and 77e(c)].

### SEVENTH CLAIM

### Pavlico and Baylor Violated Exchange Act Section 15(a)

79.     The Commission realleges paragraphs 1 through 78 above.

80.     Defendants Pavlico and Baylor, while acting as a broker or dealer, made use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any securities in the form of purchase agreements and promissory notes without being registered with the Commission as a broker or dealer or an associated person of a registered broker-dealer.

81.     By reason of the foregoing, defendants Pavlico and Baylor have each violated and, unless restrained and enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## CLAIM AGAINST RELIEF DEFENDANTS

82.     The Commission realleges paragraphs 1 through 81 above.

83.     Relief defendants Global Funding , Lewis, GPH, Cooper, Jackson, Baldassari, and The Julian Estate received, directly or indirectly, funds and/or other benefits from the defendants which are the proceeds of unlawful activities alleged in this Complaint and to which these relief defendants have no legitimate claim.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that the defendants violated the federal securities laws and Commission rules as alleged in this Complaint;

### II.

Permanently enjoin the defendants from further violations of the federal securities laws and Commission rules alleged against them in this Complaint;

**III.**

Order all defendants and relief defendants to disgorge, as the Court may direct, all ill-gotten gains received or benefits in any form derived from the illegal conduct alleged in this Complaint, together with pre-judgment interest thereon;

**IV.**

Order all defendants to pay civil monetary penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**V.**

Bar Pavlico and Baylor from serving as an officer or director of any public company pursuant to Securities Act Section 20 (e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**VIII.**

Grant such other equitable and legal relief as may be appropriate or necessary for the benefit of investors pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)].

The Commission demands a trial by jury on all issues so triable.

Date:  February 24, 2012                          Respectfully submitted.

_____
James A. Kidney D.C. Bar No. 252924
Stephen L. Cohen
Timothy N. England
Christopher McLean
Carolyn Morris

Counsel for Plaintiff
Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549
Tel:  (202) 551-4441 (Kidney)
Email:  kidneyj@sec.gov