UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION, )
                                                   )
            Plaintiff,                      )
                                                   )
          v.                               )         Civil No.11-cv-02132 (RMC)
                                                   )
THE MILAN GROUP, INC., a/k/a THE MILAN   )
TRADING GROUP, INC. et al.              )

### EXPERT REPORT OF PROFESSOR JAMES E. BYRNE

I, James E. Byrne, declare under penalty of perjury pursuant to 28 U.S.C. Section 1746:

**I.    INTRODUCTORY STATEMENT**

1.    **Mandate**. I have been requested by the U.S. Securities and Exchange Commission to render my expert opinion in this Report in the above-styled litigation against The Milan Group, Inc., a/k/a The Milan Trading Group, Inc., Frank L. Pavlico III, a/k/a Frank Lorenzo [hereafter Mr. Lorenzo/Pavlico"], Brynee K. Baylor [hereafter "Attorney Baylor"], Baylor & Jackson, P.L.L.C., and various relief defendants.

2.    **Scope**. Specifically, I have been asked to opine regarding Prime Bank or High Yield Investment Schemes, the character, nature, viability, and legitimacy of the transactions that are the subject of this action, and any resemblance that they may have to Prime Bank or High Yield Investment Schemes.

3.    **Duty**. I understand that it is my duty to this Court to express my expert opinion independently of any influence or advocacy.

4.    **Basis for Opinions**. In rendering my opinion, I have been provided with the documents indicated in Exhibit A (Materials Provided to Professor Byrne) that accompanies this Report. In this Report, these materials are referred to generically as "materials". My opinions are subject to revision or amplification should further documentation or information be provided to me. I have rendered my opinions based on these materials in light of my experience, knowledge, research, and studies in the field of commercial transactions, banking operations, financial and payment systems and instruments, and commercial fraud.

5.    **Organization**. I have organized my Report in the following manner:

# SEC EXPERT REPORT – EXHIBIT A

I.      Introductory Statement (¶ 1 to ¶ 5)
II.     Qualifications (¶ 6 to ¶ 13 )
III.    Summary of Opinions (¶ 14)
IV.     Explanation of Opinions (¶ 15 to ¶ 87)
    A.      The Transactions Reflected in the Materials  (¶ 15 to ¶17 )
    B.      Prime Bank or High Yield Investment Schemes (¶18 to ¶28 )
    C.      Resemblance of the Transactions in the Materials to Prime Bank or High
        Yield Features (¶ 29  to ¶ 87)
V.      The Difference between Intermediaries and Promoters of a High Yield Investment
    Scheme (¶ 88 to ¶ 93)
VI.     Conclusions (¶ 94 to ¶ 96)

## II.    QUALIFICATIONS

6.      **Résumé**. My qualifications and my publications are set forth in my résumé which is attached as Exhibit B.

7.      **International Banking Roles**. In particular, I  have served or do serve, among other positions, in the following capacities related to international banking and finance:

- Chair and Reporter of the International Standby Practices Working Group (1994 - 1998) which drafted ISP98 (ICC Publication No. 590) and Secretary to the Council on International Standby Practices (ISP) (since 1998) which issues Official Comments on the ISP and the ISP98 Model Forms.
- Member of the Advisory Group to the International Chamber of Commerce ("ICC") Task Force that drafted UCP600 (ICC Publication No. 600) (2003 - 2007).
- Member of the U.S. Delegation to the Commission on Banking Technique and Practice of the ICC (since 1995).
- Chair of the Group of Experts summoned to advise the Secretariat of the United Nations Commission on International Trade Law ("UNCITRAL") on the adoption and implementation of the United Nations Convention on Independent Guarantees and Standby Letters of Credit (since 2001).
- Head of the U.S. Delegation to the UNCITRAL Working Group on International Contract Practices which drafted the United Nations Convention on Standby Letters of Credit and Independent Bank Guarantees (1988 - 1995).
- Past Chair of the American Bar Association's Subcommittee on Letters of Credit (1996 - 2000); Vice Chair (1994 - 1996).
- Member of the ICC Task Forces on the eUCP (2000-2001) and the International Standard Banking Practice (2000-2002).
- Member of SWIFT drafting group for Formats for Messages for Standbys and

2

Demand Guarantees (2010 - present).
- Advisor to the US Commissioners on Uniform State Laws' Drafting Committee on the Revision of UCC Article 5 (1990 - 1995).
- Director of the Institute of International Banking Law & Practice (since 1987).
- Editor of *Letter of Credit Update* (1985 - 1997) and of *Documentary Credit World* (since 1997), monthly journals of letter of credit and bank guarantee law and practice including related commercial frauds.

8.    **Commercial Fraud Roles**. For more than 20 years, I have been involved in the following activities in connection with studying and combating commercial and financial fraud:

- Chair of the Group of Experts on Commercial Fraud of the Secretariat of UNCITRAL (2002 to 2005).
- Co-Chair of the UNCITRAL Symposium on International Commercial Fraud (14 to 16 April 2004).
- Co-Chair of the North American and European Steering Committees on Combating Commercial Fraud (1999 - 2005).
- Advisor to the Secretariat of UNCITRAL on Commercial Fraud (2005 - 2008).
- At the request of the U.S. Department of State, I addressed the Plenary Session of UNCITRAL on its project on combating commercial fraud in 2002, 2003, and 2004.

9.    **Consultation**. Since I first became aware of the problem of commercial fraud in 1987, I have been consulted by the U.S. Office of the Comptroller of the Currency, the U.S. Securities and Exchange Commission and various state securities enforcement officials, the Federal Bureau of Investigation, the U.S. Bureau of the Public Debt, the U.S. Department of Justice, OKOKRIM of Norway, the Ontario Canada Attorney General's office, Scotland Yard, Standard & Poor's, the Commercial Crime Bureau of the ICC, various U.S. state and federal prosecutors, various banks and corporations, and numerous individuals regarding commercial and financial fraud. In connection with this work, I have examined more than 2,000 suspected Prime Bank or High Yield Schemes.

10.   **Courses Taught**. For more than 25 years, I have lectured and taught courses in the areas of letters of credit, international trade finance, and commercial fraud to bankers, business people, lawyers, banks, corporations, and trade associations in more than 35 countries throughout the world.

11.   **Degrees**. I have received the following degrees: L.L.M., University of Pennsylvania (1978); J.D., magna cum laude, Stetson University College of Law (May 1977); B.A., cum laude, University of Notre Dame (June 1968).

12.   **Employment**. I have been a full-time faculty member at George Mason University School of Law since August 1982 where I teach subjects related to commercial law and

3

practices including Commercial Paper, Letter of Credit Law, Contracts, Sales, Electronic Commerce, International Commercial Transactions, and Commercial Fraud.

13. **Expert Testimony**. I have been admitted as an expert on commercial and financial investment fraud, banking operations, and standby letter of credit practice to give expert testimony in Canada, Hong Kong, Norway, and Thailand as well as in approximately 20 federal and 8 state courts in the United States including the U.S. District Court for the District of Columbia and have given sworn written expert statements to courts in China, France, England, Singapore, South Korea, and Switzerland. In the past four years, I have testified or been deposed in: U.S. v. Thornburg (N.D. Okla. 2009); Fox v. Bank Mandiri (Bankruptcy S.D. N.Y. 2009); GECC v. Deutsche Bank N.A. (arbitration 2009); CNA v. Certain Underwriters at Lloyd's of London (Cook County, Ill. 2010); Midcontinent Express Pipeline, LLC. v. MAN Industries (India) Ltd. (District Court of Harris County, Texas 2009 & 2010); Regina v. Cranston (Ontario Court of Justice Criminal Court, Hamilton, Ontario 2011); U.S. v. Edwards (U.S. District Court N.D. Ga. 2011); U.S. v. Morgan (U.S. District Court M.D. Fla. 2011); Itec Refining and Marketing Co. Ltd. v. Astra Oil Co., LLC. (Arbitration New York 2012); Alabama v. Tucker (District Court of Baldwin County, Alabama 2012); and People v. Rodriguez (Los Angeles Superior Court 2012). I am being compensated for my work in this matter at a rate of US$ 400 per hour in addition to expenses incurred which is within my normal rate. My compensation is irrespective of the outcome of this proceeding.

## III.  SUMMARY OF OPINIONS

14. **Opinion Summarized**. In my considered professional opinion, the investments described in the materials that I have examined in connection with this case are not legitimate but resemble and are classic instances of Prime Bank or High Yield Investment Schemes. The proposed returns are excessive for even the most risky legitimate investments and are not possible for safe or guaranteed investments. In addition, the materials are replete with other common features of Prime Bank or High Yield Investment Schemes.

## IV.  EXPLANATION OF OPINIONS

### A.  The Transactions Reflected in the Materials

15. **Typical Transaction**. While the materials contain multiple explanations of the investment transaction, a typical transaction as reflected in the materials involves the use of investors' funds to lease a standby letter of credit which is to be leveraged to obtain an instrument in an exponentially larger amount which is to be monetized, producing funds which are to be used in trading instruments such as medium term notes. The proceeds of the trade will yield the promised returns.

16. **Example**. A figure given in one transaction in the materials [Exhibit 27 McLean

4

# SEC EXPERT REPORT – EXHIBIT A

Declaration[1] page 214] was that an investment of US$ 325,000 would be deposited in the Baylor & Jackson IOLTA trust account. Based on this deposit, the Milan Group promised to acquire a leased instrument for US$ 10 million which would monetized to acquire an instrument valued at US$ 150 million. Monetization of this instrument of a least US$ 150 million which would yield not less than US$ 100 million which would be used in a "trading platform", profits from which would produce the promised returns. While details, amounts, and the second tier instruments differ, most of the other transactions described in the materials follow this pattern.

17.   **Other Transactions**. The materials also contain references to Brazilian corporate bonds [McLean Declaration Exhibit 41; Baylor Deposition 180:12].

**B.     High Yield or Prime Bank Investment Schemes**

18.   **Investment Schemes.** While it is my opinion that the investment programs described in the materials that I have reviewed do not resemble legitimate transactions, it is also my opinion that they do resemble and are, in fact, an instance of a fraudulent international financial scheme known loosely as "High Yield" or "Prime Bank" Investment Schemes.

19.   **Prime Bank.** The term "prime bank" appears in legitimate finance. It refers loosely to a major bank such as a money center bank or the top banks in the world. The term has no precise meaning outside of the context in which it is used. In Prime Bank Investment Schemes, "Prime Bank" refers to the supposed involvement of major or "prime" banks which provides assurance of the safety and credibility of the scheme. The term "Prime Bank" is used on the Project Fund Materials, materials in Mr. Lorenzo/Pavlico's possession at [SEC-Pavlico-E-0000910; SEC-Pavlico-E-0000918]. In addition, the names of major banks are regularly mentioned in the materials as indicated in Paragraph 73 of this Report.

20.   **High Yield.** As the name "Prime Bank" attracted notoriety, "High Yield" began to be used to avoid unfavorable association. The name "high yield" is used in legitimate finance to describe bonds that are not rated as investment grade. Another name for these High Yield Bonds is "Junk Bonds". "High Yield" in High Yield Investment Schemes refers to the disproportionate yields supposedly returned and differs from legitimate high yield bonds.

21.   **The Name.** The names "Prime Bank" and "High Yield" are used interchangeably in fraudulent investment schemes. To be such a scheme, however, the investment need not

---

[1] References to the McLean Declaration in the Report are to that Declaration of Christopher M. McLean and accompanying exhibits filed on 11/30/2011 as listed in Exhibit A to this Report and not the Declaration of Mr. McLean which SEC Counsel have informed me will be filed in connection with a Motion for Summary Judgment in this action.

# SEC EXPERT REPORT - EXHIBIT A

use either name and some of the schemes that I have studied do not. What is critical is not the name by which the scheme is identified but its features. The materials given to investors in this transaction do not use either term but do promise a disproportionately high yield and do reference major banks.

22.  **Historical Background.**  High Yield or Prime Bank Investment Schemes began appearing in the 1980s. They evolved from various financial frauds that emerged following World War II, combining elements of advance fee schemes, forgery of commercial and bank instruments, insider fraud, affinity fraud, charitable fraud, ponzi schemes, and pyramid schemes. They enable fraudsters to tap the credibility of the international financial system.

23.  **Features of High Yield/Prime Banks Schemes.**  Certain features recur in High Yield or Prime Bank Investment Schemes. These features are not of equal importance and, while not all of these features need be present, the presence of many of them and especially those that are most characteristic, suggest the fraudulent character of the scheme and its classification as a High Yield or Prime Bank Investment Scheme. The defining characteristic is the promise of a disproportionate return without risk or with low risk from a source which is obscure or unable to be ascertained objectively. Much of the rest of the scheme is concerned with explaining how such excessive returns are possible, why everyone is not investing in them, in distracting the investor from insisting on definitive answers, and in postponing or eliminating any reckoning when the investment invariably fails.

24.  **High Yield or Prime Bank Investment Schemes Are Not Legitimate Investments.**  High Yield or Prime Bank Investments do not exist in legitimate finance. They are purported to enable those planning and promoting them and their confederates to obtain investors' funds. With the exception of Ponzi payments of invested funds as if they were yields from the investment, the investments do not yield or pay any funds and the bulk of the principal is invariably dissipated. In all of the instances of High Yield or Prime Bank Investment Schemes that I have studied, there has been no evidence that any of them have yielded any returns.

25.  **Features.** The features of High Yield or Prime Bank Investment Schemes features include
     - offered returns that are disproportionate to the low risk involved;
     - mimicking of legitimate financial instruments;
     - obscuring of the commercial basis for and source of the return, with vague references to "trading";
     - significant technical flaws that would not be expected in a legitimate investment of the same caliber;
     - improper references to legitimate financial institutions or similar organizations;
     - elements of a Ponzi scheme and a structure like a pyramid scheme;

SEC EXPERT REPORT – EXHIBIT A

- unnecessary secrecy;
- a charitable, humanitarian, or religious dimension;
- preying on groups linked by common religious, ethnic, or other affiliation;
- an international dimension; and
- intricate explanations and excuses as to why the promised returns have failed to materialize.

26.    **Use (or Misuse) of Invested Funds in High Yield Investment Schemes.** In addition to these features, the invested funds are not invested in the manner indicated. In the High Yield or Prime Bank Investment Schemes that I have studied, virtually all of the invested funds have been dissipated without being invested. Nor are those funds that are actually invested used as promised but in a manner inconsistent with the investment and without disclosure to the investors. In the High Yield or Prime Bank Investment Schemes that I have studied, some of the funds are used for personal purposes by the persons organizing the scheme, some funds are used to pay confederates for soliciting the investments, some funds are used to pay prior investors from this investment or other investments in order to silence them, some funds are paid to the perpetrators of other similar schemes, and some funds are sent offshore or secreted for later access.

27.    **Detailed Discussion of Features to Follow.** As indicated, features of High Yield or Prime Bank Investment Schemes are present in the materials as explained subsequently in this Report. The transactions and terms in the materials fall into predictable patterns, and the words, phrases, ideas and documents are similar or identical to those that appear in the High Yield or Prime Bank Investment Schemes that I have studied.

28.    **Public Warnings.** Regulatory authorities and other responsible institutions of the leading developed countries began issuing public warnings about High Yield or Prime Bank Investment Schemes and disassociating themselves from them.  They include the US Office of the Comptroller of the Currency (since 1986), the Federal Reserve (1993), all US banking regulators (1993), the Head of the Banking Supervision Division of the Bank of England (1994), the British Bankers Association (1993), the US Securities and Exchange Commission (1993), the International Chamber of Commerce (1993), and the US Bureau of the Public Debt (1999). These warnings were the first of many and they are kept current and echoed in pronouncements by major banks, organizations, regulators, and enforcement authorities around the world. UNCITRAL and the UN Commission on Drugs and Crime led an international effort to identify and warn against aspects of commercial fraud including High Yield and Prime Bank Investment Schemes in 2007 that reinforced these warnings. This information is readily available and can be obtained by any person with access to a computer or a telephone. Moreover, any person professionally experienced in investments should be aware of these warnings or be able to readily access them.

**C.    Resemblance of the Transactions in the Materials to High Yield or Prime Bank**

# SEC EXPERT REPORT – EXHIBIT A

### Features

29. **Approach.** This section will consider the features of High Yield or Prime Bank Investment Schemes that are present in the materials that I have examined in connection with this case. Because the materials given to investors do not use the term "prime bank" and because they indicate that there will be a high yield, the name "High Yield Investment Scheme" is used hereinafter in this Report to describe the fraudulent schemes that the transactions in the materials resemble.

### 1. Disproportionate Returns

30. **Disproportionate Returns.** The feature most characteristic of a High Yield Investment Scheme is the disproportion between the supposed safe or risk free character of the investment and the indicated returns. In many of the Schemes, the indicated returns are phenomenal.

31. **Returns In the Materials.** This feature was present in all the materials that I have studied. Large returns are intended to entice investors to invest notwithstanding their concerns, particularly if credible assurances or safeguards are offered. The materials indicate phenomenal returns on the investment. The returns include 282% in 40 weeks [367% per annum] [Letter on Milan Group stationary dated 9 Dec. 2010, from Frank P. Lorenzo to Fred Murrell], 250% for a period of 45 days [2,028% per annum] [Exhibit 21 McLean Declaration pages 183-184], and 1,900% in 60 days [11,558% per annum] [Exhibit 16 McLean Declaration pages 161-162].

32. **Perspective.** It is possible to place these indicated returns in perspective with the returns for legitimate investments. The Callan Periodic Table of Investment Returns at callan.com which is based on publicly reported figures contains the following comparative information. S&P 500 which is a market-value-weighted index of 500 stocks that are traded on the NYSE, AMEX and NASDAQ is widely used as a measure of the general performance of the US stock market. In 2011, the annual return for S&P was 2.11%. In 2010, the annual return for S&P 500 was 15.06%. In 2009, the annual return for S&P 500 was 26.47%. According to *2010 Ibbotson Classic Yearbook* published by Morningstar, Inc., S&P's 500 had an average return of 9.8 percent per year between 1926 and 2010. MSCI EAFE is a Morgan Stanley Capital International Index that is designed to measure the performance of the developed stock markets in Europe, Australasia and the far East. The annual return for MSCI EAFE was -12.14% in 2011, 7.75% in 2010, and 31.78% in 2009. BC AGG is the Barclay's Capital Aggregate Bond Index. It includes US government, corporate and mortgage-backed securities with maturities of at least one year. The annual return for BC AGG was 7.84% in 2011, 6.54% in 2010, and 5.93% in 2009.

33. **Comparison**. It should be noted that the investments in the materials are not represented

# SEC EXPERT REPORT – EXHIBIT A

as stocks or equitable interests in companies whose values are prone to increase or decrease based on the perceived value of the company and, accordingly, subject to much greater upward swings (and drops) in price than promises to repay money. As a result, bond price figures are a better gauge of returns that could be expected in legitimate investments.

34. **Compared to Safe Investments.** Compared to relatively safe investment returns of 7.84% (2011), 6.54% (2010), and 5.93% (2009) per anna, the returns indicated in the materials of over 367%, 2,028%, or 11,558% per annum as indicated in Paragraph 31 would not occur in a safe investment, or in my experience, in a legitimate investment in a bond or medium term obligation.

35. **Return Correlated to Risk.** The return on financial investments correlates to the relative perceived risk inherent in the investment. The riskier the investment, the higher the return and the lower the perceived risk, the lower the return on the investment. In legitimate financial transactions, investment risk is measured in various ways. The best known means is by various rating agencies such as Standard & Poor's or Moody's. Under this system, investments are distinguished between investment grade and non-investment grade. An investment grade investment would be regarded as relatively safe and rated by the rating agency. The returns on investments in the materials that I have examined turn this fundamental principle of investment on its head, indicating extremely high yields from safe investments. I have not encountered this type of promise in legitimate investments or finance whereas it is a regular feature of High Yield Investment Schemes. The phenomenal promised returns in the materials are simply inconsistent with the indication that there is no risk and, excessive even were there risk.

**2. Risk Free**

36. **Safety.** As indicated, another critical feature that appears in all of the High Yield Investment Schemes that I have studied is their affirmation that the principal (and often the promised return) is safe and without risk. The reason for such assurances is to quiet the inherent scepticism that the indicated high yields inevitably generate. If the investor is convinced that the funds invested are safe, he, she, or it is more likely to take the attitude that there is nothing to lose.

37. **Safety in the Materials.** The materials indicate that the principal is secure and guarantee its return to the investors. The assurances of safety are guaranteeing the principal, the involvement of major banks, the expertise behind the program, the use of an attorney trust account, blocked funds, and the use of SWIFT.

38. **Principal.** The materials indicate that the principal is "guaranteed" or will be returned. [Letter to John V. Bach on Milan Group stationary signed by Frank Lorenzo dated 15 Dec. 2010; Exhibit 16 McLean Declaration 24:6-7, 27:1-2 (both principal and returns)]

9

These promises suggest that the principal is not at risk, giving considerable comfort to investors.

39.    **Successful Completion of Prior Transactions**. Another form of assurance in the materials were statements that prior transactions of a similar type had been successfully completed. [Exhibit 16 McLean Declaration 24:8-12, 91:1-92:1; Baylor Deposition 360:15-361:7]

40.    **Expertise and Assurances**. The perpetrators of the schemes in the materials claimed to have experience in international banking and investment [Exhibit 26 McLean Declaration 122:20-123:10; Baylor Deposition 168:7-20, 172:12-14; 217:13-21] or to be a legal professional. Because international banking and investment is esoteric, the involvement of persons with expertise adds to the perception of safety of the transaction as does the involvement of a legal professional. These perpetrators provided numerous assurances of the safety of the investments and the principal.

41.    **Use of an Attorney Escrow or Trust Account**. The materials indicate that the funds are to be sent to an attorney trust account and the majority of the investors sent their funds in this manner. [E.g, Exhibit 17 McLean Declaration page 170 Paragraph I.1; Exhibit 27] The use of an attorney trust account is a significant indication that their investment is safe because of the widespread perception that these accounts are regulated and linked to the reputation of the attorney or law firm whose account it is.

42.    **Involvement of Major Banks and Financial Organizations**. The materials contain references to major banks and financial organizations who are involved in some capacity in the transaction. Some that are used in the materials are listed in Paragraph 73 of this Report. The involvement of such organizations adds assurance of the safety and soundness of the instrument.

43.    **Blocked Funds**. Another indication contained in the materials that the investment was safe was that either instruments [Exhibit 37 to the investigation testimony of John V. Bach on Sept. 22, 2011] or funds [Exhibit 15 to the investigation testimony of John V. Bach on Sept. 22, 2011] were "blocked" or that "internal blocking codes" [Exhibit 12 of the investigation testimony of Thomas Freeman Moss on Aug. 2, 2011] were used.

    a.    Attorney Baylor.  Attorney Baylor testified that "they can either block your money and just use the money to trade off of your blocked funds and your money goes nowhere for a period of 30 days." [Baylor Deposition 359:21 to 360:2] She also testified that it was her understanding that "there will be no risk because the understanding was that funds would be blocked or placed into an escrow." Lest there be any confusion that the word "or" signified that these were alternatives, her subsequent answer stated "[t]hat funds would be blocked and placed in an escrow." [Baylor Deposition 401:5-11] This reference could not have been to the Jackson & Baylor trust account since the funds were transferred out of it almost as

soon as they were transferred into the account.

b.    **Legitimate Blocking.** In legitimate banking, there are situations where funds or accounts are blocked as a result of orders of the US government in furtherance of its international policies against rogue countries, organizations, or individuals. Private individuals cannot cause funds to be blocked nor can banks do so absent governmental authority. However, many of the High Yield Investment Schemes that I have examined contain references to "blocking" funds or certain instruments in some manner. The notion is that by being "blocked", the funds or instrument cannot be misused and are safeguarded. This use of the notion of blocking is not consistent with its use in legitimate transactions. There is no such thing as "blocking" of an account at the request of a private person in the sense indicated in the materials.

c.    Therefore, the references to "blocked" funds or instruments in the materials are nonsense. Moreover, the notion that one can "trade" based on "blocked funds" is absurd. Assuming that "blocked" means that the funds cannot be accessed, the notion of "trading on or off them" carries the fiction to another level since it suggests that trading occurs on the basis of funds that are not at risk.

44.    **SWIFT.** The materials refer extensively to SWIFT. [Examples are given subsequently in this Report at Paragraph 65.] SWIFT (an acronym derived from the "Society of Worldwide Interbank Financial Telecommunication") is an international network owned by more than 2,500 member banks that provides a system of interbank telecommunications that are standardized and formatted and that provide a high degree of comfort regarding the authenticity and security of the telecommunications that are sent over its proprietary messaging system, FIN. The SWIFT FIN system has multiple Message Types ("MT") that are grouped into similar categories, including the MT 700 series for letter of credit related undertakings. MT 760 (Bank Guarantee / Standby Letter of Credit) is a formatted message that is intended to be used for bank guarantees and standby letters of credit. MT 799 (Free Format Message) is an unformatted message that can be and is used for standby letters of credit and demand guarantees as well. SWIFT messages are highly technical and have detailed protocols regarding their content. The misuse of SWIFT will be apparent in the discussions of the various aspects of the materials. Virtually every Prime Bank Investment Scheme that I have examined contains significant references to SWIFT as do the materials (cited later) that I have examined in this case. Such references give the illusion of sophistication and security since SWIFT can be readily identified as being real by persons who have a superficial familiarity with banking to whom the reference to SWIFT in these schemes connotes authenticity. References to SWIFT are quite a different thing than a message actually sent via SWIFT.

45.    **Impression.** As a result of these factors, the impression was conveyed that the investment was without risk. In my opinion, this impression was conveyed in a manner similar to that which is used in the High Yield Investment Schemes that I have studied and was equally without any basis in reality.

11

### 3. Trading Bank Instruments

46.   **Trading in High Yield Investment Schemes.** The source of the exorbitant returns in High Yield Investment Schemes is invariably said to be "trading". Some form of "trading" appears in virtually every scheme that I have studied. Because few investors understand trading in markets other than the stock market (if that), the use of technical and esoteric terms that are often used in describing trading sounds impressive but is difficult for most investors and their advisers to verify. In legitimate transactions in debt instruments, "trading" occurs on public markets and the figures are regularly reported in the financial press. High Yield Investment trading, however, is said to occur on secret markets known only to insiders. Moreover, some of the items that are said to be traded, such as standby letters of credit and bank guarantees, are not traded. Debt instruments, such as bonds and medium term obligations, are traded but not in the way indicated in the materials and are reported in the financial press. These traded instruments do not operate in the manner indicated in the materials or yield the indicated returns.

47.   **Platforms**. High Yield Investment Schemes also commonly refer to "trading platforms". The notion of "platform" is vague, permitting a variety of interpretations of the term. It suggests a context in which trading can occur. The question to be asked is whether such a "platform" exists and, if so, what can be known about the trades that take place on it. The sense in which the term "platform" is used in the materials is unreal. With respect to standbys and bank guarantees, there can be no real platform because they are not traded or tradable. With respect to debt instruments such as bonds and medium term notes that are traded, such trades occur on public markets which, if they are to be regarded as "trading platforms" are known and knowable and do not require the mechanisms involved in the Milan scheme or produce the results indicated in the materials.

48.   **Trading in the Materials**. The materials that I have examined regularly refer to trading as the source of the exorbitant returns. [McLean Declaration Exhibit 16: 27:3-7, 106:12; Exhibit 17 page 170 ("Leveraged Lease Trading Program" at Paragraph IV.3; Exhibit 37 page 271; Exhibit 26: 124:18-20]  There is said to be a "trade program" or a "platform" for trade, that the various instruments would be "placed in trade", and that there was a "Platform bank". As one victim witness expressed it, "they were trading these instruments, interbank, to season them, and that's where the return came in, because they kept trading and trading." [Exhibit 16 to McLean Declaration, page 27 lines 3-6]

49.   **Observations About Trading in the Materials**. One of the difficulties presented by the descriptions of the transactions in the materials is their vagueness. As will be noted, this vagueness is purportedly due to the need for confidentiality about this process. It can, however, be observed that some of the instruments described in the materials such as standby letters of credit and bank guarantees are not traded, as will be explained in detail, and that the instruments that are traded do so on public markets where the prices and

# SEC EXPERT REPORT – EXHIBIT A

yields are publicly available in the financial press and on the internet. There is no secrecy in trading of financial instruments such as notes and bonds and no such returns as are claimed in the materials are available on investment grade notes or bonds.

## 4. Mimicking Legitimate Transactions & Significant Technical Flaws

50.    <u>Generally</u>. The High Yield Investment Schemes that I have studied often contain references to and documents that mimic legitimate transactions. This practice gives the transactions an aura of legitimacy, providing a degree of comfort to investors. This cloak of legitimacy appears in a variety of guises, involving real terms or writings that are misused or forged or fictional terms or writings. Moreover, the documents often lack the degree of professionalism that would be expected from financial or business transactions of that sort. The materials contain a number of problems of this sort which are detailed in the following paragraphs.

### a. Mimicking Legitimate Transactions

51.    <u>Legitimate Financial Transactions in the Materials</u>. The materials that I have examined involve, refer to, mimic, or use a number of devices and instruments that exist in legitimate commerce. They include standby letters of credit, bank guarantees, MTNs (medium term notes) and bank notes, bonds, and Pre Advices. While these undertakings exist, they are misrepresented in the form that they are referenced in the materials because they either do not appear or function in the manner indicated in legitimate finance.

### Standby Letters of Credit

52.    <u>In High Yield Investment Schemes</u>. Standby letters of credit (hereafter "SBLC") regularly appear in High Yield Investment Schemes. They are said to be investment vehicles that are traded or to assure principal or returns.

53.    <u>Legitimate Bank Undertaking</u>. SBLCs exist and are regularly issued by banks. There are approximately US$ 1.5 trillion in SBLCs and similar undertakings. They constitute a promise to honor a timely presentation of documents that comply with the terms and conditions of the undertaking. SBLCs are used to assure performance or payment of funds. They are specialized promises that only run to the named beneficiary, are not transferable unless they expressly so state and then only with the consent of their issuer, they expire on a fixed date after which they cease to be available, and they do not "automatically" mature, that is the beneficiary must make a drawing that complies by presenting the required documents containing the required statements on or before their expiry date. The drawing cannot be made at will but only in accordance with the terms and conditions of the underlying agreement that gave rise to them and often in the context of funds being due. A drawing in any other situation would be improper.

13

54. **What SBLCs are Not**. SBLCs are not investments, they do not pay interest, they are not discounted, they are not traded or bought and sold, and there is no market in which they are traded or could be traded even were they freely transferable and freely drawable (which is most unlikely) because each must be evaluated individually and in light of its terms and the transactions which they support. While SBLCs are used to assure performance, banks do not issue them unless there is a dependable means of reimbursement and their issuance is treated like a loan. There must be an established line of credit or they must be collateralized. SBLCs are not profit centers for banks; therefore a bank will only issue them as a service for established customers. In High Yield Investment Schemes, even when the fraudsters get the function of the SBLC right, there is no basis for actual issuance of a SBLC by a bank since there is no coherent basis for reimbursement.

55. **SBLCs in the Materials**. There are numerous references to SBLCs in the materials that I have examined. Some of the materials suggest that the invested funds will be used to lease a SBLC for an amount exponentially greater than the investment (e.g. lease of a US$ 20 million SBLC for an investment of US$ 900,000 [McLean Declaration Exhibit 18] . Other materials suggest that SBLCs are to be "monetized" in order to obtain a "larger" instrument (which in at least one instance appears to have been a SBLC) [McLean Declaration Exhibit 19 and Exhibit 39] , which I take to mean an instrument with a larger face value. Some materials imply that it is either the initial SBLC or the "larger" instrument or that is to be traded [McLean Declaration Exhibit 22 page 188, Exhibit 37 page 271, and Exhibit 39 pages 275-76].

56. **Why these References Are Not Legitimate SBLCs**. There are several reasons why these references to SBLCs in the materials do not involve legitimate SBLCs.

a.     Not "Leased". There is no such thing as the "lease" of a SBLC. Indeed, it is odd to think of "owning" a SBLC. The SBLC itself has no intrinsic value. This promise cannot readily be transferred and even when it is transferable and the issuer consents to a transfer request, the transfer is of the entire right of the transferor. The only value to the transferee would be the ability to draw on it. A transfer of this right to draw suggests that there has been an exchange of value between the transferee and transferor. Once the SBLC is drawn in full, there is no balance available and no value to the SBLC letter of credit. These characteristics differ from a lease in which the right to use property is conveyed in order to be used for a term but under which the property is to be returned at the end of the term with normal wear and tear. A SBLC cannot be returned without effecting another transfer, requiring the consent of the issuer, and if it has been "used" (i.e. drawn) by the transferee, cannot be returned because there is nothing left to return.

b.     Other Financial Instruments. Nor, for that matter, are there or can there be "leases" of other types of financial instruments for the same reasons. If the instrument is held without being used, it has no value. If it is used, the instrument is reduced or extinguished in a manner that would not be expected of other leased

property. In other words, one cannot "lease" a promise to pay money.

    c.    Leases of Instruments in Fraudulent Transactions and High Yield Scams. On the other hand, it is common to find references to the lease of SBLCs or other financial instruments in connection with various frauds. The so-called "lease" of such an instrument (even assuming that the instrument itself is legitimate and not forged or falsified) is useful only to enhance the balance sheet of the so-called lessee. It suggests that the assets of the lessee are greater than they actually are. But being the lessee of something that you cannot use is not an asset.

57.    **Supposed Example of a SBLC**. Despite the numerous references to SBLCs in the materials that I have examined, there is only one example of a SBLC issued by a bank. It is contained in Exhibit 30 of the McLean Declaration. This document contains many highly suspicious features and in my opinion is not legitimate. It is not uncommon for forged or fraudulent SBLCs to be used in connection with High Yield Investment Schemes. It is possible to download the format of a SBLC from the internet or to obtain it from banks and to fill it in and it is my opinion that this supposed SBLC was created in this manner. Indeed, the Project Funding materials found in the Lorenzo/Pavlico materials and apparently not given to investors (but very similar to the documents and representations that were provided to investors) [SEC-Pavlico-E-0000912; SEC-Pavlico-E-0000920; SEC-Pavlivo-E-0000921; SEC-Pavlico-E-0000922; SEC-Pavlico-E-0000924] contain four forms of this sort for SBLCs and one for a bank guarantee. Counsel for the SEC informed me that there were several sets of such forms in the materials obtained from Mr. Lorenzo/Pavlico.

    a.    Name of Purported Issuer. The name of the purported issuer on the supposed SBLC is "National Australian Bank" and there is a logo. There is an Australian bank named "National Australia Bank" with the same logo that appears on the supposed SBLC. There is no bank named "National Australian Bank". There is no possibility that a bank would misstate or misspell its own name on its own SBLC. Moreover, the bank name appears in the first substantive paragraph as "Nationale Australian Bank". No bank would spell its name two different ways in the same document, which reinforces the conclusion that this is fraudulent. Even more interesting is that a stamp that appears to have been superimposed on the supposed SBLC states that it is "APPROVED National Australia Bank" which is the name of the real Australian bank which constitutes the third spelling of the bank issuer on the same document.

    b.    AUD. The commonly accepted symbol for Australian dollars is "AUD" as is indicated in the field for the letter of credit number in the supposed SBLC. However, it is given as "AU$" in the Amount & Currency field of the same instrument "AU$" is understandable as an alternative to "AUD" but such an inconsistency would be very unusual in a bank issued instrument, particularly by an Australian bank.

    c.    The supposed SBLC contains a recital that it is "divisible, assignable and transferable". In this context, this formula has no meaning apart from the term

"transferable". This formula has been disapproved by letter of credit bankers for decades and it is my opinion that it was taken from an outdated form that has not been used by banks for some time. This conclusion is reinforced by the reference to practice rules, the "UNIFORM CUSTOMS AND PRACTICES FOR DOCUMENTARY CREDITS", ICC Publication No. 500. Incidentally, I note that the proper name of the rules is the "Uniform Customs and *Practice* for Documentary Credits" [*italics* for emphasis and comparison], a minor mistake but not one that I have ever seen made in a bank instrument although the mistake is common in fraudulent SBLCs. Although the supposed SBLC states that it was issued on 29 January 2011, it references rules that went into effect on 1 January 1993 and that were superseded on 1 July 2007. What makes this provision virtually certain evidence that it is a fraudulent instrument is that it also states "LATEST REVISION". As stated and as would be apparent to any letter of credit banker, UCP500 is not the latest version. This mistake would never be made by a letter of credit banker because the two versions differ considerably and would cause many difficulties for the bank in examining documents presented under it in that there is uncertainty as to whether it is governed by UCP500 or its successor, UCP600.

d.      Due/Maturity. The supposed SBLC gives a "DATE OF MATURITY" and states in Paragraph 3 that the amount is "due" a period of one year and one day after the date of issue. SBLCs do not "mature" and are not "due". They do, however, "expire" on an "expiration date" after which the issuer ceases to be obligated. Although an expiry date is required under applicable banking regulations and UCP500 (and UCP600), there is no expiry date in the supposed SBLC. Maturing or being due is quite different from the expiration of an obligation. This mistake is not one that a letter of credit banker would make because it affects the time when the undertaking ceases to be available and how it is carried on the banks' books.

e.      One Year and One Day. In the thousands of legitimate SBLCs that I have reviewed or studied, I have never seen a SBLC with a time frame of one year and one day. However, many of the fraudulent SBLCs that I have examined in connection with High Yield Investment Schemes contain this period for reasons that I am at a loss to explain apart from copying off a matrix of other fictitious documents. The oddity is one that stands out.

f.      Confirm. Paragraph 3 states that "WE CONFIRM THAT THE DEMAND DRAFT ...." The term "confirm" is a term of art in letter of credit practice signifying that another bank (the "confirmer") adds its undertaking to the beneficiary to that of the issuing bank. This SBLC is purportedly issued by NAB and not confirmed yet it uses this term. This misuse is not one that would be made by a letter of credit banker in a letter of credit because of the significance and meaning of the term.

g.      Spelling. The supposed SBLC purportedly issued by an Australian bank in Australia to an entity in the Bahamas uses the terms "FAVOR" (Paragraph 1) and "HONORED" (Paragraph 3) in the text, and "Authorized" over the signatory at

16

the lower right. These terms are spelled "favour", "honour", and "authorised" throughout the English spelling world with the exception of the US. In addition, the instrument is dated "January 29, 2011" and the other five dates in the supposed SBLC follow the same format. This format is only followed in the US and parts of Canada. In Australia and the Bahamas, the format would be "29 January 2011". These lapses into American spelling and dating in a supposedly Australian SBLC are highly suspicious.

58.    **Use of the Supposed SBLC**. Even apart from the legitimacy of the supposed SBLC, it could not be used in the manner suggested in the materials. In an email indicating that it is from Mr. Lorenzo/Pavlico to Attorney Baylor dated February 03, 2011 at 2:18PM and bearing a stamp marking it as Exhibit 35, it is stated that this instrument is being used for a "test run". Mr. Lorenzo/Pavlico states that there was agreement as to "how this instrument will be authenticated and moved from National Australian Bank to Santander Bank." SBLCs are authenticated by being advised via SWIFT, a process that is simple, effective, and well known and understood. Had two banks been involved, they would have been aware of this method and used it. The reference to "moving" the purported SBLC from the bank that issued it to another bank is more problematic. If there was an original of a real SBLC in the hands of Mr. Lorenzo/Pavlico, it would have already have been issued. It is, therefore, unclear what is meant by "moving" it. Since it would have been issued, only the named beneficiary, Pegasus Capital Group LTD, can draw on it unless and until it is duly transferred which can only be effected by the issuer at the request of the named beneficiary if it elects to do so. It is not clear what role is intended for Santander Bank since there is nothing more to be done apart from transfer. Not only is it my opinion that the supposed SBLC was not authentic but also that all of the discussions related to it were fictional and that nothing was done or intended to be done with bankers about it. Extended discussions and correspondence about forged, fraudulent, or fictional instruments are common in High Yield Investment Schemes since they give the illusion of reality and suggest that those participating believed that they were real. If the supposed SBLC discussed above is what was being used, as is suggested by the email, then it would have been readily apparent to a banker that the instrument was seriously problematic and an inquiry to the letter of credit department would have immediately exposed its fraudulent character. Apart from reporting the incident as a suspicious activity, no bank would have had anything to do with it or those persons bringing it.

59.    **Other SBLCs**. I note that the four forms for SBLCs and one for a bank guarantee in the Project Funding materials found in the Lorenzo/Pavlico materials referred to in Paragraph 57 of this Report [SEC-Pavlico-E-0000920; SEC-Pavlico-E-0000921; SEC-Pavlico-E-0000922; SEC-Pavlico-E-0000924] contain many of the problems noted above and many additional ones. Indeed, the supposed SWIFT MT 760 form at SEC-Pavlico-E-0000922 is not a SBLC at all but a promissory note. These forms are examples of the type of nonsensical materials that are readily available on the internet or that otherwise circulate and are able to be customized to fit any specific scheme. It is my opinion that the

materials that I have reviewed are of the same genre, that is customized forms drawn from such sources.

### Bank Guarantees

60.    **Bank Guarantees.** The materials also refer to bank guarantees including leasing them. [McLean Declaration Exhibits 17, 22, and 26 at 146:15-20] Bank guarantees are virtually identical to SBLC letters of credit and the observations made above regarding SBLCs would also apply to bank guarantees.

### Other Instruments in the Materials

61.    **Medium Term Notes & Bonds.** Another instrument referred to in the materials is MTNs or medium term notes issued by corporations and banks. These entities do issue medium term notes. Such undertakings are typically promises to pay the indicated sum within a period of time ranging generally from 90 days to 10 years, are generally unsecured, and are typically in negotiable form. Such notes are also traded on secondary markets. Many of the Prime Bank Investment Schemes that I have studied contain references to medium term notes as a means of investment or a source of the extraordinary returns promised.

   a.    Return on Investment in Medium Term Notes. The return on medium term notes correlates to the relative perceived risk inherent in the investment and the riskier the investment, the higher the return. In legitimate financial transactions, investment risk is measured by various rating agencies such as Standard & Poor's or Moody's. Under this system, investments are distinguished between investment grade and non-investment grade. An investment grade investment would be regarded as relatively safe and so rated by the rating agency. Instruments issued by the US government are regarded as the safest investment and the return on US Treasury instruments for the equivalent period sets the bench mark for investment grade investments with financial instruments from the highest rated organizations calculated in basis points from that amount. (A basis point is 1/100th of 1 percent.) The figures for medium term notes are available and published in the financial press on each business day and on various financial websites. Because of the correlation of risk to return, notes issued by investment grade banks or corporations (which are relatively risk free) yield relatively low returns.

   b.    Bonds. The materials also refer to bonds. Bonds are also debt instruments which can be secured. They tend to be longer than 10 years in duration. They are traded in various markets, as well, which are also widely reported.

   c.    Medium Term Notes and Bonds in the Materials. The materials contain references to trading medium term notes and bank notes, references and purported screen shots of Morgan Stanley medium term notes [McLean Declaration Exhibit 16: 22:20-25; Exhibit 17 page 171 Paragraph III.1; Exhibit 43; Baylor Deposition 384;3-5; 435:20]. Investing in or trading in these notes, to the extent that they are real, would not yield the promised returns.

    d.    Observations Regarding References to Medium Term Notes and Bonds in the Materials. Neither investment in nor trading in medium term notes of major banks or corporations will yield the returns suggested in the materials. While investment or trading in non-investment grade investments known as "Junk Bonds" or "High Yield Bonds", could yield profits (although not at the ratios indicated in the materials), they are also proportionately more risky and are more likely to result in loss than gain as the risks (and yields) increase.

62.    **Pre Advice**. The materials use the term "pre advice". A pre advice is a promise to issue a commercial letter of credit in a format similar to the pre advice without delay. It is used where complete shipping information is not available but it is necessary that a commercial letter of credit be in place in order for the seller to arrange financing.

    a.    Use. Pre advices are not used in SBLCs or demand guarantees and almost never in contemporary commercial letter of credit practice since instantaneous communication by internet is commonplace, permitting rapid transmission of shipping details prior to issuance of the commercial letter of credit. This term appears regularly in High Yield Investment Schemes, however, typically in a context in which it is meaningless.

    b.    In the Materials. In a letter dated 28 October 2010 [Exhibit 42 to McLean Declaration], Attorney Baylor states that the pre advice was "completed and the banker to banker script has been approved." The phrase "banker to banker script" is without meaning to me and the statement that the pre advice was completed makes no sense under standard international SBLC practice. The letter goes on to say that the Milan Group is "awaiting the MT-799 to be sent to Platform's Banker after Bankers speak." If the terms were agreed, the SBLC itself could be sent and there would be no reason to send a pre advice. If the terms were not final, there would be nothing to pre advise. In any event, even were one to use a pre advice with a SBLC (which SBLC bankers would not since there is no practice), they would not use a SWIFT MT 799 as suggested in the materials but a MT 705 (Pre-Advice of A Documentary Credit) because the formatted version contains protocols that afford structure and protection not afforded by an unformatted message. Attorney Baylor also confused a Pre Advice with a SWIFT MT 799 in an email to Banio Koroma, Jr. [B&J-SEC 00007672].

63.    **Pre Issued Debentures**. A paper on Milan Group letterhead entitled "Leveraged Lease Trading Program" [Exhibit 17 to McLean Declaration] under heading III.1 (Acquisition of the Larger Instrument) states that this instrument "will be a pre-issued debenture, i.e. bank guarantee, bond, medium term note, etc." I am unfamiliar with the term "pre issued debenture" and cannot understand to what it refers but am familiar with the term "debenture" which includes general debt instruments but which would not include a bank guarantee which is not a debenture. This type of mis-classification would not be expected in a prospectus or description of an instrument of between US$ 150 million to 1 billion but is the type of confusion which regularly attends High Yield Investment Schemes.

# SEC EXPERT REPORT – EXHIBIT A

While I have not heard of this combination of undertakings misdescribed as "pre issued", it is not uncommon to see the three things grouped together as types of debentures in High Yield Investment Schemes that I have studied.

64.  **"Monetization" & Leverage of Instruments.** The materials that I have examined contain numerous references to the "monetization" of various instruments and particularly of the standby letter of credit. [E.g. Baylor Deposition Exhibit 6; McLean Declaration Exhibits 19; 20; and 23] The term "monetization" is not used with respect to SBLCs under standard international banking practice. If "monetization"means to draw on the instrument to obtain the amount available under it, that would mean that the bank issuing it would demand reimbursement from the applicant who requested its issuance. The result would be a zero sum gain with respect to the funds plus the costs for the SBLC. The SBLC could serve as collateral for another instrument or a loan but not for a larger loan or instrument unless there is a credit line or other collateral. However, such a process is not "monetization" of the SBLC in any sense that I understand. Moreover, as indicated a SBLC is not simply convertible into cash like a note. It can only be drawn by making the recital required, if the recital can be made, and only drawn on by the named beneficiary. The vague references to monetization serve to mask the series of credit upgrades involved in this process by which an investment of a relatively small amount is upgraded into one that is proportionately 3:40 in Exhibit 16 McLean Declaration pages 161-2 where US$ 75,000 is said to generate US$ 1.5 million. Such an upgrade involves significant credit risk, particularly where the funds are being used for speculative trading in order to obtain and pay exorbitant returns. The possibility that any legitimate organization would be prepared to extend credit in the amounts indicated for the purposes suggested in 2010-2011 were virtually zero. Indeed, the amounts indicated in the materials which run from millions to hundreds of millions to billions are out of touch with reality. For example, Attorney Baylor speaks of a "$30 billion Bank Gurantee [*sic*]" said to be issued by Barclays and for which there was a commitment (presumably to buy it) from "DB" (presumably Deutsche Bank) in an email dated November 01, 2011 at 11:41AM. [SEC-Pavlico-E-0003228]. To give an idea of the absurdity of these figures, it is useful to compare them with real ones. The entire portfolio of Deutsche Bank for such undertakings (SBLCs and bank guarantees) at its US New York office as reported to federal bank regulators at the end of the third quarter of 2011was US$ 17,232,273,000. Barclay's New York office is not listed in the third quarter 2011 reports of 143 US branches of foreign banks but for the fourth quarter of 2011 reported outstanding net SBLCs and bank guarantees of US$ 56 million. Only 4 US banks had a portfolio for the third quarter in excess of US$ 30 billion with JP Morgan at US$ 104.3 billion, Citibank at US$85.8 billion, Bank of America at US$60.8 billion, and Wells Fargo at US$39.9 billion.

65.  **SWIFT MT 760 & MT 799**. Among the multiple references to SWIFT are regular odd references to SWIFT MT 760 and MT 799. These messages are described in Paragraph 44 in this Report.

20

a.  A 8 February 2011 at 12:19 PM email from Attorney Baylor [Exhibit 40 to the McLean Declaration] indicates that once a MT 760 message has been "swifted", the parties will begin a call and "begin the swifting of the $200 million instrument. Swifting takes 24 hours." Apart from the terms "swifted" and "swifting" which I have only encountered in connection with High Yield Investment Schemes, the statements about the process and time it takes to send a SWIFT message are wrong. The impression that these statements make is that the process is similar to a telefax that the parties can initiate. SWIFT messages can only be sent by bank members of SWIFT. The parties to this supposed transaction cannot "send" a SWIFT which can only be sent by a SWIFT bank member. The transmittal of a SWIFT message is instantaneous. It does not take 24 hours although it is common to see similar statements in High Yield Investment Schemes to explain why promised deliveries or transactions do not occur when promised.

b.  The Leveraged Lease Trading Program paper on Milan Group letterhead [McLean Declaration Exhibit 17] at III.9 states that the "larger instrument" ($200 million) will be issued via SWIFT MT 760. This instrument was to be "a pre issued debenture, i.e. bank guarantee, bond, medium term note, etc." SWIFT MT 760 is exclusively for bank guarantees and standby letters of credit and cannot be used for debentures, bonds, medium term notes, "etc.", or a "pre issued debenture", whatever that is. Such misuse of the SWIFT system is common in the High Yield Investment Schemes that I have studied. Since none of the things discussed will ever occur in these Schemes, it only matters that an impression be given that important and official sounding things are happening without any regard for the accuracy of what is being stated.

c.  The 28 October 2010 letter from Attorney Baylor referenced above [Exhibit 42 to McLean Declaration] after referring to "the MT 799" indicates that "[n]ext, the MT-760 will be sent and the delivery of said instrument of 100M BG will be made." The statement seems to suggest that the delivery of the instrument (the bank guarantee) will be made after the MT 760 is sent. If so, there is a failure to understand that the MT 760 communication, were it sent, would be the bank guarantee and that there is nothing else to be "delivered".

### b. Fictitious Terms & Phrases

66.  **Fictional Terms and Phrases.** In addition to the misuse of legitimate financial or banking terms, it is common for High Yield Investment Schemes to use fictitious terms that have no meaning in legitimate commerce, banking, or finance. The use of such terms alone suggests that the persons using them are uninformed at best but what is of special interest to me is that many of these terms regularly appear in High Yield Investment Schemes in an identical or similar manner. In my opinion, the regular appearance of such terms is not a coincidence but results from copying the methodology, explanations, terminology, and even forms and formats from similar schemes.

67. **Clean, Clear Funds.** The materials also regularly use the phrase "CLEAN, CLEARED, LIEN FREE AND UNENCUMBERED FUNDS, EARNED FROM CONSULTING SERVICES PROVIDED TO COMMERCIAL ENTERPRISES OF NON-CRIMINAL AND NON-TERRORIST ORIGINS, KNOWN BY BUYER OR PROVIDER CODE 000001". [Exhibit 15 and Exhibit 27 of the investigation testimony of John V. Bach on Sept. 22, 2011; McLean Declaration Exhibit 18 page 176; Exhibit 25 pages 200-205]

   a. It appears that this statement is supposed to accompany payment by investors of their investment. Although none of the messages accompanying the transmittal of invested funds appear to have contained this statement, it does not appear that any funds were refused.

   b. Apart from the fact that such a statement could not be included in most wire systems and would be resisted by the sending banks due to its bizarreness where it could be included, the strangeness of the statement is striking. Presumably this statement is to come from investors regarding their own funds. Its meaning is difficult to comprehend. The value of such a self-serving statement is zero. Does the statement mean that the investor's funds being wired are of non criminal origin, etc.? Had the funds come from criminal or terrorist origins, it is hardly likely that its source would be revealed. And it is difficult to understand how an investor could recite that the funds were earned from consulting services provided to commercial enterprises of non-criminal etc. origin since there is no indication in the materials that the investors were providing consulting services.

   c. If the phrase relates to the reason the payment is being made, it is similarly confusing albeit for different reasons. And the reference to a "buyer" is even more opaque unless the investors are the buyers.

   d. More striking, however, is that a similar statement appears in virtually every High Yield Investment Scheme that I have studied and that I have never encountered such a statement in connection with legitimate investments, commerce or finance. The fact that the statement does not fit the investor in these transactions reinforces my opinion that this statement was lifted from a form without thought. Some of these statements include the formula "WITH FULL BANKING RESPONSIBILITY" [e.g. McLean Declaration Exhibit 25 page 200], a phrase in my experience which banks never use and which makes no sense in the context of a funds transfer of the sort being contemplated here.

68. **RWAs.** Both Mr. Lorenzo/Pavlico and Attorney Baylor refer to a "RWA".

   a. In an email dated 3 February 2011 at 2:18 PM (Exhibit 39 to McLean Declaration), Mr. Lorenzo/Pavlico states that the banks ("National Australian Bank" and Santander) are "ready and willing to send and receive the RWA from this point on." In an email dated 8 February 2011 at 12:19 PM (Exhibit 40 to McLean Declaration), Attorney Baylor states that the "lessor" and the platform "have agreed to finish the preparation of RWA letter" and will initiate the "swift" on "acceptance of the RWA".

    b.    "RWA" signifies "ready, willing, and able". It is a phrase which is used loosely in a variety of contexts. It is not, however, reified into a thing in the legitimate world that is "an RWA". Such usage is, however, an important part of commercial frauds and was a precursor to High Yield Investment Schemes. RWAs were a typical part of advance fee scams in which the victim was required to send "an RWA" together with the advance fee payment to indicate willingness to receive the big payout that was to follow. The point of the exercise was to distract the investor from the advance payment by focusing on the expected payoff.

    c.    The device has been carried forward into many High Yield Investment Schemes. Contrary to what is suggested here, legitimate banks do not send "RWAs" to other banks and were a customer to request one, the bank is more than likely to invite the customer to explain the context and then probably file a suspicious activity report.

69.    **European Banking Days**. It is common for High Yield Investment Schemes to contain strange references to types of banking days such as "international banking days" or hours, minutes, and even seconds. These references may sound impressive but are nonsense. A day, hour, minute, or second is the same length in one part of the world as another. As to what days a bank is open, this practice differs from country to country and even within a country. While the materials given to investors do not mention these phrases, a communication from Lorenzo/Pavlico on Milan Group letterhead dated 19 November 2010 refers to a promise to repay an investor if the program does not yield a return "after Twenty One European Banking days from receipt...." There is no such thing as a "European Banking Day" in legitimate banking practice. While I have never seen this particular odd phrase before, it is consistent with the absurd types of phrase that I have encountered. A day in Europe is 24 hours and what days are banking days vary from country to country and even from federal state to federal state within a country.

70.    **Fresh Cut BG.** The materials refer to "Fresh Cut" bank guarantees or other instruments.

    a.    The Lease Leverage Trading Program on Milan letterhead at I.2 & 3 [Exhibit 17 to McLean Declaration] informs investors that the $100 million bank guarantee will be "carved" into $10 million increments and that the investor's payment will be used in part to cover "cut fees for a Fresh Cut BG will be a fresh cut instrument cut to the name of the client with the beneficiary being the platform/monetizing entity." Paragraph I.7 states that a "new FC BG of $ 100 million instrument will be cut by the agreed upon bank". Mr. Lorenzo/Pavlico states in a letter on Milan Group letterhead dated 8 September 2010 [Exhibit 37 to McLean Declaration] that the investor's banker will confirm with our banker this week that the instrument "will be cut and delivered to Platform Bank".

    b.    Bank guarantees are not "cut" and the notion of cutting does not appear in banking nor does it make any sense, particularly with an undertaking that is to be communicated electronically.

    c.    The term may stem remotely from bonds which carried coupons that are to be

"cut" when payments were sought but, whatever the origin, its use here is not only incorrect but an indication to me that this transaction is an instance of a High Yield Investment Scheme because such references to "cutting" and "fresh cut" instruments regularly appear in such schemes.

**5.    Name Dropping**

71.    **Name Dropping in Prime Bank Investment Schemes.** The High Yield Investment Schemes that I have studied invariably include references to legitimate organizations, persons, or institutions. They improperly suggest that the named institution approves of or participates in the scheme or that the scheme is part of or affiliated with the legitimate entity. This tactic which is commonly used in Prime Bank Investment Schemes seeks to influence people and to gain credibility by association with well regarded names. In the materials, there are references to the International Chamber of Commerce (ICC), its rules, and the names of major banks and organizations.

72.    **ICC**. The ICC and its rules regularly are used in High Yield Investment Schemes because of their prominence in international finance and because, while recognized, they are not well understood specifically by non specialists. As indicated above at Paragraph 57(c) with respect to the UCP and as will be explained further in Paragraph 76(d), the references to ICC rules in the materials are inapt and an indication that those who made them did not understand what they are doing. The ICC through its Commercial Crime Bureau has played a leading role in combating High Yield Investment Schemes such as that contained in these materials.

73.    **Banks**. The banks referenced include National Australia Bank whose name was mangled in the SBLC that it supposedly issued, as discussed in Paragraph 57 of this report, "Santander Bank" (which presumably signifies Banco Santander) [Exhibit 17 Bach] , and HSBC ["Project Financing Procedures" SEC-Pavlico-E-0000897] , Deutsche Bank [Exhibit 18 McLean Declaration page 174] , Rabobank ["Master Fee Protection Agreement" B&J-SEC00007679], ABN Amro ["Master Fee Protection Agreement" B&J-SEC00007679], Commerz Bank ["Master Fee Protection Agreement" B&J-SEC00007679], Credit Suisse [Frank Lorenzo email to Val Johnson, Oct. 28, 2011 @ 2:28pm; B&J-SEC00008226], Barclays [Abdul Alhamri email to capital@epix.net @ 04:05:47; B&J-SEC00008204, and La Caxia Bank [Frank Lorenzo email to bbaylor@baylorjackson.com Mar. 15, 2011 @ 11:16am; B&J-SEC00007622] as well as Morgan Stanley [Exhibit 44 McLean Declaration page 297] and a list of banks designated as "acceptable (investment - MTN - Issuing Bank)" which contains all the leading European banks.  As indicated above, none of these organizations would knowingly deal with transactions of the sort indicated in these materials and would report them as suspicious activities under the various regulatory schemes under which they operate. There are also generic references to major banks. In an email dated July 21, 2010 at 4:24 PM, Attorney Baylor mentions "different bank options" for the instruments, providing in

a parenthetical "(Top 10 worldwide)". [B&J-SEC00007672] SEC-Pavlico-E-0003916 contains a list of 14 UK banks said to be "Eligible Institutions part of HM Treasury Guarantee Scheme". While it is common for High Yield Investment Schemes to provide menus of bank issuers, in legitimate finance such menus are not available. A company has banking relationships from which SBLCs must be issued.

### 6.      Unnecessary or Excessive Secrecy

74.      **Unnecessary or Excessive Secrecy.** While legitimate transactions are sometimes confidential with respect to trade secrets or contain limitations on circumvention, such provisions would not be used in connection with bank guarantees, medium term notes, or trading of financial instruments on a market. By their nature, markets are public and thrive on the availability of information. While there are some confidential investments in legitimate commerce and finance, they are not connected with trading on public markets.

75.      **Secrecy in High Yield Investment Scams.** As indicated, most of the High Yield Investment Scams that I have studied contain an excessive element of secrecy that is inconsistent with a market-oriented investment or trade.  The notion of secrecy enables fraudsters to explain why the High Yield Investment Scams are not well known and to restrict disclosure by the victim to others. It also serves to discourage investors from seeking advice from investment professionals or trusted advisers and, more importantly, serve to prevent them from speaking to regulatory or law enforcement officials either because of the fear of violating the secrecy provisions or out of concern that any such disclosure would cause the arrangement to be terminated, depriving them of their principal and any proceeds that may eventually be generated.

76.      **Confidentiality in the Materials.** The materials contain several indications that the details of the transaction and those involved in it are highly confidential.

  a.  One of the investors responded to a question about obtaining information (Exhibit 16 to the McLean Declaration at page 28 line 25 and following by stating) "I said, you know, who is the platform. Give us like names. Everything is supposed to be like confidential. Everything is confidential, so they can't release information on specific parties' names." When asked the reason for this excessive secrecy, the reply was "If it gets out and somebody knows, you know, the platform know, you know their name, and they get calls from investors, this is just going to kill the whole thing."

  b.  The Irrevocable Profit Participation Agreement & Pay Order (Exhibit 25 to the McLean Declaration) stated that the "applicable Non-Circumvention/Non-Disclosure conditions of the ICC 500 rules and regulations are binding upon all parties.... It is understood that all parties herein involved are considered to be bound by international standard of non-circumvention/non-disclosure as governed by the International Chamber of Commerce...."

  c.  References to the ICC standards of Non Circumvention and Non Disclosure are common in the High Yield Investment Schemes that I have studied. The ICC has

SEC EXPERT REPORT – EXHIBIT A

published a pamphlet with clauses that can be used in contracts in order to protect middlemen in a sale contract from disclosure of confidential information about the end buyer and end seller. The clauses are listed and no recommendations are made about them. They are available for the parties to select if they wish to do so. There are, therefore, no ICC "standards" of non circumvention or non disclosure and the reference to them would be no different than referring to a book of forms with multiple forms. Such a reference might be overlooked as a matter of careless drafting except that such references in exactly the same form are common in High Yield Investment Schemes.

d.  More significantly, as indicated the materials refer to the "Non-Circumvention/Non-Disclosure conditions of the ICC 500 rules". As indicated in Paragraph 57(c) of this Report, the ICC 500 rules are practice rules for commercial letters of credit that focus on the issuance of letters of credit and the compliance of documents presented under them. They have nothing to do with non-circumvention and non-disclosure whatsoever. References to these rules appear regularly, however, in the High Yield Investment Schemes that I have examined, reinforcing my opinion that the documentation in this transaction is drawn from and reflects a High Yield Investment Scheme.

### 7.  Humanitarian or Religious Dimension

77.  **Humanitarian in High Yield Investment Scams.**  As indicated, a common feature of many of the High Yield or Prime Bank Investment Schemes that I have examined is the notion that they are linked to humanitarian, charitable, or religious projects.  The reasons for such a requirement vary in my opinion, but in most cases they serve to make the investor feel good while doing well, provide a somewhat plausible explanation for the excessive profits and waiver of repayment obligations, and distract the investor from asking penetrating questions about the investment itself. There is no parallel phenomenon in legitimate investment. It is, of course, possible to make endowments to some charitable organizations and to receive yields from them but such investments are quite different from what is described in High Yield Investment Schemes.

78.  **Humanitarian Dimension in the Materials.**  The materials indicate that some of the victims intended to use the proceeds for humanitarian purposes and had been told that such a component was necessary. [Exhibit 27 of the investigation testimony of John V. Bach on Sept. 22, 2011; Page 9 of the investigation testimony of Thomas Freeman Moss on Aug. 2, 2011; McLean Declaration Exhibit 26: 148:23-149:4] In addition, "IRREVOCABLE PROFIT PARTICIPATION AGREEMENT & PAY ORDER" dated 15 December 2010 states that "funds received from the above assignee, will have a percentage dedicated to a humanitarian project."

### 8.  Attorney Trust or Escrow Account

79.  **Escrow Arrangements and Trust Accounts in Legitimate Commerce and Finance.**

# SEC EXPERT REPORT – EXHIBIT A

Because many investors are familiar with escrow accounts, they are perceived to be a source of safety for the funds held which will not be disbursed unless the escrow agent determines that it is appropriate to do so based on an escrow agreement. This level of comfort is greater when the escrow agent is an attorney or the funds are being held in an attorney trust account. Because of the seriousness with which attorney trust accounts are treated by bar associations or the courts who monitor attorneys and the significant ethical penalties attached to their misuse, their use and the involvement of an attorney also suggests that the investment is legitimate, particularly where the attorney vouches for the legitimacy of the transaction.

80. **Attorney Trust and Escrow Accounts in Prime Bank Investment Schemes**. It is common for Prime Bank Investment Schemes to involve either an escrow account, an attorney trust account or both. Through making these accounts available, attorneys or escrow agents facilitate Prime Bank Investment Schemes through the use of their trust or escrow accounts, often seeking to use their status as professionals to shield themselves from disgruntled investors or prosecution. This feature is one of the most pernicious aspects of Prime Bank Investment Schemes precisely because of the role of an attorney as a person exercising independent judgment with supposed neutrality is critical to commercial transactions.

81. **Role**. In my opinion, attorney trust accounts played an important role in the transactions indicated in the materials that I have examined. They were mentioned prominently in many of the materials related to the transaction and by the investors who were interviewed.

82. **Function of Trust Accounts**. In my studies, it is apparent that whether or not a trust or escrow account is properly used with respect to a transaction turns on the total circumstances surrounding the account and its use. These factors include the need for a trust account other than for the appearance of safety, whether the account is used to assure compliance with conditions, whether it is a revolving door, for whom the funds are being held, whether there are conflicts of interest by the person holding the account. In the Milan Group transactions involving a trust account, the payments were automatically disbursed on receipt of the claim that the trust conditions had already been fulfilled, making the trust account meaningless.

83. **Trust Accounts in the Milan Group Transaction Materials**. The references to trust accounts in the Milan Group materials were to the IOLTA trust accounts of the Baylor & Jackson law firm. I note that the trust or escrow agreements state that the investors are the clients of the trust agreements which imposes obligations of disclosure and faithful execution of the trust mandate on Attorney Baylor. [McLean Exhibit 27]

### 9. Predictable and Incredible Excuses

84. **Need for excuses.** As indicated, disproportionately high returns are an ordinary feature of

Prime Bank Investment Schemes. Because such returns are not possible, it invariably comes to pass that the indicated returns are not forthcoming and it is necessary for the perpetrators of the scheme to deal with concerned, suspicious, and increasingly irate investors. These excuses are a typical and necessary feature of every Prime Bank Investment Scheme. They often follow a pattern. For example, they almost always plead that foreign markets or banks are closed for long holidays such as Christmas, the Chinese New Year or explain delays as being due to current tragedies or disasters and events whose impact on international banking is remote.

85.  **Excuses in the Materials.** The materials are replete with failures to meet deadlines and extensions or to perform what is promised. [E.g. McLean Declaration Exhibit 16: 109:3-8; 126:20-24; Exhibit 37; Exhibit 38; Exhibit 39; Exhibit 40; Exhibit 41; and Exhibit 42] In many situations, multiple excuses are offered. In others, promises of future performance are made in lieu of excuses. However, it is my understanding that no performance was or has been forthcoming from the perpetrators of this scheme.

### 10.  Lack of Professionalism

86.  **Documentation and Its Absence**. Not only is the professional quality of documentation accompanying the transactions inconsistent with what would be expected in transactions involving the large amounts of money indicated but it is noteworthy by what is absent. A legitimate investment of the sort indicated here would be accompanied by letters from banks, other professionals, various forms and applications, and various formalities related to them. With the exception of the supposed standby from NAB, there is no indication whatsoever of any standby actually issued by a bank or other such documentation in the materials.

### 11.  Use of Invested Funds

87.  **Use in the Transaction**. As indicated, one of the indicators of High Yield Investment Schemes is the failure to use the invested monies or most of them for the actual promised investments. I note that Exhibit 16 to the Pavlico Deposition charts the use of US$ 2,085,000 of the investor's funds. Of this amount, it appears that $644,000 went to Baylor & Jackson, $841,000 went to Milan, $225,000 went to relief defendant Global Funding (Cooper), and $375,000 went to relief defendant GPH Holdings (Lewis). None of these investor funds were invested.

## V.  The Difference between Intermediaries and Promoters of a High Yield Investment Scheme

88.  **Scope**. I have been asked to opine on the role of Attorney Baylor in this transaction.

89.  **The Role of Intermediaries in Prime Bank Investment Schemes.** As do most transactions, Prime Bank Investment Schemes rely on intermediaries to function. My

SEC EXPERT REPORT - EXHIBIT A

studies have revealed two categories of intermediaries in these transactions, namely neutral intermediaries and promoters. A neutral intermediary acts in the normal course of its business for an appropriate fee commensurate with the services rendered. A promoter goes beyond the normal ministerial function associated with its role, such as holding funds, making a determination of whether or not disbursal is appropriate based on objective criteria, holding deposits, or delivering messages, and lends itself and its uses function actively to promote the scheme.

90. **Types of Intermediaries.** The neutral character of some intermediaries is apparent from the scope of their work. For example, couriers and banks that hold accounts provide intermediary services but have no significant contact with the transaction. On the other hand, professionals such as accountants or attorneys have the possibility of greater involvement in the transaction. Based on the materials that I have examined including documents that she wrote and her testimony, it is apparent that Attorney Baylor acted as more than a simple provider of a trust or escrow account.

91. **Factors**. In determining the character of an intermediary's role, important factors include the fees charged, the merit of the work done, what is said to investors, whether what is said to investors is within the scope of the professional role of the intermediary or is promotional in character, whether there are representations about the investment, its past successes, and its ongoing progress, its safety, and the likelihood of receiving returns, and what duties are owed by the intermediary and to whom, whether a percentage of profits were to be received as or in addition to professional fees, whether invested funds received by the intermediary were used for the purposes for which they were given to the intermediary, what representations were made about the intermediary and whether the intermediary was aware of any representations that went beyond the scope of the professional engagement, whether the actions, words, or role of the intermediary was perceived as endorsing the scheme.

92. **Time Line**. Another factor that must be taken into account is the extent to which the intermediary is or should be aware of the character of the transaction and the accuracy of what is said about the transaction. In an ongoing relationship, the information on which these determinations are to be based are not static. In a two year relationship, things that are known at the end of the second year must be weighed in the context of what is or should be known at the end of the second year and not at the beginning of the relationship.

93. **Attorney Baylor's Professional Work**. As indicated, one of the factors to be weighed is the merit of the work undertaken. With respect to this work, I am able to offer an expert opinion. As an attorney and expert on standby letters of credit, I have examined Attorney Baylor's billing records, the contracts on which she worked, and her testimony in response to questions propounded about the substance of the matters on which her bills indicated that she worked. It is my opinion that there is no evidence in the materials of any written legal research or advice being given to anyone. The advice or opinions

SEC EXPERT REPORT – EXHIBIT A

indicated in the written exhibits or disclosed in the testimony of the investors or the transcript of the conversation with the FBI agents constitutes vetting of investors, promotional activities, or giving status reports and not legal advice or opinions.

## VI.   CONCLUSIONS

94.   The transactions as described in the materials that I have examined do not and cannot exist in legitimate finance. Their basis is leveraging and re-leveraging a leased SBLC or bank guarantee.

   a.   There is no such thing as the legitimate "lease" of financial instruments such as SBLCs, bank guarantees, or medium term notes.

   b.   SBLCs and bank guarantees are not "monetized" and do not operate in the manner indicated in the materials.

   c.   The use of a SBLC to leverage a transaction in the manner indicated makes no economic sense nor does "trading" based on it.

   d.   The supposed profit from trading medium term notes and bonds in the exorbitant amounts indicated in the materials is not possible if the investments are investment grade and exorbitantly speculative if they are not. They are more likely to produce a loss than a gain.

   e.   Investments in medium term notes and bonds are not secret or particularly mysterious and can be tracked on line and in the financial press.

   f.   The transactions described in the materials play on a confusion between equities or stocks which can rise in value (although rarely at the rates indicated and can equally fall) but whose fortunes and misfortunes are reported daily and debt instruments which the transaction purports to be dealing. The rate of return projected is so excessive as to be mythical. The result is a mythical return on a fictional investment.

95.   The transactions are not only founded on a fiction but contain many of the indicators of a High Yield Investment Scheme. Therefore, it is my considered professional opinion that the programs described in the materials that I have reviewed constitute an instance of High Yield Investment Schemes, are not legitimate, and to the extent that they mimic legitimate investments, do so without any legitimacy. This opinion is reinforced by the close resemblances between the materials that I have examined and materials that I have seen in other High Yield Investment Schemes. The distortions of legitimate finance in these materials are so calculated that it is my opinion that they could not have occurred through inadvertence or accident but only by deliberation.

96.   It is also my considered professional opinion that the transactions, terms, and explanations of them reflected in the materials are so patently fictitious that any person who held themselves out as being knowledgeable about such programs is either deliberately making a false statement or is acting recklessly in disregard of their patently

# SEC EXPERT REPORT – EXHIBIT A

fictitious character.

Signed this 4th day of September 2012
In the State of Maryland
County of Montgomery

James E. Byrne

# EXHIBIT A

**Exhibit A**

**Documents Provided to Professor Byrne**

1. SEC v. The Milan Group, Inc. - Motion for Temporary Restraining Order

2. SEC v. The Milan Group, Inc. – Stamped Complaint

3. SEC v. The Milan Group, Inc. – First Amended Complaint

4. Declaration of Christopher M. McLean filed on 11/30/11

5. Index to Exhibits of Declaration of Christopher M. McLean filed on 11/30/11

6. Exhibits of Declaration of Christopher M. McLean filed on 11/30/11; Exhibits 1 - 49

6. Transcript of Testimony of Thomas Freeman Moss

7. Exhibits to Testimony of Thomas Freeman Moss; Exhibits 1 - 12

7. Transcript of Testimony of John V. Bach

8. Exhibits to Testimony of John V. Bach; Exhibits 13 - 38

9. Transcript of Deposition of Brynee K. Baylor

10. Exhibits to Deposition of Brynee K. Baylor; Exhibits 1 – 24

11. Transcript of Deposition of Frank L. Pavlico

12. Exhibits of Deposition of Frank L. Pavlico; Exhibits 7 – 12, 16

13. Additional Pavlico Deposition Documents: SEC-Pavlico-E-0000105, SEC-Pavlico-E-000035 – SEC-Pavlico-E-0000360, SEC-Pavlico-E-0000896 – SEC-Pavlico-E-0000918, SEC-Pavlico-E-0000919 – SEC-Pavlico-E-0000927, SEC-Pavlico-E-0003228, SEC-Pavlico-E-0003867, SEC-Pavlico-E-0003915 – SEC-Pavlico-E-00003916; B&J-SEC00007672, B&J-SEC00007679 – B&J-SEC00007682

SEC EXPERT REPORT - EXHIBIT A

# EXHIBIT B

# SEC EXPERT REPORT – EXHIBIT A

## Professor James E. Byrne

George Mason University School of Law,
Arlington, Virginia

| | | |
|---|---|---|
| EDUCATION: | degree: | LL.M., UNIVERSITY OF PENNSYLVANIA (1978) |
| | thesis: | *Exceptions to the Requirement of Honor in American Letter of Credit Law* |
| | advisors: | Professors John O. Honnold and Covey T. Oliver |
| | degree: | J.D. magna cum laude, STETSON UNIVERSITY COLLEGE OF LAW (May 1977) |
| | degree: | B.A. cum laude, UNIVERSITY OF NOTRE DAME (June 1968) |
| EMPLOYMENT: | position: | FACULTY OF LAW, 8/82 to present |
| | employer: | George Mason University School of Law |
| | courses taught: | Commercial Paper, Commercial Transactions, International Banking Operations, Electronic Commerce |
| | position: | FACULTY OF LAW, 8/81 to 7/82 |
| | employer: | Stetson University College of Law |
| | courses taught: | Commercial Paper, Sales, Research and Writing |
| | position: | ASSOCIATE ATTORNEY, 6/79 to 8/81 |
| | employer: | McMullen, Everett, Logan, Marquardt & Cline, P.A. |
| | areas of practice: | Commercial Practice, Real Estate & Probate |
| | position: | LAW CLERK, 6/78 to 5/79 |
| | employer: | Hon. Paul H. Roney, Judge, United States Court of Appeals for the Fifth Circuit |
| | duties: | research, drafting opinions, bench memos |
| ADMITTED TO BAR: | | Florida 1977 |
| | | Maryland 1983 |

PROFESSIONAL DISTINCTIONS:

Member, SWIFT ISO 20022 Demand Guarantees and Standby Letters of Credit Formatting Project (since Fall 2010).

Chair of the Group of Experts on Commercial Fraud of the UNCITRAL Secretariat (2002-2008).

Chair of the Combating Commercial Fraud Colloquium sponsored by the United Nations Commission on International Trade Law and the UN Crime Unit. (2003).

# SEC EXPERT REPORT - EXHIBIT A

Co-Chair of the Combating Prime Bank and Hi-Yield Investment Fraud Steering Committees and Seminars  (2001-2006).

Consultant at the UNCITRAL Meeting in Vienna on Commercial Fraud (January 2007).

Consultant on Hi Yield Investment Scams for banks and governmental organizations, including the FBI, SEC, and U.S. Department of Justice.

Chair and Reporter, International Standby Practices Project (1994-1999) and Reporteur of the Council on International Standby Practices (since 1999).

Director, International Center for Letter of Credit Arbitration (since 1995).

Head, U.S. Delegation, United Nations Commission on International Trade Law of the Working Group on International Contract Practices on its work on the Convention on Independent Guarantees and Stand-by Letters of Credit (1988 to 1995).

Director, Institute of International Banking Law & Practice (since 1987).

Member, The International Academy of Consumer and Commercial Law (since 1996).

Chair, American Bar Association, Business Law Section, Letter of Credit Subcommittee of the Uniform Commercial Code Committee (1996 – 2000); Vice Chairman  (1994 – 2000).

Advisor, Drafting Group on the Revision of U.C.C. Article 5, National Conference of Commissioners on Uniform State Laws (1990 to 1995).

Editor-in-Chief, *Documentary Credit World*, monthly journal of letter of credit and bank guarantee law and practice (1997 to present).

Editor-in-Chief, *Letter of Credit Update*, monthly journal of letter of credit and bank guarantee law and practice (from 1985 to 1997).

Member, Editorial Board, Revista de la Contratación Electrónica, Spanish electronic commerce journal (since 1999).

Arbitrator between Council on International Banking, Inc., Mid-America Council on International Banking, Inc., and the Western Council on International Banking in facilitating the formation of U.S. Council on International Banking (now the International Financial Services Association).

Chairman, Task Force on the Revision of U.C.C. Article 5 of the American Bar Association's Letter of Credit Subcommittee of the Uniform Commercial Code Committee, Business Law Section and U.S. Council on International Banking, Inc. (1986 - 1990).

Talks and Presentations on International Banking Operations (including letters of credit, collections, bankers' acceptances and funds transfers, commercial fraud and electronic

2

# SEC EXPERT REPORT – EXHIBIT A

commerce) in Austria, Australia, Bahrain, Barbados, Belgium, Brazil, Canada, China, Costa Rica, Croatia, Cyprus, the Czech Republic, Denmark, France, Germany, Greece, Hong Kong, India, Ireland, Israel, Italy, Japan, Jordan, Lithuania, Macau, Malaysia, Mexico, the Netherlands, Norway, the Philippines, Russia, Saudi Arabia, Singapore, South Korea Sweden, Switzerland, Taiwan, Thailand, Turkey, the United Arab Emirates, the United Kingdom, and the United States.

Law School Courses Taught: Admiralty, Bankruptcy and Insolvency, Commercial Paper, Consumer Credit, Electronic Commerce, Electronic Contracting, Corporations, Insurance Law, International Banking Operations, International Commercial Transactions, Letters of Credit, Personal Property, Sales, Secured Transactions.

PUBLICATIONS [in chronological order from the present]:

*International Letter of Credit Law and Practice,* (Thomson Reuters, West) (1518 pages) (2011 Edition).

*2010 Annual Supplement*, Revised UCC Article 5: Letters of Credit and Article 5: Letters of Credit, Vol 6B, *Hawkland's Uniform Commercial Code Series* (Thompson Reuters, West) (2010).

*Overview of International Banking Law & Practice in 2010* in the *2011 Annual Review of Letter of Credit Law & Practice*, 3 (2010).

*2010 Case Law Survey* in the *2011 Annual Review of Letter of Credit Law & Practice*, 10 (2011).

Co-Editor, *2011 Annual Review of Letter of Credit Law & Practice* (Institute of International Banking Law and Practice) (760 pages) (2011).

(with James G. Barnes) *Letters of Credit, The Business Lawyer* vol. 65, no. 4, (August 2010).

*Overview of International Banking Law & Practice in 2009*, 2010 Annual Review of Letter of Credit Law & Practice (Institute of International Banking Law and Practice) (2010).

*2009 Case Law Survey* (Institute of International Banking Law and Practice), from *Annual Review of Letter of Credit Law & Practice* (2010).

*Introduction to Commercial Fraud* (Institute of International Banking Law and Practice) (267 pages) (2010).

(With Vincent M. Maulella, SOH Chee Seng, Alexander Zelenov) *UCP600: An Analytical Commentary.* (Institute of International Banking Law and Practice) (1462 pages) (2010).

Co-Editor, *2010 Annual Review of Letter of Credit Law & Practice* (Institute of International Banking Law and Practice) (2010).

# SEC EXPERT REPORT – EXHIBIT A

*International Letter of Credit Law and Practice,* (Thomson Reuters, West) (1420 pages) (2009-2010).

Co-Editor, *2009 Annual Review of Letter of Credit Law & Practice* (Institute of International Banking Law and Practice) (2009).

*Overview of International Banking Law & Practice in 2008*, 2009 Annual Review of Letter of Credit Law & Practice (Institute of International Banking Law and Practice) (2009).

*2009 Annual Supplement*, Revised UCC Article 5: Letters of Credit and Article 5: Letters of Credit, Vol 6B, *Hawkland's Uniform Commercial Code Series* (Thompson Reuters, West) (2009).

(with James G. Barnes) *Letters of Credit,* The Business Lawyer, Vol. 64, No. 4, August (2009).

Revised UCC Article 5: Letters of Credit and Article 5: Letters of Credit, Vol 6B, *Hawkland's Uniform Commercial Code Series* (Thompson Reuters, West) (2008).

Editor*, Contracts Texts: Restatement 2d Contracts, US UCC Article 2 & The CISG* (Institute of International Banking Law and Practice) (4th ed. 2008).

(with James G. Barnes) *Letters of Credit:  2007 Cases*, 63 Business Law 1329 (2008).

Co-Editor, *2008 Annual Survey of Letter of Credit Law & Practice* (Institute of International Banking Law and Practice) (2008).

*Overview of Letter of Credit Law & Practice in 2007*, 2008 Annual Survey of Letter of Credit Law & Practice (Institute of International Banking Law & Practice) (2008).

*UCP600, An Exercise in International Private Sector Self Regulation*, The International Commerce & Law Review, Vol 36, 47 (Dec 07).

*The Comparison of UCP600 & UCP500*, (Institute of International Banking Law and Practice) (252 pages) (2007).

Editor*, Restatement 2d Contracts and US UCC Article 2* (Institute of International Banking Law and Practice) (3rd ed. 2007).

(with James G. Barnes) *Letters of Credit:  2006 Cases*, 62 Business Law 1607 (2007).

*Negotiation in Letter of Credit Practice and Law: The Evolution of the Doctrine*, 42 Tex. Int'1 L.J. 3 (2007).

(with Lee H. Davis) *New Rules for Commercial Letters of Credit under UCP600*, 39 UCC L.J. 301 (2007).

Co-Editor, *2007 Annual Survey of Letter of Credit Law and Practice* (Institute of International Banking Law and Practice, 2007) (306 pages).

# SEC EXPERT REPORT – EXHIBIT A

*Overview of Letter of Credit Law & Practice in 2006*, 2007 Annual Survey of Letter of Credit Law & Practice (Institute of International Banking Law & Practice), 3 (2007).

*Contracting Out of Revised UCC Article 5 (Letters of Credit)*, 40 Loy. L.A. L.Rev. 297 (2006).

(with James G. Barnes) *Letters of Credit:  2005 Cases*, 61 Business Law 1591 (2006).

Co-Editor, *2006 Annual Survey of Letter of Credit Law and Practice* (Institute of International Banking Law and Practice, 2006) (496).

*Overview of Letter of Credit Law & Practice in 2005*, 2006 Annual Survey of Letter of Credit Law & Practice (Institute of International Banking Law & Practice), 3 (2006).

(with Linda J. Rusch) American Law Institute - American Bar Association Continuing Legal Education December 15-17, 2005 The New Uniform Commercial Code, *Hot Topics in Letter of Credit Law,* SL051 ALI-ABA 237.

(with James G. Barnes) *Letters of Credit:  2004 Cases*, 60 Business Law 1699 (2005).

Editor, *Restatement 2d Contracts and US UCC Article 2* (Institute of International Banking Law and Practice) (2nd ed. 2005).

Co-Editor, *2005 Annual Survey of Letter of Credit Law and Practice* (Institute of International Banking Law and Practice, 2005) (496 pages in press).

*Overview of Letter of Credit Law & Practice in 2004*, 2005 Annual Survey of Letter of Credit Law & Practice (Institute of International Banking Law & Practice), 3 (2005).

*Negotiability: The Doctrine and Its Application in US Commercial Law* (Institute of International Banking Law and Practice 2005).

(with Linda J. Rusch) American Law Institute - American Bar Association Continuing Legal Education December 9-11, 2004 The New Uniform Commercial Code, *Developments in Letter of Credit Law*, SK038 ALI-ABA 35

(with James G. Barnes) *Letters of Credit:  2003 Cases*, 59 Business Law 1619 (2004).

Editor, *LC Rules & Laws: Critical Texts 3rd Edition* (Institute of International Banking Law and Practice 2004).

Co-Editor, *2004 Annual Survey of Letter of Credit Law and Practice* (Institute of International Banking 2004) (420 pages).

*Overview of Letter of Credit Law & Practice in 2003*, 2004 Annual Survey of Letter of Credit Law & Practice (Institute of International Banking Law & Practice), 3 (2004),

# SEC EXPERT REPORT – EXHIBIT A

*Codification and Regulation of Letter of Credit Law*, a paper delivered to a congress of former Soviet states in Kazan, Russia and published in a major Russian banking journal whose name is written in Cyrillic characters,

*Ten Major Stages in the Evolution of Letter of Credit Practice (Part 1 of 2)*, Documentary Credit World November/December 2003, 28 (January 2004).

Co-Editor, *2003 Annual Survey Letter of Credit Law and Practice* (Institute of International Banking Law and Practice 2003) (411 pages).

*Overview of Letter of Credit Law & Practice in 2002*, 2003 Annual Survey of Letter of Credit Law & Practice (Institute of International Banking Law & Practice) 3, and reprinted in February 2003 Documentary Credit World, 25.

(with Dan Taylor) *ICC Guide to the eUCP* (ICC Publishing) (234 pages) (2003).

(with James G. Barnes) *Letters of Credit: 2002 Cases*, 58 Business Law 1605 (2003),

(with James G. Barnes) *Letters of Credit: 2001 Cases*, 57 Business Law 4 (2002),

Editor, *LC Rules and Laws: Critical Texts* (Institute of International Banking Law and Practice) (2nd ed. 2002).

*The Myth of Prime Bank Financial Investment Scams* (Institute of International Banking Law) (3rd Ed. 2002) (214 pages)

Co-Editor, *2002 Annual Survey of Letter of Credit Law and Practice* (Institute of International Banking 2002) (531 pages)

(with James G. Barnes) *Letters of Credit: 2000 Cases,* 56 Business Law 4 (2001)

(with James G. Barnes) *E-Commerce and Letter of Credit Law and Practice,* 35 Business Law  23 (2001)

Compiled and Published, *Restatement 2d Contracts & UNIDROIT Principles: Student Texts* (2001) (604 pages)

Wholesale Transfer of Funds, Chapter 23 of Kozolchyk & Molloy, United States Law of Trade and Investment (4 vols) (2001).

Co-Editor, 2001 Annual Survey Letter of Credit Law & Practice (Institute of International Banking Law 2001) (499 pages)

*ISP98 & UCP500 Compared*, Institute of International Banking Law and Practice (2000) (358 pages).

(with James G. Barnes) *Letters of Credit: 1999 Cases,* 55 Business Law. 2005 (2000).

6

# SEC EXPERT REPORT – EXHIBIT A

Preface to *Droit et Pratique De La Lettre De Credit Standby* by Jean-Laurent Anglade (2000).

*The Myth of Prime Bank Investment Scams* (2nd Edition Institute of International Banking 2000) (196 pages).

Co-Editor, *2000 Annual Survey of Letter of Credit Law & Practice* (Institute of International Banking 2000) (510 pages).

*Overview of 1999 Letter of Credit Law & Practices,* 2000 Annual Survey of Letter of Credit Law & Practice, 1.

Editor, *Standby LC Rules and Laws* (Institute of International Banking Law) (1999) (378 pages).

*The Myth of Prime Bank Financial Instruments,* 1999 Enforcement Law Reporter 178.

*International Standby Practices (ISP98).  Reporter.*  (Translated as of 1 June 2002 into Bulgarian, Chinese, Chinese (Taiwan), French, Greek, Hebrew, Italian, Korean, Portuguese, Russian, Spanish, and Turkish).

*The Original Documents Controversy (*160 pages) (1999).

*The Official Commentary on the International Standby Practices (ISP98)* (353 pages) (1999).

(with James G. Barnes & Amelia H. Boss) *The ABCs of the UCC Revised Article 5: Letters of Credit,* American Bar Association (1998) (75 pages).

(with James G. Barnes) *Letters of Credit: 1998 Cases*, 54 Bus. Law.  1885 (1999)*.*

*International Standby Practices (ISP98):  New Rules for Standby Letters of Credit*, 32 U.C.C.L.J. 149 (1999).

*Standby Rulemaking: A Glimpse at the Elements of Standardization and Harmonization of Banking Practice*, New Developments in International Commercial and Consumer Law (Ziegal, ed.), 135 (1998).

ISP98: *New Rules for Standby Letters of Credit*, TMA Journal 66 (Sept/Oct 1999).

*Defending the ISP,* Trade and Forfaiting Review (July/August 1999)

*ISP98: New Standby Rules,* Commercial Law Newsletter (July 1999)

Editor, 1999 Annual Survey of Letter of Credit Law & Practice  (Institute of International Banking Law & Practice 1999) (486 pages).

(with James G. Barnes) *Letters of Credit, 1997 Cases*, 1999 Annual Survey of Letter of Credit Law and Practice, 31 (1999).

# SEC EXPERT REPORT – EXHIBIT A

*Convention on Independent Guarantees,* Mercado Asegurador (May 1998).

*Overview of letter of Credit Law & Practice in 1998*, 1999 Annual Survey of Letter of Credit Law and Practice, 1 (1999).

*International Standby Practices ISP98,* (Institute of International Banking Law and Practice) (1998).

*New Rules for Standby Letters of Credit: The International Standby Practices/ISP98*, Business Credit Magazine (May 1998).

*ISP98: New Standby Rules,* Letters of Credit Report, Vol 13, No 4 (1998)

Editor, *1998 Annual Survey of Letter of Credit Law & Practice* (Institute of International Banking Law & Practice) (1998) (678 pages).

*Introduction: Overview of 1997 Letter of Credit Law & Practice,* 1998 Annual Survey Letter of Credit Law and Practice l (1998).

*Cross-Border Electronic Banking: Some Reflections on its Implications for Central Banks*, Current Legal Issues Affecting Central Banks, 121 (1998).

(with James G. Barnes) *Letters of Credit, 1996 Cases*, 52 Bus. Law 1547 (1997).

*Finality in Commercial Law: Some General Reflections*, American Bar Association (1997).

*Why New Draft Rules for Standbys are Necessary,* Documentary Credit Insight (Spring 1997).

*Revised UCC Section 5-108(e): A Constitutional Nudge to Courts*, 29 U.C.C. L.J. 419 (1997).

Editor, *1997 Annual Survey of Letter of Credit Law & Practice* (Institute of International Banking Law & Practice 1997) (615 pages).

*Introduction: Overview of 1996 Letter of Credit Law & Practice, 1997 Annual Survey of Letter of Credit Law & Practice 1.*

*Rules of Arbitration,* International Center for Letter of Credit Arbitrations, Inc. (ICLOCA) (1996) (35 pages).

(with Harold Burman) *Introductory Note to the UN Convention on Independent Guarantees & Stand-by Letters of Credit*, 35 International Legal Materials 735 (1996).

*An Overview of 12 C.F.R. Section 7.1016, Understanding the New OCC Interpretive Rulings 12 C.F.R. Section 7.1016 & 7.1017* (1996) (151 pages).

8

Brief of Amicus Curiae *In Re: Sarrio, S.A.* on Appeal to the United States Court of Appeals for the Second Circuit (Spring 1996).

(with James G. Barnes) *Letters of Credit: 1995 Cases*, 51 Bus. Law 1417 (1996).

Editor, *1996 Annual Survey of Letter of Credit Law & Practice* (Institute of International Banking Law & Practice 1996) (757 pages).

Brief of Amicus Curiae in *Banco General Ruminahui, S.A. v. Citibank International* on Appeal to the United States Court of Appeals for the Eleventh Circuit (Fall 1995).

(with James G. Barnes) *Letters of Credit: 1994 Cases*, 50 Bus. Law. 1577 (1995).

(with James G. Barnes) *Revision of U.C.C. Article 5*, 50 Bus. Law. 1449 (1995).

Brief of Amicus Curiae in *Koch Oil Company v. Committee of Creditors Holding Unsecured Claims Against Powerine Oil Company, Debtor in Bankruptcy* on Petition for Writ of Certiorari from the United States Supreme Court (Fall 1995).

Phantom Sugar Trade Analysis of Commodities Fraud: Sugar Fraud in Phantom Sugar Trade at 1 (1995).

Co-Editor, *1995 Annual Survey of Letter of Credit Law & Practice* (Institute of International Banking Law & Practice 1995) 686 pages.

*Treatment of Successors to the Beneficiary in Non Transferable Credits: In  support of an Alternative Approach* in 1994 Annual Survey of Letter of Credit Law & Practice at 365 (1994).

*Critical Issues in the International and Domestic Harmonization of Letter of Credit Law and Practice* in del Ducca & del Ducca (eds), *Commercial Law Annual 1995*, 389 (1995).

Brief of Amicus Curiae in *Banco Nazionale del Lavora v. SMS Hasenclever GmbH* on Petition to the Supreme Court of the United States (Fall 1994).

Editor, *1994 Annual  Survey of Letter of Credit Law & Practice* (Institute of International Banking Law & Practice 1994) (549 pages).

(with James G. Barnes) *Letters of Credit*, 49 Bus. Law. 1907 (1994).

*Domestic and International Harmonization of Letter of Credit Law: UCP, U.C.C. Article 5, and the UNCITRAL Convention--An Evaluation at Midstream* in del Ducca & del Ducca (eds) *Commercial Law Annual 1993*, 325 (1993).

*Formalities, Establishment, Liabilities and Obligations of Parties: An Overview* in *1993 Annual Survey of Letter of Credit Law & Practice*, 177 (1993).

Editor *1993 Annual Survey of Letter of Credit Law & Practice* (Institute of International Banking Law & Practice 1993) (439 pages).

9

# SEC EXPERT REPORT - EXHIBIT A

(with James G. Barnes) *Letters of Credit*, 48 Bus. Law. 1635 (1993).

*Standby Letter of Credit Rules: An Exercise in Drafting a Commercial Statute*, 9 Ariz. J. Int'l & Comp. L. 366 (1992).

(with James G. Barnes and Boris Kozolchyk) *National Law Center/Select Advisory Group Rules and Commentary on Standby Letters of Credit*, 9 Ariz J. Int'l & Comp 361-485 (1992).

*Fundamental issues in the Unification and Harmonization of Letter of Credit Law*, 37 Loyola L. Rev. 1 (1991).

(Preamble) *Present Problems with U.C.C. Article 5*, (*The Business Lawyer*) 45 (June 1990).

*The Revision of U.C.C. Article 5: A Strategy for Success*, 56 Brooklyn Law Review 13 (Spring 1990).

*The Revision of U.C.C. Article 5* (13 pgs.), Memorandum for the Executive Committee of the National Conference of Commissioners on Uniform State Laws, Feb. 5, 1990.

*Need to Harmonize Letter of Credit Law and Practice* pg. 5, *The Business Lawyer Update* (Jan./Feb. 1990).

Introduction to Kozolchyk, *Bank Guarantees and Letters of Credit; A Time for a Return to the Fold,* University of Pennsylvania Journal of International Business Law (Winter 1989).

*Review of Letter of Credit Operations in the U.S.* Government Information Services Press (1989) (51 pgs.).

Tribute to Boris Kozolchyk, 1988 Arizona Journal of International and Comparative Law 14.

*The 1983 Revision of the Uniform Customs and Practice for Documentary Credits,* 102 Banking L.J. 151 (1985).

*Electronic Trade Payment - U.S. Legal Perspective, Papers* Society for Worldwide Interbank Financial Telecommunication (S.W.I.F.T.) Annual Conference (S.I.B.O.S. '87) 47 (1987).

Co-author with Professor Robert A. Anthony, *Report to the Administrative Conference of the United States:  International Trade Commission Release of Confidential Information Under Protective Orders in Antidumping and Countervailing Duty Cases,* U.S. Administrative Conference *Recommendations and Reports 1984* 573.

Co-Author with Professor Robert A. Anthony, *Safeguarding Confidential Information in ITC Injury Proceedings:  Proposals to Reduce the Risks of Disclosure,* 17 *Law and Pol'y Int'l* Bus. 1 (1985).

*Letter of Credit*, 43 *The Business Lawyer* 1353 (1988).

# SEC EXPERT REPORT - EXHIBIT A

*Letters of Credit: Issuance, Establishment, Amendment, Revocation, Termination and Relationships Among Parties in Letters of Credit and Bankers' Acceptances 1988*, R. Ryan, Editor [Practicing Law Institute] 69.

*Performance of the Issuer's Obligations Upon Presentment of Documents in Letters of Credit and Bankers' Acceptances 1988*, R. Ryan, Editor [Practicing Law Institute] 489.

*Is the Law Worth What It Costs?* 1987 Journal of the Council on International Banking 22 (1987).

*The Doctrine of Negotiability and Its Application to U.S. Commercial Law.*

*UCP Guide to Revision in the Uniform Customs and Practice for Documentary Credits.* Government Information Services (1985).

*Partnerships and Corporations*, Friend, ed., *Actions and Remedies*, vol. 2 Callaghan & Co. (1986) (328 pages).

*Supplement*, Partnerships and Corporations, 2 Actions and Remedies, Callaghan & Co. (1987).

Editor, *Letter of Credit Executive Portfolio.* Government Information Services (1986).

*Introduction* to Kozolchyk, *Is Present Letter of Credit Law Up to Its Task?* 8 G.M.U.L. Rev. 286 (1986).

PAPERS AND PRESENTATIONS:

Moderator, 2011 Review of International Letter of Credit and Guarantee Practice, ICC Russia, St. Petersburg, Russia

Speaker, 2011 Standard Rules for Standbys and Demand Guarantees, IFSA, Palm Springs, Florida

Speaker, 2011China University of Political Science and Law, Beijing, China

Moderator, 2011 Letter of Credit Review, Taipei

Chair, 2011 Letter of Credit Review, Association of Banks in Singapore, Singapore

Chair, 2011 Letter of Credit Review, Taipei Academy, Association of Banks in Singapore, Taipei

Moderator, 2011 Annual Surveys of LC Law and Practice: Tampa, La Hulpe, Dubai, Hong Kong, Singapore

Moderator, 2011 Guarantee and Standby Forum:  London, Dubai, Hong Kong, Singapore, New York

# SEC EXPERT REPORT – EXHIBIT A

Speaker, 2011 *The Four Stages in the Electrification of Letters of Credit*, UNCITRAL Colloquium on Electronic Commerce

Speaker, 2010 *Two Party Letters of Credit and the Independence Principle*, International Academy of Commercial and Consumer Law

Chair, 2010 The New URDG 758: Compared with ISP98 & UCP600, Vnesheconombank, Moscow

Chair, 2010 The New URDG 758: Compared with ISP98 & UCP600, Erste Bank, Vienna

Chair, 2010 The New URDG 758: Compared with ISP98 & UCP600, National Bank of Canada, Montreal

Chair, 2010 The New URDG 758: Compared with ISP98 & UCP600, Bingham McCutchen LLP, New York

Moderator, 2010 Annual Surveys of LC Law and Practice: Tampa, Vilnius, Dubai, Hong Kong, Singapore, Kuala Lumpur

Moderator, 2010 Guarantee and Standby Forum:  London, Dubai, Hong Kong, Singapore, New York

Moderator, 2009 Annual Surveys of LC Law and Practice: Charlotte, San Francisco, Copenhagen, Dubai, Hong Kong, Singapore

Moderator, 2009 Guarantee and Standby Forum:  London, Dubai, Hong Kong, Singapore, New York

Moderator, 2008 Letter of Credit Law Summit: New York

Moderator, 2008 Annual Surveys of LC Law and Practice:  Tampa, Amsterdam, Dubai, Hong Kong, Singapore

Moderator, 2008 Guarantee and Standby Forum:  Sweden, Dubai, Hong Kong, Singapore, New York

Moderator, 2008 Letter of Credit Law Seminar:  Singapore

Speaker, IFSA Annual Meeting (28 September – 1 October 2008) Bonita Springs, FL

Speaker, 41st Annual Uniform Commercial Code Institute (27–29 April 2008) Washington, DC

Moderator, 2007 Letter of Credit Law Summit: New York

Moderator, 2007 Guarantee and Standby Forum:  New York

Speaker, IFSA Annual Meeting (16 – 19 September 2007) Orlando, FL

# SEC EXPERT REPORT - EXHIBIT A

Speaker, Developments in Commercial Fraud (May 2007, Beijing, China) for The National Office of Rectification and Standardization of Market Economic Order

Moderator, 2007 Annual Surveys of LC Law and Practice: Miami, Dubai, Vienna, Moscow, Korea, Hong Kong, Singapore

Speaker, Letters of Credit, *The New UCP600: Everything You Were Too Afraid to Know But Need to Ask About*, ABA Spring Meeting (March 2007)

Conducted a series of web based presentations:
Handling Extraneous Documents (March 2008)
Exclusions: UCP Article 12(b) (February 2008)
Introduction to Standbys and Guarantees (January 2008)
Update on Recent LC Cases for Bankers (November 2006)
Silent Confirmation (October 2006)
Implementation of UCP (June 2006)
Negotiation (May 2006)
Inoperative Conditions (April 2006)
New Chinese LC Rules (2006
Deferred Payment Undertakings (March 2006)
Oil Fluctuation Clauses (February 2006)

Conducted three separate UCP600 Training Series for Bankers, Lawyers, and Corporates in OnLine and replay format.

Presented a paper entitled *The Revision of UCP600* to the International Academy of Consumer and Commercial Law and at its bi annual 2006 meeting at the University of Texas.

Moderator, 2006 Letter of Credit Law Summit: New York

Speaker, IFSA Annual Meeting (10 – 13 September 2006) Fort Lauderdale, FL

(with James G. Barnes) Paper, *Letter of Credit Law*: 2006 Cases, IFSA Spring Meeting

Conducted a seminar on the Chinese Supreme People's Court adopted rules for letter of credit cases before the Chinese courts in Melbourne and Sydney, Australia with Judge Gao Xiang and mediated by Doctor Alan Davidson of the University of New South Wales (2006).

Revision of LC Practice, Kyoto, Japan: Using UCP600: New Rules for Letters of Credit, Doshisha University Law School (November 2006)

Panelist, United Nations Task Force on ID Theft at the 3rd Annual I.D. Theft Symposium sponsored by Strategic Research Institute (2006).

Speaker, Implementing UCP600 (July 2006) Singapore

# SEC EXPERT REPORT – EXHIBIT A

Speaker, Forum on New Rules Governing Letters of Credit, ICC Bahrain, May 2006

Moderator, 2006 Annual Surveys of LC Law and Practice: Dubai, Miami, Prague, Moscow, Singapore, Shanghai, Hong Kong, Mumbai

Moderator, 2005 Letter of Credit Law Summit: New York, London

Moderator, 2005 Commercial Fraud Seminars: Washington, DC, London

Moderator, 2005 Annual Surveys of LC Law and Practice: Dubai, Miami, Belgium, Moscow, Singapore, Shanghai, Hong Kong

Moderator, 2004 Annual Surveys of LC Law and Practice: Dubai, Miami, Goteburg, Shanghai, Hong Kong, and Singapore

Moderator, 2004 Letter of Credit Law Summit: New York, London

Moderator, 2003 Commercial Fraud Seminars: Washington, DC, London, Singapore

Moderator, 2003 Annual Surveys of LC Law and Practice: Washington, DC, Vienna, Shanghai, Hong Kong, and Singapore

Moderator, 2003 Letter of Credit Law Summit: New York

Speaker, International Standard Banking Practice: ISBP, ABA Section of Business Law (April 03) Los Angeles, CA

Speaker, Letter of Credit Legal Issues, IFSA 2002 Annual Conference (September 02) Fort Lauderdale, FL

UN Convention LC Subcommittee ABA (11 August 02) (Washington, DC)

ISP98 (19 July 2002) Thai Bankers Association

Moderator, 2002 Commercial Fraud Seminars: Washington, DC, London, Singapore

Moderator, 2002 Annual Surveys of LC Law and Practice: Washington, DC, Amsterdam, Beijing, Hong Kong, and Singapore

eUCP Seminars ICC (23 April 02) (Paris)

eUCP (22 April 02) ICC-Austria (Vienna)

eUCP (24 January 02) Singapore Bankers Association

Prime Bank Fraud (3 January 02) North American Security Administrators Association (NASAA)

Speaker, ISP98, (4 December 01) ICC Brazil

SEC EXPERT REPORT – EXHIBIT A

Speaker, Combating Hi Yield Financial Instrument Fraud, International Banking Security Association, (8 October 01) Toronto

Speaker, eUCP & LC Law Update, IFSA Annual Meeting (11 and 13 September 01) Scottsdale, Arizona

International Symposium on Letter of Credit Law & Practice (19-20 July 2001) Beijing

Symposium, "Responding to the Obstacles to Electronic Commerce in Latin America: Part I: Panel Reports: Panel VI: Financing Electronic Commerce: Security and Reliability", reported in Arizona Journal of International and Comparative Law (winter 2000)

Speaker, Letter of Credit Legal Issues, IFSA Annual Conference (September 2000)

Speaker, Identifying and Dealing with Fraudulent Documentation, International Law Congress (10 April 00)

ISP98 (20 November 2000) ICC-Turkey (Istanbul)

Speaker, Advanced Letters of Credit:  Issues and Challenges, NACM's 104th Credit Congress and Exposition (14 – 17 June 2000)

Panelist, "UNCITRAL and the Developing International Law of Electronic Commerce", New York City (24-25 February 2000)

Electronic Commerce (5 November 1999) Chase Manhattan Bank, Hong Kong.

International Standby Practices (2 November 1999) ICC Asia, Hong Kong.

Moderator, An Introduction to ISP98 (29 October 1999) N.Y.

Moderator, ISP98 for Lawyers (22 October l999) N.Y.

Moderator, Advanced ISP98 for Bankers (21 October 1999) N.Y.

Panelist in LC Legal Issues IFSA Annual Conference (14 October 1999) San Antonio, TX

Panelist, Responding to the Legal Obstacles to Electronic Commerce in Latin America: Banking Transactions (1 October 1999) O.A.S. Washington, D.C.

Speaker, Standby & Guarantee Practice (2 - 3 July 1999) University of Singapore Law School Singapore.
Speaker, ISP98 ICC (27 April 1999) Paris, France.

Chair, New Rules For Standbys ABA Bus. Law Section (17 April 1999) San Francisco, CA.

Chair, Annual Survey Letter of Credit Law & Practice (18 -19 March 1999 NY; 22 -23 March London).

# SEC EXPERT REPORT – EXHIBIT A

ISP98 Training Courses (Fall 98) Atlanta, Baltimore, Boston, Chicago, Columbus, Dallas, Detroit, Denver, Houston, Los Angeles, Miami, Memphis, New Orleans, New York, San Francisco, Seattle, Washington, D.C., Toronto, Vienna, London, Frankfurt, Milan, Athens, Zurich.

Panelist, ISP98 and Speaker:  Legal Issues Affecting LCS (15 October 1999) IFSA Annual Conference, Marco Island, Florida.

Panelist, UN Convention on Independent Guarantees & Strand-by LCs Panelist, ISP98 1st Inter American Conference On Banking Law (24 25 September 1998) Mexico City.

International Banking Operations Training Course (26 April - 2 May 1998) Goa, India.

Chair, 1998 Annual Survey of Letter of Credit Law & Practice (New York City, March 12 - 13, 1998).

Meeting, "Introduction and Explanation for the Rules for Standbys I.e. the International Standby Practices (the "ISP")" USCIB Education Workshop (4 December 1997)

*The Draft 1997 ISP, The Commission on Banking Technique & Practice*, International Chamber of Commerce, (3 November, 1997) Paris, France.

*Fraud in Letters of Credit*, Florida Bar Continuing Legal Education (16 October, 1997), Miami, Fla.

*International Standby Practices (ISP): Rules for Standby Letters of Credit*, International Petroleum Credit Association, (7 October, 1997) Marco Island, Fla.

*New Standby Rules: The International Standby Practices*, US Council on International Banking Annual Conference, (17 September, 1997) Palm Springs, Ca.

*Formation of a Commercial Law Association*, 25th Anniversary Ceremony of United Nations Commission on International Trade Law (26 May 1997) Vienna, Austria.

*New World Letters of Credit*, National Association of Credit Managers (14 May, 1997) Salt Lake City, Utah.

Meetings in Asia - *International Standby Practices*: Attended ICC Banking Commission meeting, Shanghai (April 7, 1997); Shanghai Banker's Association: *Developments in Letter of Credit Practice* (April 8, 1997); *Standby Letters of Credit*: Philippine Banker's Association and Financial Executives - Institute of the Philippines (April 11, 1997).

Chair, *Finality in Business Transactions*, ABA Section of Business Law (Boston, MA, April 4, 1997).

*ICLOCA Rules*; International Petroleum Credit Association (Tampa, FL, March 18, 1997).

Chair, 1997 Annual Survey of Letter of Credit Law & Practice (N.Y., March 13 - 14, 1997).

16

# SEC EXPERT REPORT - EXHIBIT A

*International Standby Practices*, USCIB (Miami, FL February 1997).

Meetings of U.S. Delegation and Secretary of UNCITRAL on ISP, ICLOCA, and UN Convention: Japanese Banker's Association (November 11, 1996); Bank of China, Beijing (November 13, 1996); Hong Kong Banks (November 15, 1996); Singapore Banker's Association (November 18, 1996).

ICLOCA Arbitration Rules & Point/Counterpoint on UCC Article 5 USCIB Annual Conference (Hilton Head, SC, October 28 - 30, 1996).

Letters of Credit and Bank to Bank Reimbursements, Senior Staff of Vnesheconombank (New York, September 20 - 24, 1996).

*The Formulation of Standby Letter of Credit Proceedings*, International Academy of Consumer & Commercial Law, Bar Ilan University (Israel, August 19, 1996).

Commentator on *Cross-Border Electronic Banking/EDI*, Seminar on Current Legal Issues Affecting Central Banks, International Monetary Fund (Washington, D.C. May 9, 1996).

*United Nations Convention on Independent Guarantees and Stand-by Letters of Credit and Other Legal Texts on International Payments and Banking*. CARICOM/UNCITRAL Regional Seminar on International Trade Law (Barbados, April 23 - 26, 1996).

*Payment Assurances - New Laws and Practices for Bank Guarantees and Standbys*. The 4th Gulf Economic Forum (Manama, Bahrain, April 8 - 10, 1996).

*The New OCC Letter of Credit Regulations Section 7.1016*: An Introduction to the Revision of 12 C.F.R. Section 7.1016  (New York, April 1, 1996).

Meeting, "Update on Working Group on Standby Practices and United Nations Commission on International Trade Law ("UNCITRAL") Convention on Independent Guarantees and Standbys" USCIB Education Workshop (March 27, 1996)

Chair, 1996 Annual Survey of Letter of Credit Law and Practice (New York, 14 - 15 March).

*An Overview of Letter of Credit Law and Practice and EDI*, University College Dublin, Faculty of Law (March 3, 1996, Dublin, Ireland).

*Disputes Involving Letters of Credit*. International Litigation and Arbitration Seminars, Baker & McKenzie (January 23, 1996, New York).

*Update on Working Group on Standby Practices and United Nations Commission on International Trade Law*. "UNCITRAL" Convention on Independent Guarantees and Standbys, USCIB (November 13, 1995, New York).

*Negotiability in an EDI Environment*: Letters of Credit and Cotton Warehouse Receipts, Worldwide Electronic Commerce (October 19, 1995, Bethesda, MD).

# SEC EXPERT REPORT - EXHIBIT A

*Letter of Credit Frauds and Scams*: Bankers' Compliance Group (12-14 September 1995, Anaheim, Ca; Monrovia, CA; Santa Clara, CA).

*Prime Bank Instruments*: Discerning Sound Investment Opportunities From Scams, (June 14, 1995, New York).

*Phantom Sugar Trade*: The Commodities Scam of the Year, (June 14, 1995, New York).

*Practice Rules for Standby Letters of Credit*, National Law Center for Inter-American Free Trade & the Mexican Bankers Association (31 May 1995, Mexico City).

Chair, 1995 Annual Survey of Letter of Credit Law and Practice (9 - 10 March, New York).

*Commercial Paper and Bank Collections under U.S. Law* (Contatos y el Codigo de Commercio Uniforme), Instituto Tecnologico Autonomo de Mexico (16 November 1994, Mexico City).

*Introduction to Letter of Credit Law and Practice*, Legal and Treasury management Staff of Mobil Oil Co. (24 August 1994, Fairfax, Va.).

R*egulation of Letters of Credit*, Staff of the Office of the Comptroller of the Currency (21 June 1994, Washington, DC).

*Assignment of Proceeds & Transfer; Prime Bank Instrument Fraud*, The Chartered Institute of Bankers (16 June 1994, Hong Kong).

*Issues in UCP 500,* The Macau Association of Banks (14 June 1994, Macau).

*The Impact of UCP 500 on Letters of Credit; Standby Letters of Credit; Letter of Credit Fraud--A Three Day Seminar*, Senior Supervisory Personnel, The Bank of China (6-8 June 1994, Beijing).

*Protecting Banks Against Fraud* (1-3 June 1994, Singapore).

*Issues & Problems in Applying UCP 500* (30-31 May 1994, Singapore).

Chair, 1994 Annual Survey of Letter of Credit Law & Practice (24-25 March 1994, New York).

*Letter of Credit Law Revision: UNCITRAL*, Annual meeting of the American Bar Association (9 August 1993).

*EDI & Negotiability: Cotton Warehouse Receipts*, Meeting on NAFTA Registries (17 May 1993, Tucson, AZ).

*U.C.C. Article 5*, Fairfax Bar Association Seminar on the U.C.C. (Fairfax, Va., 4 May 1993).

Chair, 1992 Annual Survey of Letter of Credit Case law Survey (West Coast) and *An Overview of L/C Developments* (14 May 1993 San Francisco, CA).

# SEC EXPERT REPORT - EXHIBIT A

*Current Revision of U.S. Letter of Credit Law*,  Forum Fur Internationales Wirtschaftsrecht of the Secretariat of the United Nations Commission on International Trade Law, Institute fur Zivil-, Handels- und Wertpapierrecht of the University of Vienna, and Abteilung fur Unternehmensrecht of the Wirtschaftsuniversitat Wien.   (3 Dec. 1992, Vienna, Austria).

*The Revision of the UCP,* NCITD International Trade Facilitation Council (June 24, 1992, Washington, DC).

*Analysis of U.S. Regulatory Actions Affecting Letter of Credit,* Roundtable of Views -- United Kingdom International Operation and Guarantee Community--The Byrne Group (March 9, 1992, London).

*Electronic Letters of Credit*, E.D.I. and the Law Conference (Feb. 26, 1991, Washington, DC).

Chair, 1992 Annual Letter of Credit Case law Survey & 1992- *An Overview of Letter of Credit Developments* & *Formalities, Establishment, Liabilities and Obligations of Parties* (19 February 1993, New York).

*Prospective International Rules Related to L/Cs*, A.B.A. Business Law Section (April 12, 1991, Williamsburg, VA).

*Legal Issues Relating to the Harmonization of Letter of Credit Law* and *Standby Letters of Credit and 3039 Fraud*, Roundtable of Views--United Kingdom International Operations and Guarantee Community--The Byrne Group (April 26, 1991, London).

*Revision of the UCP*, NCITD--The Trade Facilitation Council Annual Conference (June 19, 1991, Washington, DC).

*Vital Issues in the Reform of Letter of Credit Law and Practice*, USCIB Workshop on Letters of Credit and Bankers Acceptances (April 18, 1991, Newport Beach, CA).

*The Abolition of the U.C.C.*, Uniform Commercial Code Committee, A.B.A. (Aug. 11, 1991, Atlanta, GA).

*U.S. Efforts at International Harmonization of L/C Law*, A.B.A. Annual Meeting, Working Group on Letter of Credit Law Revision (Aug. 11, 1991, Atlanta, GA).

*U.C.C. Article 4A and Article 2A*, Guest Lecturer, The Judicial School of the Supreme Court of Costa Rica (La Escuela Judicial de la Corte Suprema de Justicia) (July 15-19, 1991, San Jose, Costa Rica).

*Survey of Letter of Credit Law and Practice*, Off Balance Sheet Risk Conference, Federal Financial Institutions Examinations Council (Feb. 1, 1991, Arlington, VA).

*Issues in Transfer and Assignment of Credits*, USCIB Forum on Letters of Credit Issues, (Nov. 19, 1990, New York City).

# SEC EXPERT REPORT - EXHIBIT A

Co-Chairman (with Professor Boris Kozolchyk), Symposium on The New World of Letters of Credit, New Orleans, Louisiana, Nov. 15-17, 1990; Talks: *The Scope of the UNCITRAL Effort*; *U.C.C. Revision--Estoppel, Warranty: How Should it Fit?* .

*Current Initiatives for the Harmonization of Laws Governing Letters of Credit and Bank Guarantees*, "Recent Developments in the Internationalization of Commercial Law", American Bar Association Annual meeting (Aug. 5, 1990, Chicago, Illinois).

Observer, Meeting of the Commission on Banking Technique and Practice of the International Chamber of Commerce (June 28, 1990, Hamburg, Germany).

Lecturer in Commercial Law, Virginia Judges Institute sponsored by the Supreme Court of Virginia (June 18, 1990, University of Virginia Law School).

*UNCITRAL: Uniform Law on International Bank Guarantees and Standby letters of Credit*, Secretary of State's Advisory Committee on Private International Law (May 4, 1990, Washington, D.C.).

*The State of Letter of Credit Law Reform* - NCITD - The Trade Facilitation Council (Apr. 19, 1990, Williamsburg, Virginia).

Moderator, A Multi-Dimensional Look at Trade Facilitation Through E.D.I. and *Letters of Credit and E.D.I.*  E.D.I.: Letters of Law, Data Interchange Standards Association, National Institute of Standards, and Accredited Standards Committee X12 (Feb. 15, 1990, Dallas, Texas).

U.S. State Department Study Group on Letters of Credit (Dec. 12-13, 1989, New York).

Second Roundtable of Views, United Kingdom International Operations & Guarantee Community, Academics, and Representatives of Government:
> - *Proposed Revision of U.C.C. Article 5*
> - *The Bill of Lading as a Security Device in International Trade Finance* (Dec. 12, 1989, London, England)

Invited Observer, Commission on Banking Techniques and Practices of the International Chamber of Commerce (Oct. 24, 1989, Paris).

Moderator, Seminar on New Directions for the Uniform Commercial Code, 1989 Annual Conference of the U.S. Council on International Banking (Oct. 23, 1988, Naples, Florida.

U.S. State Department Study Group on Letters of Credit (Sept. 18, 1989, New York).

*Standby Letters of Credit:  Current Issues*, Annual Workshop on Letters of Credit, U.S. Council on International Banking (June 15, 1989, New York City).

*Standby Letters of Credit* Annual Workshop, U.S. Council on International Banking (June 14, 1989, New York City).

20

# SEC EXPERT REPORT - EXHIBIT A

*Opportunities for Harmonization* Letter of Credit Workshop, U.S. Council on International Banking (May 10, 1989, Scottsdale, Arizona).

*An Answer to the Non Documentary Condition Dilemma*, Letter of Credit Workshop, USCIB Western Region, (May 10, 1989, Scottsdale, Arizona).

*L/Cs & Banks Independent Guarantees* A Roundtable with U.K. Bankers, Lawyers & Scholars hosted by SITPRO (Apr. 17, 1989, London, England).

Roundtable of Views - United Kingdom International Operations & Guarantee Community, and Academics and Government Representatives: *Standby Letters of Credit* (Apr. 17, 1989, London).

American Bar Association, Business Law Section *UNCITRAL and International Commercial Law* Moderator, Report of the Article 5 Task Force and *Non Documentary Conditions* (Mar. 30, 1989, Houston, Texas).

*Revision of U.C.C. Article 5*, Paper at the Annual Section Meeting of the Section Business, Banking and Corporation Law of the American Bar Association (Mar. 25, 1988, Philadelphia).

*Issuance and Termination of Letters of Credit*, Seminar on Letters of Credit and Bankers' Acceptances, Practicing Law Institute, (Mar. 10, 1988, New York City).

*Performance*, Seminar on Letters of Credit and Bankers' Acceptances, Practicing Law Institute (Mar. 10, 1988, New York City).

Chairman, Symposium on the Future of International Banking Operations:  An Agenda for the 21st Century (June 16-17, 1988, World Trade Center, New York City).

*Arbitration and Letters of Credit* and *A New Approach to Strict Compliance*, Opportunities in International Banking Operations:  An Agenda for the 21st Century (June 18, 1988, New York City).

*U.C.P. Article 43 & 65  A Guideline in Need of Guidance*, 1988 Annual Conference, U.S. Council on International Banking (Nov. 3, 1988, Tucson, Arizona).

*The Revision of U.C.C. Article 5*.  19th Annual Conference of Council on International Banking, (Oct. 6, 1987, Charleston, South Carolina).

*Telematics in Trade: U.S. Legal Perspective*.  10th Annual Conference (S.I.B.O.S.) of Society for Worldwide Interbank Financial Telecommunications (S.W.I.F.T.) (Sept. 8, 1987, Montreal, Canada).

*The Status of the Revision of U.C.C. Article 5*, Letter of Credit Subcommittee of the American Bar Association's U.C.C. Committee, A.B.A. Annual Meeting (Aug.10, 1987, San Francisco, California).

# SEC EXPERT REPORT – EXHIBIT A

*The Cost of Injunctive Relief*.  Annual Letter of Credit Workshop, Western Council on International Banking (May 7, 1987, Scottsdale, Arizona).

*The State of Letter of Credit Law and Practice:  Problems and Opportunities*.  Council on International Banking, (Feb. 20, 1987, New York City).

*An Overview of Letter of Credit Law*.  Annual Letter of Credit Workshop, Western Council on International Banking (May 8, 1986, San Diego, California).

*Update on Letter of Credit Law*.  Financial Institutions Law Seminar, Florida Bar Association and Consumers Bankers Association (Feb. 21, 1986, Ft. Lauderdale, Florida).

*The Reaction of the Business Community:  An Empirical Approach*.  Forum on the Convention of the International Sales of Goods, International Law Society, George Mason University School of Law (Apr. 8, 1984, Arlington, Virginia).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil No. 11-cv-02132 (RMC)** |
| | : | |
| **THE MILAN GROUP, INC., a/k/a THE** | : | |
| **MILAN TRADING GROUP, INC., et al.,** | : | |
| | : | |
| **Defendants,** | : | |
| | : | |
| **And** | : | |
| | : | |
| **MIA C. BALDASSARI, et al.,** | : | |
| | : | |
| **Relief Defendants.** | : | |

---

## CERTIFICATE OF SERVICE

The undersigned counsel for the plaintiff hereby certifies that a copy of the Expert Report of Professor James E. Byrne and accompanying exhibits was served this 4th day of September, 2012, on the following defendants via e-mail:

Frank L. Pavlico III, a/k/a Frank Lorenzo
113 Upland Terrace
Clark's Summit, PA 18411
pavlico111@gmail.com

      Pro Se

William P. Opeil Jr.
109 Shady Lane Dr.
Dickson City, PA 18447
570-383-0077
opeillaw@gmail.com

      Counsel for The Milan Group, Inc. and The Julian Estate

Christopher F. Robertson

Seyfarth Shaw LLP
Two Seaport Lane
Suite 300
Boston, MA 02210
617-946-4989
617-790-6774 (fax)
crobertson@seyfarth.com

Alan I. Baron
Seyfarth Shaw LLP
975 F St., NW
Washington, D.C. 2004-1454
202-828-3589
202-641-9189 (fax)
abaron@seyfarth.com

   Counsel for Defendant Brynee Baylor

Vincent P. (Trace) Schmeltz III
Barnes & Thornburg LLP
One North Wacker Dr.
Suite 4400
Chicago, IL 60606-2833
tschmeltz@btlaw.com

Gregory S. Gistenson
Barnes & Thornburg LLP
One North Wacker Dr., Suite 3300
Chicago, IL 60606-2833
312-214-4573
312-357-1313
Gregory.gistenson@btlaw.com

   Counsel for Defendants Dawn Jackson and Baylor & Jackson PLLC

Christopher B. Jones, Esquire
Christopher B. Jones, P.C.
406 Jefferson Avenue
Scranton, PA 18510
(570) 342-9295 (phone)
(570) 955-0340 (fax)
cbjlaw@comcast.net

   Counsel for Defendant Mia C. Baldassari

Gerard J Martillotti
JERRY MARTILLOTTI & ASSOCIATES
P.O. Box 18509
4221 Ridge Avenue
Philadelphia, PA 19129
(215) 849-9040
Fax: (215) 849-9042
Email: gjm15@verizon.net

John Zohlman
Hagner & Zohlman
1820 Chapel Avenue West, Suite 160
Cherry Hill, NJ 08002
jzohlman@hzlawpartners.com

     Counsel for Defendants Brett A. Cooper and Global Funding Systems

Patrick T. Lewis                   :
570 South 250 East
Richmond, Utah 84333
patlewis70@msn.com
     Pro Se

Not served because in default or no appearance has been made: GPH Holdings.

               /s/James A. Kidney