## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 11-2132 (RMC) |
| MILAN GROUP, INC., *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## OPINION

The Securities and Exchange Commission sued The Milan Group, Inc., the law firm Baylor & Jackson, P.L.L.C., and certain individuals as "Principal Defendants" for conducting an alleged securities fraud from which victims suffered losses amounting to millions of dollars. SEC also named certain "Relief Defendants"—that is, persons who allegedly received money resulting from the fraudulent activities but who are not charged with personally engaging in the fraud. SEC seeks disgorgement from both sets of defendants for restitution to the victims. SEC moves for summary judgment. For the reasons stated below, SEC's motion will be granted in part and denied in part. Relief Defendant Mia Baldassari's cross-motion for summary judgment and for release of funds will be denied.

## I. FACTS

### A. Background

The Securities and Exchange Commission complains that the Principal Defendants—The Milan Group, Inc. a/k/a The Milan Trading Group, Inc. (Milan); Frank Pavlico III a/k/a Frank Lorenzo (Pavlico); Brynee K. Baylor; and through Ms. Baylor, her law firm Baylor & Jackson P.L.L.C.—made untrue statements of material fact or omitted to state material

facts in connection with the sale of securities in violation of Section 17(a) of the Securities Act of 1933 (Securities Act), 48 Stat. 74, *codified at* 15 U.S.C. § 77a *et seq.*; Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), Pub. L. 73-291, 48 Stat. 881, *codified at* 15 U.S.C. § 78a *et seq.*; and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. *See* Am. Compl. [Dkt. 53] ¶¶ 62–65 (Count I, Section 10(b) and Rule 10b-5), ¶¶ 68–70 (Count III, Section 17(a)). Alternatively, Mr. Pavlico, Ms. Baylor, and Baylor & Jackson are alleged to have aided and abetted Milan's violation of these statutes and the Rule. Am. Compl. ¶¶ 66–67 (Count II, aiding and abetting violations of Section 10(b) and Rule 10b-5), ¶¶ 71–72 (Count IV, aiding and abetting violation of Section 17(a)).

SEC also complains that all Principal Defendants offered and sold securities without a registration statement or exemption from registering in violation of Sections 5(a) and 5(c) of the Securities Act. *Id.* ¶¶ 73–76 (Count V, Sections 5(a) and 5(c)). Alternatively, Ms. Baylor and her law firm are alleged to have aided and abetted these violations. *Id.* ¶¶ 77–78 (Count VI, aiding and abetting violations of Sections 5(a) and 5(c)). Finally, SEC complains that Mr. Pavlico and Ms. Baylor induced, or attempted to induce, the purchase or sale of a security by an unregistered broker or dealer in violation of Section 15(a) of the Exchange Act. *Id.* ¶¶ 79–81 (Count VII, Section 15(a)).

Relief Defendants Mia Baldassari; Dawn Jackson; Brett Cooper and his former business, Global Funding Systems, Inc. (referred to in some materials as GFS); Patrick T. Lewis and his former business, GPH Holdings LLC (referred to in some materials as GPH); and The Julian Estate, Inc., a Pennsylvania company incorporated by Pavlico, are alleged to have received funds from defrauded investors through the Principal Defendants without providing any legitimate product or service. *Id.* ¶¶ 21, 82–83.

SEC asks the Court to enjoin the Principal Defendants from further violations; to order them to disgorge all proceeds from their fraud, with interest; to bar them from serving as officers or directors of any public company; and to order them to pay a large civil penalty. SEC asks the Court to exercise its equitable powers to order the Relief Defendants to disgorge the funds they received from the Principal Defendants, with interest.

### B. The Alleged Prime Bank Scheme

SEC alleges that the Principal Defendants defrauded at least 13 investors out of $2.665 million in a "Prime Bank" scheme that operated from August 2010 through November 2011. Am. Compl. ¶¶ 22–29, SEC MSJ Mem. [Dkt. 109-2] at 3–7. Mr. Pavlico and Ms. Baylor (and, therefore, Milan and Baylor & Jackson) are alleged to have lured investors into the scheme by offering extraordinary returns ranging from 180% to 2400% per year at little to no risk. The purported investment involved the purchase or lease of bank instruments, including "standby letters of credit," "bank guarantees," or "medium term notes," all of which were to be "leveraged" to increase their value and then "monetized" or "traded" to generate extraordinary returns. SEC MSJ Mem. at 3–4.

Calling himself Frank Lorenzo,[1] Mr. Pavlico initiated this scheme in 2010. He created Milan and recruited Ms. Baylor as his lawyer, who then allegedly used her position as an attorney to give an aura of legitimacy to the "investments." Among other things, Ms. Baylor is

---

[1] Mr. Pavlico's legal name is Frank Pavlico, III. He pled guilty to conspiracy to conduct financial transactions involving proceeds of drug trafficking in violation of 18 U.S.C. § 371 in U.S. District Court for the Middle District of Pennsylvania on February 8, 2007. *United States v. Pavlico*, No. 3:07-cr-00052-JMM (M.D. Pa. Feb. 8, 2007) (plea agreement, ECF No. 2). The charges arose from Mr. Pavlico's alleged role in laundering the profits of marijuana trafficking earned by a co-conspirator, including by facilitating transfers of currency, gold, and silver in small amounts to avoid reporting requirements. *See United States v. Pagnotti*, No. 3:05-cr-00064-TIV (M.D. Pa. Nov. 8, 2006) (2d superseding indictment, ECF No. 116). Mr. Pavlico was sentenced to ten months of incarceration, to be followed by three years of supervised release.

alleged to have told investors that she had known Mr. Pavlico for years, that Mr. Pavlico and

Milan had previously completed numerous successful bank instrument transactions at great

investor profit for years, that investors' funds would remain in escrow in her law firm's IOLTA

account,[2] that Milan and Mr. Pavlico offered a great investment opportunity that she had

validated, and that she and Mr. Pavlico were working in the best interests of the investors.  *See*

SEC MSJ Mem. at 3–7.  For example, SEC cites a September 15, 2011, telephone call between

Mr. Pavlico and agents of the Federal Bureau of Investigation acting as investors, in which Mr.

Pavlico assured the FBI:  "And you can speak to our attorneys, too, and they'll let you know of

the credibility of who we are. . . .  They were just involved in the 15 million. . . .  They actually

speak to the bankers.  They actually—they know everybody.  They know everything.  We don't

do anything without them."  SEC MSJ, Decl. Christopher McLean (McLean Decl.) [Dkt. 109-4],

Exs. 1–68 [Dkts. 109-5 to -17] (SEC Exs.), SEC Ex. 35, Dep. of Frank Pavlico, at 98–99.

SEC contends that the bank instruments were fictitious; that no victim's money

was ever invested anywhere; that almost all of the money went immediately to the pockets of the

Principal Investors or, to a lesser extent, to the Relief Defendants; that investors were lulled for

more than a year into believing that successful bank transactions were underway; and that Ms.

Baylor became the chief contact assuring suspicious investors of hard work on their behalf after

time passed with no return.  By December 1, 2011, when the scheme was terminated by this

Court's temporary restraining order, *see* Dkt. 4, and preliminary injunction, *see* Dkt. 22, the

---

[2]  IOLTA stands for Interest on Lawyer Trust Accounts.  When lawyers hold client monies, the
funds are held in trust for the client.   When these amounts are small or to be held only
temporarily, amounts from multiple lawyers can be pooled into an interest-bearing account held
in trust.   All states and the District of Columbia now have IOLTA programs, which customarily
use the IOLTA interest revenue to provide grants to legal-aid organizations.  *See generally*
*Brown v. Legal Found. of Wash.*, 538 U.S. 216, 220 (2003); D.C. R. Prof. Conduct 1.15.

Principal Defendants and Relief Defendants had allegedly received and spent the following amounts:

| | |
|---|---|
| Baylor and Jackson (Baylor) | $ 746,266 |
| Milan (Pavlico) | $ 1,318,734 |
| GFS (Cooper) | $ 225,000 |
| GPH (Lewis) | $ 375,000 |
| **TOTAL:** | **$ 2,665,000** |

SEC MSJ Mem. at 7.

After the case was filed, SEC dismissed the case against three other Relief Defendants, Susan C. Kevra-Shiner, the Law Office of Susan Kevra, and Elmo Baldassari, upon satisfaction that they no longer held any improperly gained benefits of the fraud. *See* SEC Partial Mot. Dismiss [Dkt. 52]; Minute Order dated Feb. 27, 2012 (granting SEC motion to dismiss). SEC then filed a Motion for Summary Judgment or Default Judgment on November 15, 2012. *See* SEC MSJ [Dkt. 109]. Some of the remaining Principal and Relief Defendants are no longer contesting SEC's allegations. A default judgment was entered against Relief Defendant GPH Holdings, LLC, on November 14, 2012. *See* [Dkt. 110]. Default judgment was also entered against Relief Defendant Global Funding Systems, Inc. *See* [Dkt. 137]. SEC and Relief Defendant Dawn Jackson, Ms. Baylor's former law partner, settled all disputes between them with an agreement that Ms. Jackson is liable for $153,000 of disgorgement and $9,410 in prejudgment interest, to be repaid only upon sale of certain property Ms. Jackson owns in the Bahamas. *See* Redacted Jackson Final J. [Dkt. 164].

SEC filed a Notice of Defendant Death on December 12, 2012, notifying the Court and all parties of the death of Principal Defendant Frank Pavlico.[3] *See* [Dkt. 117]. Mr.

---

[3] Mr. Pavlico was facing charges for wire fraud in violation of 18 U.S.C. § 341 for the same conduct underlying this case in the U.S. District Court for the District of South Carolina. *See United States v. Pavlico*, No. 8:11-cr-2361-TMC (D.S.C. Dec. 13, 2011) (indictment). According to the docket in that case, Mr. Pavlico was on release from custody pending trial, but

Pavlico's estate was substituted as a party, *see* Minute Order dated Jan. 18, 2013, and the executrix of Mr. Pavlico's estate has filed a response to SEC's motion stating, in part:

> As prior to his death Frank L. Pavlico a/k/a Frank Lorenzo asserted his Fifth Amendment right against self incrimination, the Estate of Frank L. Pavlico, III has no objection to Plaintiff's Motion for Summary Judgment.[4]

[Dkt. 131]. Judgment will be entered against Mr. Pavlico's estate.

Judgment will also be entered against the three entities that filed answers in the case but have ceased defending: Principal Defendants Milan and Baylor & Jackson and Relief Defendant The Julian Estate. *See* Joint Answer to Amended Complaint by Milan and Julian Estate [Dkt. 60], Answer to Amended Complaint by Baylor & Jackson, P.L.L.C. [Dkt. 65]. Milan and Baylor & Jackson have collapsed. Mr. Pavlico formed The Julian Estate to purchase a house using funds obtained from the Prime Bank fraud, *see* SEC MSJ Mem. at 2 n.1; that entity has also not defended this case since entering its answer. Because Milan, Baylor & Jackson, and The Julian Estate have not responded to SEC's motion for summary judgment, the motion is deemed conceded as to those defendants.[5] *See* LCvR 7(b).

---

the United States moved to revoke his bond due to allegations that Mr. Pavlico failed to advise a potential client/investor of the pending criminal charges. (That same conduct led SEC to file a motion for an order to Mr. Pavlico and Ms. Baldassari to show cause in this case. *See* [Dkts. 114, 115].) Mr. Pavlico failed to appear for the bond revocation hearing and was arrested in Pennsylvania. A magistrate judge for the U.S. District Court for the Middle District of Pennsylvania released Mr. Pavlico on December 11, 2012, and ordered him to appear in South Carolina the next day. *United States v. Pavlico*, No. 5:12-mj-00116-MEM (M.D. Pa. Dec. 12, 2012) (release order, ECF. No. 5). Mr. Pavlico committed suicide at his home that night.

[4] The executrix—Ms. Kevra-Shiner, the former Relief Defendant—initially appeared *pro se*. After the Court advised her that administrators or executors may only appear *pro se* in limited circumstances, Ms. Kevra-Shiner retained Dominic Vorv as counsel for the estate. The Court then gave Mr. Vorv an opportunity to file any supplement to the estate's response to SEC's motion for summary judgment, which he did not do.

[5] Moreover, for the reasons stated in this Opinion, SEC has shown that Milan and Baylor & Jackson are liable as Principal Defendants for the Prime Bank fraud perpetrated by Mr. Pavlico

Thus, presently remaining for adjudication are the arguments of the remaining persons who oppose SEC: Principal Defendant Brynee Baylor and Relief Defendants Mia Baldassari, Patrick Lewis, and Brett Cooper.

## II. LEGAL STANDARDS

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely

---

and Ms. Baylor. In addition, SEC has shown that Mr. Pavlico formed The Julian Estate to purchase 113 Upland Terrace in Clarks Summit, Pennsylvania, using $409,482 in ill-gotten gains from the Milan scheme. *See* SEC Ex. 42.

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477

U.S. at 249–50 (citations omitted).

### B. Counts I through IV—Principal Defendants—Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5

#### 1. Primary Violation

Together, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act,

and Rule 10b-5 proscribe fraud touching on the purchase or sale of a security in the United

States. *See SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 75–76 (D.C. Cir. 1980). Under Section

2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Exchange Act, 15

U.S.C. § 78c(a)(10), "security" includes "investment contracts," which the Supreme Court has

defined as (1) an investment of money, (2) in a common enterprise, (3) with profits to be derived

from the entrepreneurial or managerial efforts of others. *SEC v. W. J. Howey & Co.*, 328 U.S.

293, 301 (1946); *see also SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992).

As interpreted by the courts, these antifraud provisions promote the informational

integrity of securities transactions. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), provides:

> It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement . . . by the use of any means or instruments of

transportation or communication in interstate commerce or by use of the mails, directly or indirectly[:] (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Rule 10b-5, 17 C.F.R. § 240.10b-5, states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) [t]o employ any device, scheme, or artifice to defraud,

(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Sections 17(a)(1) and 10(b) and Rule 10b-5 essentially have the same elements.

To prove a primary violation, SEC must show that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Familant*, 910 F. Supp. 2d 83, 92 (D.D.C. 2012) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).[6]  Materiality means "a substantial likelihood that a reasonable

---

[6] Courts formulate these elements in different ways.  *See SEC v. May*, 648 F. Supp. 2d 70, 77 (D.D.C. 2009) (requiring the SEC to show that a defendant "(1) made a misrepresentation, or an omission (where there was a duty to speak), or other fraudulent device; (2) that was material in the case of a misrepresentation or omission; (3) in connection with the sale or purchase of a security; (4) . . . acted with scienter; and (5) the involvement of interstate commerce, the mails or

shareholder would consider it important in deciding how to vote." *Basic Inc. v. Levinson*, 485

U.S. 224, 231–32 (1998) (internal quotation and citation omitted). "[I]f there is a substantial

likelihood that a reasonable investor would have viewed the misleading or omitted fact as

'significantly alter[ing] the total mix of information,' it is material." *Rockies Fund, Inc. v. SEC*,

428 F.3d 1088, 1096 (D.C. Cir. 2005) (quoting *Basic*, 485 U.S. at 231–32). For the "connection"

element, what is important is that there be a link between the alleged fraud and a securities

transaction—*i.e.*, it is enough that the fraud "touch" the sale of a security. *See Superintendent of*

*Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971); *see also SEC v. Tex. Gulf*

*Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) ("Rule 10b-5 is violated whenever assertions are

made . . . in a manner reasonably calculated to influence the investing public.").

　　　　　To prove the scienter element of a claim under Section 17(a)(1), Section 10(b),

and Rule 10b-5, SEC must show that the primary defendant "acted with an 'intent to deceive,

manipulate, or defraud.'" *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992) (quoting *Ernst*

*& Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). The D.C. Circuit has "determined, along

with a number of other circuits, that extreme recklessness"—"'a lesser form of intent,'" but more

than ordinary negligence—satisfies this scienter element. *Id.* at 641–62 (quoting *Sanders v. John*

*Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977); other citations omitted). SEC must show an

"extreme departure from the standards of ordinary care" that "presents a danger of misleading

buyers or sellers that is either known to the defendant or is so obvious that the actor must have

been aware of it." *Id.* (quoting *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045

(7th Cir. 1977)); *see also Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008)

---

a national security exchange." (quoting *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 714
(D.N.J. 2005))).

(*Steadman* refers to a "danger [that] was so obvious that the actor was aware of it and consciously disregarded it").

Sections 17(a)(2) and (a)(3) require SEC to show essentially the same elements, with one exception: they do not require a showing of scienter. *See Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006). Instead, "[p]roof of negligence is sufficient to establish a violation of these provisions." *Id.* (citing *Aaron v. SEC*, 446 U.S. 680, 697, 701–02 (1980)).

## 2. Aiding and Abetting

The relevant aiding and abetting provision of the Exchange Act, Section 20(e), 15 U.S.C. § 78t(e), is substantially identical to the relevant aiding and abetting provision of the Securities Act, Section 15(b), 15 U.S.C. § 77*o*(b). Each states that "any person that knowingly or recklessly provides substantial assistance to another person . . . shall be deemed to be in violation . . . to the same extent as the person to whom such assistance is provided."

"[T]hree principal elements are required to establish liability for aiding and abetting a violation of section 10(b) and Rule 10b-5: (1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter'—i.e., that she rendered such assistance knowingly or recklessly." *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000) (surveying law of other circuits); *see also SEC v. May*, 648 F. Supp. 2d 70, 78 (D.D.C. 2009) ("The scienter element for aiding and abetting requires a showing that [the aider-and-abettor] 'knowingly' provided substantial assistance."). "A secondary violator may act recklessly, and thus aid and abet an offense, even if he is unaware that he is assisting illegal conduct." *Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004). Scienter "may be found if the alleged aider and abettor encountered 'red flags,' or 'suspicious events creating reasons for doubt' that should have

alerted him to the improper conduct of the primary violator." *Id.* (quoting *Graham*, 222 F.3d at

1006).

### C.  Counts V and VI—Principal Defendants—Sections 5(a) and 5(c)

Section 5 of the Securities Act requires putative securities issuers to register

securities with SEC before offering them for sale unless an exemption applies.  Section 5(a),

codified at 15 U.S.C. § 77e(a), prevents sale or delivery until the registration statement is

effective.  That section states:

> Unless a registration statement is in effect as to a security, it shall
> be unlawful for any person, directly or indirectly (1) to make use
> of any means or instruments of transportation or communication in
> interstate commerce or of the mails to sell such security through
> the use or medium of any prospectus or otherwise; or (2) to carry
> or cause to be carried through the mails or in interstate commerce,
> by any means or instruments of transportation, any such security
> for the purpose of sale or for delivery after sale.

Section 5(c), codified at 15 U.S.C. § 77e(c), bars any offer to sell or buy securities

prior to the registration statement being filed:

> It shall be unlawful for any person, directly or indirectly, to make
> use of any means or instruments of transportation or
> communication in interstate commerce or of the mails to offer to
> sell or offer to buy through the use or medium of any prospectus or
> otherwise any security, unless a registration statement has been
> filed as to such security, or while the registration statement is the
> subject of a refusal order or stop order or (prior to the effective
> date of the registration statement) any public proceeding or
> examination under section 77h of this title.

To show a violation of Sections 5(a) and 5(c), the SEC must show "that the

investments offered are securities, and that the Defendants offered or sold these securities

without first filing a registration statement."  *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 10–

11 (D.D.C. 1998).  "Once participation in an unregistered sale has been shown," the burden of

showing that the securities were covered by an exemption, such as Securities Act Section 4(1)

(exempting "transactions by any person other than an issuer, underwriter, or dealer," 15 U.S.C.

§ 77d(1)), shifts to the defendant. *Zacharias v SEC*, 569 F.3d 458, 464 (D.C. Cir. 2009) (citing

*SEC v. Ralston Purina*, 346 U.S. 119, 126 (1953)). "There is . . . no scienter requirement under

Section 5." *SEC v. Parkersburg Wireless Ltd. Liab. Co.*, 991 F. Supp. 6, 9 (D.D.C. 1997)

(rejecting argument that "since [the defendant] had no idea that the units he was selling were

securities, he should not be held accountable to the SEC").

   The aiding and abetting provision relevant to a Section 5 violation is Section

15(b) of the Securities Act, 15 U.S.C. § 77*o*(b), which provides that "any person that knowingly

or recklessly provides substantial assistance to another person in violation of a provision of this

subchapter, or of any rule or regulation issued under this subchapter, shall be deemed to be in

violation of such provision to the same extent as the person to whom such assistance is

provided."

### D.  Count VII—Section 15(a)

   15 U.S.C. § 78*o*(a) codifies Section 15(a) of the Exchange Act, which prohibits a

broker from undertaking any securities transaction without being registered with SEC or being

associated with a registered broker-dealer.  Section 15(a) states:

> (1) It shall be unlawful for any broker or dealer which is either a
> person other than a natural person or a natural person not
> associated with a broker or dealer which is a person other than a
> natural person (other than such a broker or dealer whose business
> is exclusively intrastate and who does not make use of any facility
> of a national securities exchange) to make use of the mails or any
> means or instrumentality of interstate commerce to effect any
> transactions in, or to induce or attempt to induce the purchase or
> sale of, any security (other than an exempted security or
> commercial paper, bankers' acceptances, or commercial bills)
> unless such broker or dealer is registered in accordance with
> subsection (b) of this section.
>
> (2) The Commission, by rule or order, as it deems consistent with
> the  public  interest  and  the  protection  of  investors,  may

conditionally or unconditionally exempt from paragraph (1) of this subsection any broker or dealer or class of brokers or dealers specified in such rule or order.

A broker is a person "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). "The broker-dealer registration requirement serves as the keystone of the entire system of broker-dealer regulation." *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (internal quotation marks and citation omitted). SEC "need not prove the broker's scienter to establish a violation of Section 15(a)." *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003).

### E.  Liability of Relief Defendants

SEC's claims against the Relief Defendants rest on the Court's equitable powers to order disgorgement of the profits of securities fraud even from persons who are not alleged to have been involved in the fraud themselves. *See* 15 U.S.C. § 78u(d)(5) ("[A]ny Federal court may grant[ ] any equitable relief that may be appropriate or necessary for the benefit of investors."). A federal court "may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998) (citing *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998)); *see also Zacharias,* 569 F.3d at 471. Relief defendants are "joined to aid the recovery of relief" because they have "no ownership interest in the property [that] is the subject of litigation." *SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (quoting *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991)). The disgorgement amount only needs to be a "reasonable approximation of profits causally connected to the violation." *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).

# III. ANALYSIS

## A. The Fraudulent Securities

SEC has submitted a lengthy Expert Report of Professor James E. Byrne, Dkt. 136 ("Byrne Rep."), which is uncontested by any remaining Defendant. The Court notes that Professor Byrne has been accepted as an expert "on commercial and financial investment fraud, banking operations, and standby letter of credit practice" in approximately 20 federal and eight state courts in the United States as well as in foreign courts and, without objection, accepts him as an expert here. *See* Byrne Rep. ¶ 13. Professor Byrne summarized his opinion:

> In my considered professional opinion, the investments described in the materials that I have examined in connection with this case are not legitimate but resemble and are classic instances of Prime Bank or High Yield Investment Schemes. The proposed returns are excessive for even the most risky legitimate investments and are not possible for safe or guaranteed investments. In addition, the materials are replete with other common features of Prime Bank or High Yield Investment Schemes.
> . . .
> [A] typical transaction as reflected in the materials involves the use of investors' funds to lease a standby letter of credit which is to be leveraged to obtain an instrument in an exponentially larger amount which is to be monetized, producing funds which are to be used in trading instruments such as medium term notes. The proceeds of the trade will yield the promised returns.

*Id.* ¶¶ 14–15. As one example, Professor Byrne noted an investment of $325,000, to be deposited in the law firm's IOLTA account, based on which Milan was to have acquired a "leased instrument" for $10 million which would have been monetized to obtain an instrument valued at $150 million. *Id.* ¶ 16. The yield from further monetization of $100 million would then have been used in a "trading platform" to produce the extraordinary promised returns. *Id.*

Certain aspects of Defendants' materials "sounded" legitimate; Professor Byrne opines that prime bank schemes often "involve, refer to, mimic, or use a number of devices and instruments that exist in legitimate commerce" to give "transactions an aura of legitimacy." *Id.*

¶¶ 50–51.  "Prime bank" is a term used in legitimate finance to refer to the top banks in the world; the involvement of a Prime Bank in a financing scheme indicates its trustworthiness to victims.  *Id.* ¶ 19.  "High Yield" is a term of legitimate finance used to describe junk bonds that are not rated as investment grade.  *Id.* ¶ 20.  In contrast to these legitimate uses of the terms, "the defining characteristic" of a Prime Bank or High Yield scheme "is the promise of a disproportionate return without risk or with low risk from a source which is obscure or unable to be ascertained objectively."  *Id.* ¶ 24.  Such investment schemes may offer disproportionate returns at low risk; mimic legitimate financial instruments; obscure the commercial basis for and source of the returns with vague references to "trading;" utilize documents with significant technical flaws; refer to legitimate financial institutions without connection; contain elements of a Ponzi scheme; insist on secrecy; present a charitable, humanitarian, or religious dimension and often prey on such associated groups; intimate an international dimension; and/or provide "intricate explanations and excuses as to why the promised returns have failed to materialize."  *Id.* ¶ 25.  Each of these characteristics was present in the Pavlico/Baylor scheme.

Professor Byrne provides a detailed discussion of the features of Prime Bank and High Yield schemes and compares them directly to the financial "investments" offered by Milan and Mr. Pavlico.  He notes particularly that "some of the instruments described in the materials such as standby letters of credit and bank guarantees are not traded."  *Id.* ¶ 49.  Standby letters of credit are "a promise to honor a timely presentation of documents that comply with the terms and conditions of the undertaking," thereby assuring performance or payment.  *Id.* ¶ 53.  "They are specialized promises that only run to the named beneficiary, are not transferable unless they expressly so state and then only with the consent of their issuer," and they expire on a date certain agreed to by the parties.  *Id.*  Most critically, Professor Byrne is absolutely clear that:

> [Standby Letters of Credit] are not investments, they do not pay interest, they are not discounted, they are not traded or bought and sold, there is no market in which they are traded or could be traded even were they freely transferable and freely drawable (which is most unlikely) because each must be evaluated individually and in light of its terms and the transactions which [it] support[s]. While [Standby Letters of Credit] are used to assure performance, banks do not issue them unless there is a dependable means of reimbursement and their issuance is treated like a loan.

*Id.* ¶ 54.  He further states quite clearly that "[t]here is no such thing as the 'lease' of a [Standby Letter of Credit]." *Id.* ¶ 56.  Professor Byrne cogently explains why, in his opinion, the sole Standby Letter of Credit actually in the record—despite the constant references to them in Defendants' materials—"contains many highly suspicious features," such as three different spellings of the name of the purported bank, and, in Professor Byrne's opinion, is "not legitimate." *Id.* ¶ 57.  The transactions described in the Defendants' materials are no more real than unicorns, offering "a mythical return on a fictional instrument." *Id.* ¶ 95.

Professor Byrne similarly debunks other terms, as used by Defendants: "medium term notes and bonds," *id.* ¶ 61; "pre advice," *id.* ¶ 62; "pre issued debentures," *id.* ¶ 63; "monetization," *id.* ¶ 64; "SWIFT MT 760 and MT 799," *id.* ¶ 65; "Clean, Clear Funds," *id.* ¶ 67; "RWAs,"[7] *id.* ¶ 68b; "European Banking Days," *id.* ¶ 69; and "Fresh Cut BG" or bank guarantee, *id.* ¶ 70.  In context, these misused or nonsensical terms were meant to describe fictional financing instruments, explain delays, and lull investors.

Professor Byrne's expert report is uncontested.  Even Prime Defendant Brynee K. Baylor offers no defense to his opinion and conclusion but only claims her own ignorance and innocence.  Without contest, the Court finds that The Milan Group and Frank Pavlico engaged in

---

[7] RWA stands for "ready, willing and able."  While it "is a phrase which is used loosely in a variety of contexts," there is no real "thing in the legitimate world that is 'an RWA.'"  Byrne Rep. ¶ 68b.

the fraudulent securities scheme as alleged by SEC and that Frank Pavlico aided and abetted The Milan Group in its fraudulent activities.

### B. Principal Defendant Brynee K. Baylor

Attorney Brynee K. Baylor, a Principal Defendant and named partner in Principal Defendant Baylor & Jackson, opposes SEC's motion for summary judgment, arguing that proof of her intent to commit securities fraud cannot be found in a written record and that she acted only as an attorney advising her client. *See* Baylor Opp. [Dkt. 128]. She contends that "if the Commission's position is that [Ms.] Baylor went beyond that role, and is thus liable as a primary participant, these are factual issues that must be presented to a jury." *Id.* at 1. It is clearly SEC's position that Ms. Baylor is liable as a Principal Defendant because she either went well beyond the role of advising attorney into active participation in the fraud and/or aided and abetted the commission of securities fraud by Mr. Pavlico and Milan.

Ms. Baylor submits her own affidavit to support her statements of fact, quoted at length in her opposition. *See* Baylor Aff. [Dkt. 128-9]. After summarizing her career until the formation of Baylor & Jackson, Ms. Baylor asserts that she was investigating how two Virginia landowners, with valuable coal reserves, "might obtain a loan on the property." Baylor Opp. at 3. Ms. Baylor does not say that the landowners retained her for this purpose. Nonetheless, in the course of her investigation, she was introduced to Frank Pavlico, whom she knew as Frank Lorenzo, apparently by phone or on the internet. When she eventually met him in person, "he appeared to fit the profile she expected," and Baylor & Jackson agreed to represent Milan. *Id.* at 3–4. "Beginning in mid-2010, Baylor's representation of The Milan Group consisted of communications with Milan's clients, review of documentation in connection with Milan Group's proposed transactions, including purchases of insurance for jewels and art, that she understood was being used as collateral for loans." *Id.* at 4. Ms. Baylor worked primarily with

Mr. Pavlico on project financing matters. Persons introduced to her through this work reported that they had worked with Mr. Pavlico for years and successfully completed several international financing transactions. From these assertions, Ms. Baylor contends that SEC has no direct testimony or evidence that she possessed the requisite fraudulent intent to violate the securities laws; that, contrary to SEC allegations, she earned the fees paid to Baylor & Jackson; that she affirmatively denies any intent to defraud anyone; and, finally, that she is entitled to a jury trial. *Id.* at 13–19.

Ms. Baylor's protestations notwithstanding, the written record is clear: she acted with extreme recklessness concerning the fraudulent scheme, which was "so obvious that [she] must have been aware of it." *Steadman*, 967 F.2d at 641–42. "An egregious refusal to see the obvious, or to investigate the doubtful, may . . . give rise to an inference of . . . recklessness." *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (3d Cir. 1996); *see also Dolphin & Bradbury*, 512 F.3d at 640 (refusing to apply scienter standard "in a way that would protect someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away" (internal quotation marks, citation, and emphases removed)). Ms. Baylor is an educated woman: college, law school *cum laude*, admitted to practice law after passing the bar, experienced lawyer, and head of her own law firm.[8] It ill behooves her now to declare that she represented the Milan Group for more than a year, from mid-2010 to November 2011, but that she had no relevant experience, knew nothing about securities laws, and did only what Frank Pavlico/Lorenzo directed her to do, without ever exercising a modicum of lawyerly interest in the legal implications of their activities. In the meantime, as the record demonstrates, she encouraged others to invest in unregistered securities,

---

[8] According to the publicly available records of the D.C. Bar, Ms. Baylor remains an active member of the bar as of August 2013, practicing at Baylor Law Group, PLLC.

aided and abetted Milan's fraud, and knowingly allowed investors' monies—placed for safekeeping in her firm's IOLTA account—to be dispersed to Milan and then back to her.

The Court concludes that her own words and actions prove that Ms. Baylor possessed the requisite scienter and participation in connection with the purchase or sale of securities to have violated Sections 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a)(1) of the Securities Act. To the extent doubt on this question might possibly exist, Ms. Baylor very clearly (i) violated Sections 17(a)(2) and (3) of the Securities Act and (ii) aided and abetted Mr. Pavlico and Milan in their securities fraud and thereby violated Exchange Act Section 20(e) and Securities Act Section 15(b) by knowingly or recklessly providing substantial assistance to Mr. Pavlico and Milan. *See Graham*, 222 F.3d at 1000.

To put this analysis into perspective, the Court quotes at length from a September 23, 2011, telephone call between Ms. Baylor and two "prospective investors" who happened to be agents of the Federal Bureau of Investigation. When the agents asked for information about Frank Pavlico and clarification on a proposed million dollar investment that was predicted to return 250% in 30 days, Ms. Baylor responded:

> BAYLOR: Right. Absolutely. Absolutely. He actually *he just completed a transaction very similar to that and a wire is supposed to be sent out today to my escrow for the, for the, participants in a trade very very similar.* Basically the trades that he is working with he actually [garbled] is finding [garbled] they are project funding transactions and so they are inter-banking transactions that are going on. What happens is they leverage the one million dollars to obtain certain debt from one bank and sell them to another bank and this goes on and on repeatedly throughout the day for about 30 days and at the end a tremendous amount of money is made and a very high upside is in place for the actual trader. *And this of course is international and so it is not subject to federal laws or governance*, however at the end of the 30 days, the, the money has been, you know, used to leverage and trade and leverage and trade so greatly that the return is significantly higher. So that's why they are able to do the 250 percent return on your

funds. So that is what I understand. That's what I understand from Frank in terms of the deal. I did not have . . . I did not speak . . . He did tell me you'd be calling but we didn't speak specifically about what the transaction was, but that's generally how it works and so there are actually internationally licensed traders who are doing this and have relationships and contacts with different banks to buy and sell these debts.

. . .

FBI 2: What's the risk associated with the investment?

BAYLOR: Well, there is a question about that. I don't know that there is a risk. I'm not sure. Certain parties depending on where your money is domiciled now, they can either block your money and just use the money to trade off your blocked funds and *your money goes nowhere for a period of thirty days.* Or they have it in someone else's escrow account. It would not be mine, it would be another bank that they are trading out of. But again it is not supposed to even be moved. *Nobody spends that money, that money is escrowed the entire time.* That's my understanding. And any contract that you receive will dictate exactly how that will take place. Period. So if, if there is an escrow for it and possibly you would be sending to another bank account that would be going into a subaccount with the traders and he would have to be responsible for returning those funds.

FBI: . . . But you have been involved in these transactions, I guess, for some period of time and have seen . . . seen them successfully be completed, correct?

BAYLOR: Yes I have. As a matter of fact, in fact, like I said the first, not the first, the one this month, that actually took place last month. The funds are actually in place now to be paid out. And so *I was just talking to the banker yesterday about a wire being sent* and actually the participant I guess he is standing in the shoes of you who is actually set to receive the wire. So *we're actually completing one right now.*

. . .

BAYLOR: *I will be honest with you* and tell you there, that about a year ago there was another transaction and there was a situation where a third party that was contracting with Frank failed to perform and, you know, basically that was someone who was completely blacklisted and Frank still performed and has mitigated all of the other potential damages to make sure no one else really

has to suffer and so that is just something that did happen and because of that he is being extra extra specific, extra particular about who he is transacting with and, and having a history with anyone that he works with. So I mean at this point, he has kind of created a machine with it because he has working relationships with people who are performers, who are real, who are you know viable. And, *so I mean it's a really good time to be involved, absolutely.* The, the kinks, the kinks and the obstacles have pretty much been overcome so now it's kind of just smooth sailing. But I'm interested . . . it's interesting because *I did not realize that Frank was going to be taking outside clients any more.* I mean, I think he, maybe he is, is interested I guess probably in just working with you because *at this point he's in a place where now he can kind of do this all by himself without even bringing other people in. So I guess you kind of lucked out and stuff. I wasn't aware of that.*

. . .

FBI: . . . And Frank was telling, telling me that all of the fees and the money that's earned by Frank and I'm sure the fees that are earned by you are all taken out of profits that, that when we invest a million dollars all of that goes into the investment.

BAYLOR: Oh yeah. *100 percent goes to the investment. And there's no money that goes you to know fees or anything.* Anything else comes from your, from your profit. That is correct. . . .

FBI: Well, if you were in our shoes and you had a million dollars you would have absolutely no reservation whatsoever about going into this with Frank obviously.

BAYLOR: No. One thing about Frank is he is a very credible person and he really is a good person fundamentally. So his whole thing is making sure that the deal gets done. He wants to, you know, maintain great relationships and a lot of the people he works with are people he has worked with for years.

. . .

BAYLOR: Well listen. Anytime you want to call me feel free to call me. I'm always available, if I'm not, you can either e-mail me or, or you know, or, or call my cellphone. But definitely, you know, if you have any questions feel free to call me. And if once you get the specifics of your transaction just look at, you know, just take time to really see, what, how it's done, you know, how, how it is going to take place and make sure you are comfortable

> with the fact that your money is protected because I know that one thing . . . [Frank] is very adamant about is making sure that everyone's money is protected going forward. *I mean, You [sic] know what I mean, so that you don't have your money at risk.*

SEC Ex. 19 (Tr. of 9/23/11 Phone Call) at 10–15 (ECF numbering) (emphases added).

As this conversation and the rest of the record make clear, Mr. Pavlico and Ms. Baylor were engaged in "the purchase or sale of a security" under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act. Investors paid Milan, often through the trust account at Ms. Baylor's law firm, to join their funds with Milan's or other investors to purchase an alleged bank instrument (a "standby letter of credit," a "bank guarantee," or a note), to be "traded" on a "platform" by an unidentified "secret" third party, to realize a quick, high return. This type of transaction constitutes an "investment contract" as defined under Section 2(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. *See Int'l Loan Network*, 968 F.2d at 1308.

As SEC's comprehensive banking account documentation proves, Mr. Pavlico and Ms. Baylor paid themselves handsomely, with 71 percent of investor funds going to Mr. Pavlico and Ms. Baylor and no record of any funds going into any investment. *See, e.g.*, SEC Exs. 13–14, 37–38. The record is bereft of fee statements from Baylor and Jackson to support the supposed work behind the $746,266 the firm received between mid-2010 and November 2011. Ms. Baylor insists that she worked for fees, was only paid for work performed, and did not participate in any fraud. But she never submitted fee statements to Milan or Mr. Pavlico, and she does not dispute the accuracy of the phone call quoted above or any of the other documentation submitted by SEC, including her own emails. As early as October 11, 2010, Ms. Baylor sent an email to an unnamed person "to confirm the validity of the transaction that your client, [redacted] is involved in." SEC Ex. 24 (10/11/10 E-mail) at 45 (ECF numbering).

Notably, Ms. Baylor signed her emails, Brynee K. Baylor, *Esquire*, with the name and contact information for Baylor & Jackson. *Id.* Her October 11, 2010, email continued:

> First, I have observed this company successfully complete transactions of this nature whereby participants received their funds as agreed. Second, I have personally been involved in this transaction and can validate it as well as confirm the fact that the transaction is moving along very well. Although there was a delay in the initial upstart, this process is moving full speed again and I am most confident that you as well as your client will be pleased with the result.

*Id.*

Ms. Baylor never observed Milan complete a single transaction in which participants received their funds. *See* SEC Ex. 26 (Baylor Dep.) at 210 ("The way it worked out Milan received its fees and Baylor & Jackson received its fees and to my knowledge investors have not been paid back."). The record shows clearly that she used her authority as an attorney to attest to personal involvement and offer repeated validations of transactions about which she now proclaims ignorance. *See* SEC Ex. 25 (Notarized "Attorney Attestation Letter") at 46 (ECF numbering) ("This information came directly from Frank Lorenzo of The Milan Group and *has been verified by me*." (emphasis added)); SEC Ex. 29 (4/4/11 Baylor E-mail) at 9 (ECF numbering) ("Your clients will not receive bank documents as they remain confidential and have information that only the main parties are entitled to possess. Closing will depend on the actual delivery of the instrument. We are working to get this transaction closed."); SEC Ex. 29 (6/1/11 Baylor E-mail) at 13 (ECF numbering) ("Gentlemen, we have been very busy today on calls regarding the closing of a number of transactions. Below, is the real time status of the 500m SBLC from HSBC"); SEC Ex. 29 (11/17/11 Baylor E-mail) at 32 (ECF numbering) ("Trust and believe I am tired of this [delay] as well ! This is MY deal, not someone else's transaction."); Baylor Dep. at 50 ("But by the time I was out, we had never received or been aware of receiving

the profits."); *id.* at 55 ("[W]e never submitted the invoices to Milan"); *id.* at 56 ("The way it worked out Milan received its fees and Baylor & Jackson received its fees and to my knowledge investors have not been paid back.").[9]

Inasmuch as Ms. Baylor participated in encouraging investors to participate in the fraud; vouched for Mr. Pavlico as "very credible" and a "good person;" signed "client representation" letters with those sending money to the firm's IOLTA account; allowed that money to be disbursed to Milan and thence to her; and concealed the use of the funds when investors asked questions, her active and knowing participation in dissipation of funds without investment cannot be denied. The fact that the "securities" offered by Ms. Baylor and her cohorts did not actually exist does not absolve Ms. Baylor or remove the fraud from coverage of U.S. securities laws. *See SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) ("Prime Bank Instruments do not exist. . . . It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws."). As particularly relevant to Ms. Baylor, "[m]aking substantial misrepresentations as to the value of a worthless but technically extant security is a paradigmatic form of securities fraud. Extending the protection of the securities laws to the victims of schemes so fraudulent that the underlying paper does not exist logically follows, as fraudsters would have a perverse incentive to magnify their deceptive conduct." *SEC v Bremont*,

---

[9] The email chain at SEC Ex. 29 at 34–37 between a frustrated investor and Ms. Baylor well illustrates her role of stringing investors along for months. In another instance, Ms. Baylor provided explanations in the precise type of financial gobbledygook that Professor Byrne opined is a classic feature of Prime Bank fraud. On November 16, 2011—just days before Mr. Pavlico was arrested and this case was filed—Ms. Baylor wrote: "[T]he swift has been identified, but could not be delivered as of yet. It was coming from the Central Bank of Russia and has not arrived yet. We were told that it would be there in the morning, but we have not seen it yet. The buyer has agreed to do a ledger to ledger and get this resolved by the morning so stones could ship and the deal close. This is the status. We are all excited that we a[re] moving to closing, but we are not there yet." *Id.* at 34.

954 F. Supp. 726, 731 (S.D.N.Y. 1997). The quote from *Bremont* describes Ms. Baylor's role precisely.

Ms. Baylor's many misrepresentations and omissions would surely have been material to any prospective investor. *See TSC Indus*, 426 U.S. at 449 (defining materiality). For example, Ms. Baylor never disclosed that the so-called fees would be taken from an investor's IOLTA fund, prior to and without any investment. The fact that so-called fees would amount to 71% of the money collected, disregarding disbursements to Relief Defendants, would also have been "material" information. Most critically, the fact that no investment was ever made and no investment ever returned a dime to an investor would have been material, but Ms. Baylor repeatedly "validated" the contrary as fact and soothed anxious investors for months.

These are facts that Ms. Baylor does not deny, instead relying on the *ipse dixit* that she "has affirmatively denied any intent to defraud anyone," and, therefore, a genuine dispute of material fact exists. Baylor Opp. at 14. Ms. Baylor has declared under oath that she relied entirely on Mr. Pavlico and had no knowledge that Milan and its products were fraudulent until an investor informed her of Mr. Pavlico's criminal past and that he was using a pseudonym. *E.g.*, Baylor Opp. at 11–12. But her efforts to push unrelated documents in front of the Court so as to avoid the reality of her actions ring hollow. What matters in this case are the extensive material misrepresentations and omissions she made to investors concerning the use of their investment funds because "'representations and opinions . . . given without basis and in reckless disregard of their truth or falsity' establish scienter under Rule 10b–5." *Bremont*, 954 F. Supp. at 730 (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978); alteration in original). Ms. Baylor knew that she omitted telling investors about the disbursements from her IOLTA account without any investment; she knew that she told investors that Milan was just

closing a deal and/or that all would be well with multiple investments when, in fact, no profits were ever returned to an investor; she knew that she told investors that investments through Milan were outside federal oversight when, at best, she had not researched the question; and she knew that she was assuring investors that she had "validated" aspects of the transactions, as an attorney, when, in fact, she had not. Even crediting her statements of ignorance, such statements only demonstrate extreme recklessness, not innocence.

Ms. Baylor's attempt to use her role as an attorney as a shield is particularly pernicious because, as an attorney, she was in the position to lead investors to believe that their money was safe. Investors retained Baylor & Jackson to use the firm's trust account to "escrow" investor money. Each escrow agreement identified the investor(s) as a "client" of Baylor & Jackson. In every instance, investor funds were immediately disbursed from the IOLTA account to Milan and Baylor & Jackson for personal use, or, to a lesser extent, to Relief Defendants. While Ms. Baylor protests that the "fees" she received were paid only on authority of Frank Pavlico at Milan, she does not argue that she did not know that her firm's trust account was used as a revolving door to receive investors' money and pay it out to Milan/Pavlico and thence to her, despite her assurances to investors that their money was safe.

Ms. Baylor offers no real defense to Counts V through VII of SEC's amended complaint, charging Ms. Baylor with having failed to register the securities with SEC (Count V) and aiding and abetting Mr. Pavlico in doing so (Count VI), and for failing to register as a broker or to associate with a registered broker-dealer (Count VII). She argues only that she was an attorney who "provid[ed] legal advice in connection with securities transactions" and thus did not "'offer' or sell' those securities." Baylor Opp. at 16–18 (citations omitted). The Court finds, for the reasons stated above regarding Counts I through IV, that Ms. Baylor went far beyond her

role as an attorney and is liable as a Primary Defendant for violating Sections 5(a) and 5(c) of the Securities Act; for violating Section 15(b) of the Securities Act by "knowingly or recklessly" providing substantial assistance to Mr. Pavlico and Milan in such a violation; and for violating Section 15(a) of the Securities Act by "induc[ing] or attempt[ing] to induce the purchase or sale of, any security" without being registered.

It is quite possible that Ms. Baylor began her representation of Milan and Mr. Pavlico as a starry-eyed lawyer in search of a rich client. At what point she discarded her responsibilities as a lawyer and became a participant in the scheme is not important. The record demonstrates that she actively participated in the fraud. At a minimum, Ms. Baylor used her professional position to aid and abet Milan and Mr. Pavlico in 2010 before she appears to have become involved hook, line and sinker in 2011 ("This is MY deal"). The Court will grant SEC's motion for summary judgment against Ms. Baylor.

### C. Relief Defendant Patrick T. Lewis

Patrick Lewis owned GPH Holdings, LLC, which he organized in the State of Idaho on July 22, 2009. Lewis MSJ Opp., [Dkt. 126] Ex. A at 3. By amendment filed on October 6, 2009, Perk My Interest, Inc., a company owned by Mr. Lewis, and Govind Prasad of the Govind Prasad Humanitarian Foundation in New Jersey, became equal owners. *Id.*; *see also* Lewis Opp. Show Cause (Lewis SC Opp.), [Dkt. 13]. After this ostensible change in ownership, Mr. Lewis functioned as the "non-member manager" of GPH. Lewis SC Opp. at 4–5. SEC wants to recover $375,000 from Mr. Lewis, which it contends was sent to GPH Holdings from the Baylor & Jackson IOLTA account, without any corresponding value to the 18 victims of the fraud and without any lawful services by GPH or Mr. Lewis. *See* Am. Compl. ¶¶ 15, 57; *see also* SEC MSJ Reply [Dkt. 139] at 12. SEC does not claim that Mr. Lewis is a Principal

Defendant, instead alleging that he is a Relief Defendant who is obligated to return such monies for restitution to the victims.

SEC's initial Complaint, Dkt. 2, and Amended Complaint, Dkt. 53, are devoid of underlying factual contentions against Mr. Lewis. Each contains only statements that GPH received funds from the IOLTA account at Baylor & Jackson and that Mr. Lewis transferred the money to his own accounts. *See* Am. Compl. ¶¶ 15, 57. Mr. Lewis concedes that he received the money but argues that he earned the funds by attempting to secure leases of bank instruments for Mr. Pavlico. Lewis MSJ Opp. at 1–6; *see also* Lewis Supp. MSJ Opp., [Dkt. 174] at 13–14 ("I declare I did not only earn the money I received but it was not enough to deal with what I had to endure."). SEC retorts that evidence in the case, including the declaration from its expert Professor Byrne, establishes that no such "leased instruments" exist and that Mr. Lewis has introduced no evidence to the contrary. SEC Reply at 12.[10]

Mr. Lewis admits the receipt of monies from the Baylor and Jackson IOLTA account but insists that they were legally and fully earned. Thus, the first element of the test for ordering equitable relief is met; all that is in issue is whether Mr. Lewis has "a legitimate claim" to the funds. *See Cavanagh*, 155 F.3d at 136. Unfortunately, he has offered multiple and inconsistent transactions on which the monies might have been earned, all of which involved

---

[10] SEC apparently bases some of its fact contentions against Mr. Lewis on two complaints filed in other courts. One such complaint was filed against the Principal Defendants and some Relief Defendants, including GPH and Mr. Lewis, on November 10, 2010. *See Presidio Group LLC v. High Creek Holdings, LLC,* No. 3:10-cv-05819-BHS (W.D. Wa. filed Nov. 10, 2010). This suit was dismissed for lack of service on April 11, 2011. The second suit, *Princeton Developments, LLC v. Baylor*, was filed on September 8, 2011. *See* No. 4:11-cv-04471-CW (N.D. Cal. filed Sept. 8, 2011). That case remains pending, including against Mr. Lewis. These two complaints are attached to the Declaration of Christopher McLean as part of SEC's statement of facts not in dispute. *See* SEC Exs. 62, 65. A complaint only reflects a plaintiff's allegations. It does not constitute evidence. The complaints cited by SEC as part of its statement of facts show only that other parties have sued some of these same Principal and Relief Defendants elsewhere. They do nothing to support SEC's motion for summary judgment against Mr. Lewis.

bank instruments of the kinds found by the Court to violate securities laws.  *See, e.g.*, Lewis Opp., Ex. B, at 1 (agreement "to lease a financial instrument (Bank Guarantee) in the principal amount of Ten Million Dollars ($10,000,000) for a period of one (1) year").  Thus, his defense that he "earned" the monies is without merit.

Mr. Lewis's first explanation for the payment of $375,000 to GPH Holdings was offered in an unsuccessful effort to avoid a freeze on his accounts, as sought by SEC when this case began.  *See* Lewis SC Opp. at 2–3.  At that time, in December 2011, Mr. Lewis stated that the purpose of GPH Holdings was to parlay gems owned by Mr. Prasad into Standby Letters of Credit from a bank that could be leased to other persons as collateral for obtaining their own loans.  *Id.*  Mr. Lewis explained:

> In 2009 I identified a need in the financial market for consulting services in order to assist companies representing investors with construction and other projects with legitimate uses of funds to obtain leased instruments as one component in a structured finance initiative.  People seeking money to pay for their projects did not have enough credit . . . .  These people needed to lease, meaning pay money to another company to purchase collateral to finance their projects.  Leasing the collateral would be on a short term basis, usually no more than one year.  They would sign a contract agreeing to pay money for the collateral and the use of whatever the asset was (either cash or a hard asset) that backed the collateral. Then the bank instrument used to represent that collateral would be contracted with another person or company—usually a trading group to use that collateral to back a public trading program.  This means the leased collateral has a certain high value and is very much in demand and commands a high enough price in the market.

*Id.* at 2.  According to Mr. Lewis, his function "was to research, identify, contact people to bring to my clients a specific banking instrument called a stand by letter of credit (SBLC) or bank guarantee" that represented the client's collateral "such as a hard asset like gold or diamonds." *Id.*  Relief Defendant Brett Cooper was such an individual, and Mr. Lewis asserted that Mr. Cooper took the gems to an institution identified only as Sovereign Bank, from which Mr.

Cooper obtained a Stand-by Letter of Credit worth 50% of their value. *Id.* at 5. Therefore, Mr.

Lewis asserted, "[b]y providing the SBLC instruments procured by Mr. Cooper, I fulfilled my

obligations to the specific [but unidentified] GPH Holdings clients these instruments were

secured for," *id.* at 5–6, and thereby earned the contested fee of $375,000. In fact, Mr. Lewis

asserted that he "had no reason to believe Mr. Cooper could not fully perform because on at least

four occasions, Mr. Cooper did in fact deliver the requisite SBLC instruments and no deal can

happen without first the SBLC being secured." *Id.* at 6. He further asserted that he was aware of

no monies paid to GPH Holdings from Milan or Mr. Pavlico. *Id.* Mr. Lewis states that he

disassociated with GPH in March 2011. *Id.* at 4 n.2.

In response to SEC's current motion for summary judgment, Mr. Lewis offers

different explanations. *See* Lewis MSJ Opp. at 1–6. Mr. Lewis blames Roy Nielsen of Crucial

Funds for introducing Mr. Lewis to "these transactions." *Id.* at 2. He also contends that "[t]here

was no escrow agreement represented or signed to or by me (Patrick Lewis) on behalf of GPH

for any of the deposits." *Id.* Rather, according to Mr. Lewis, GPH "receiv[ed] funds according

to the contracts signed by the individuals Roy Nielsen introduced to GPH." *Id.* Those contracts

concerned a "leased Financial Instrument to be delivered to Al Hamri Enterprise, SL." *Id.*

"Upon continually working on fulfilling GPH Holdings LLC's responsibility in delivering an

Instrument to Al Hamri Enterprise, SL," without success, GPH turned the contracts over to Mr.

Cooper and GFS to complete the work. *Id.* at 3. Further protesting his innocence, Mr. Lewis

explains that before GPH signed such contracts, they had been signed and notarized by the

company introduced by Mr. Nielsen, with a notarized letter on company letterhead from an

officer of the company, and GPH had been assured that "this would all be done through an

Attorney Escrow account of their choosing." *Id.* at 3. He argues that "[t]o demonstrate that

GPH was other than an innocent third party should be the subject matter of a hearing before the court where the whole of the facts can be presented." *Id.* at 4.

Mr. Lewis further attributes the $375,000 received by GPH from the Baylor & Jackson IOLTA account to a contract with Princeton Development LLC, another company introduced to GPH by Roy Nielsen.[11] A Princeton/GBH contract is attached to Mr. Lewis's summary judgment opposition as Exhibit B. It was signed in September 2010 for Princeton by Syed Ali Abbas, Director, and for GPH by Mr. Lewis. Mr. Lewis contends that "the instrument was to be delivered to Al Hamri Enterprise, SL, in the name of Princeton Development." Lewis MSJ Opp. at 4. However, nothing in Exhibit B mentions Mr. Nielsen or Al Hamri Enterprise, SL; in fact, the Princeton/GPH contract anticipated that GPH would "lease a financial instrument (Bank Guaranty) in the principal amount of Ten Million Dollars" within 45 days, for an initial fee of $125,000 payable directly to GPH and deposited into GPH accounts within 24 hours of signing the contract. Lewis MSJ Opp., Ex. B, Recitals ¶¶ 1–2, Terms ¶ 2.

Through the exhibits attached to his Supplemental Opposition (Lewis Supp. Opp.), Dkts. 174 & 174-1, Mr. Lewis demonstrates his involvement in the business of "monetizing" and "trading" financial instruments, *i.e.*, Stand-by Letters of Credit, both before and during his long-distance association with Frank Pavlico/Lorenzo. *E.g.*, Lewis Supp. Opp., Ex. E at 38 (ECF numbering) (GPH agreement titled "Asset Lease; Letter of Credit Account"). It is this very activity that the Court has found constituted fraudulent activity by Mr. Pavlico and Ms. Baylor. SEC has documented a $375,000 transfer from the IOLTA account to GPH. It cannot be determined from the written record whether Mr. Lewis was naïve or conniving. What

---

[11] *See also* Lewis SC Opp. at 7 ("For Princeton, attorney Dawn Jackson was the Escrow Agent and Princeton wired its fees to Dawn Jackson who then paid GPH Holdings on escrow instruction. . . . For ANT Holdings [otherwise unidentified], their fees were wired to attorney Brynee Baylor who on escrow instruction then paid GPH Holdings.").

is clear is that Mr. Lewis engaged with Mr. Pavlico, Ms. Baylor, and Milan in the same kinds of

shady dealings.  SEC has established through its expert that there are no financial instruments of

the types that made up the fraud here.  (In fact, no Defendant or Relief Defendant claims that

such financial instruments are actually traded; each argues only his or her only innocent

ignorance.)  Mr. Lewis attempts to demonstrate that he "earned" the monies in question through

legitimate activities but the "work" he posits is the same as, or similar to, the illegal securities

fraud perpetuated by Milan, Mr. Pavlico, Baylor & Jackson and Ms. Baylor, and the money in

question came from Baylor & Jackson.  As he "does not have a legitimate claim to those funds,"

*Cavanagh*, 155 F.3d at 136, such "work" does not support his claim to retain the $375,000 as

money fairly earned, and it must be disgorged as proceeds of the fraud.

Summary judgment will be granted to SEC against Patrick Lewis.  The Court

declines to use its discretion to require Mr. Lewis to pay prejudgment interest, as he is not a

named wrongdoer or Principal Defendant.[12]

### D.  Relief Defendant Brett Cooper

SEC's case against Relief Defendant Brett A. Cooper is most curious.  SEC

asserts that Mr. Cooper was the managing member of Relief Defendant Global Funding Systems,

LLC; that GFS received $225,000 from Milan; and that "[i]nvestor funds received by [GFS]

were transferred to other accounts, including [Mr.] Cooper's personal accounts."  Am. Compl.

¶¶ 16, 20.  "Neither Global Funding nor Cooper provided any lawful services or products to any

---

[12] An award of prejudgment interest lies within the broad discretion of the district court.  *Kenton Capital, Ltd.*, 69 F. Supp. 2d at 16; *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1089 (D.N.J. 1996).  To determine whether to award prejudgment interest, a court should consider (1) the need to fully compensate a wronged party; (2) fairness and the equities of the award; (3) the remedial purpose of the statute; (4) any other principles deemed relevant by the court.  *Kenton Capital*, 69 F. Supp. 2d at 16 (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir.1996)).  The Court will award prejudgment interest against all Principal Defendants and The Julian Estate.

defendant or for the benefit of investors in the defendants' fraudulent scheme in return for these funds." *Id.* ¶ 58. All "[r]elief defendants . . . received, directly or indirectly, funds and/or other benefits from the defendants which are the proceeds of unlawful activities alleged in this [Amended] Complaint and to which these relief defendants have no legitimate claim." *Id.* ¶ 83. SEC wants an order to Mr. Cooper to disgorge $225,000. SEC MSJ Mem. at 7.

As relevant to Mr. Cooper in its motion for summary judgment, SEC argues, in full:

> Pavlico and Milan transferred through the B&J trust account and sometimes through the Milan checking account more than $1.2 million of their ill-gotten proceeds to relief defendants Jackson, Cooper, Lewis, the Julian Estate and Mia Baldassari. None of the relief defendants provided any services, or any other type of consideration. Accordingly, these relief defendants had no right or legitimate claim to any of the investor funds that they received, and summary judgment should be entered against them for these amounts.

SEC MSJ Mem. at 25.

SEC submitted bank records for the -0337 account of Milan that demonstrated that "at least $225,000 was transferred to relief defendant Global Funding Systems, LLC." Statement of Material Facts Not in Dispute (SEC Facts) [Dkt. 109-3] ¶¶ 63–64. Like Mr. Lewis, Mr. Cooper willingly concedes the first element of the test for ordering equitable relief. He readily agrees that GFS "was paid for services" to Milan in the amount of $225,000, from which he "paid Mr. Lewis a consulting fee of $50,000.00." Cooper Resp. SEC Facts (Cooper Facts), [Dkt. 157] ¶¶ 55, 67. He asserts that GFS contracted with Milan in 2010 to "help Milan find a $100 million dollar [sic], and later a $200 million dollar [sic] bank guarantee or letter of credit for Milan." *Id.* ¶ 67. Further, he states:

> I began by providing Milan with detailed outlines and information about the requirements to get the instruments that it wanted. I then worked for three months with three different financing groups to

> come up with different options for Milan to finish the deal. But, Milan could not get an undertaking letter, and that was required to get the guarantee/letter of credit, so the deal fell through.

Cooper Opp. [Dkt. 156] at 1–2 (ECF numbering). Mr. Cooper protests that the contract between Milan and GFS provided that GFS would be paid for its work without regard to whether a deal was ever consummated so that the failure of the deal, due to Milan's inability to get an undertaking letter, is irrelevant. *Id.* at 2.

Although not a lawyer and appearing pro se, Mr. Cooper also advances legal arguments against the SEC's demand for disgorgement of $225,000 from him personally. First, he notes that the Milan contract was with GFS, of which he was an employee, and the SEC has provided no basis on which to pierce the corporate veil. *Id.* at 3. Mr. Cooper cites *Valley Finance, Inc. v. United States*, 629 F.2d 162, 172 (D.C. Cir. 1980), for the proposition that his sole ownership of GFS is not enough to warrant ignoring corporate formalities. Cooper Opp. at 3. Second, Mr. Cooper notes the contradiction between SEC's naming him as a Relief Defendant (who is not charged with wrongdoing) and its claim for pre-judgment interest, which the SEC characterizes in its motion for summary judgment memorandum as being a remedy against wrongdoers. *Id.* at 4.

SEC's response is remarkable. In a brief devoid of citation to legal authority, it argues that Mr. Cooper has provided no documentation to support his statements of having worked for three months in an attempt to obtain a bank guarantee for Milan, that he has provided no evidence of contacts with banks or bankers from whom such an instrument might be obtained, and that he has "utterly failed to address how he could possibly arrange for instruments of $100 million or $200 million to be issued for use by Pavlico, Milan, and their investors." SEC Cooper Reply [Dkt. 158] at 1–2. SEC does not address in any way the distinctions, legal or real, between GFS and Brett Cooper. It fails to respond to Mr. Cooper's assertion that $25,000 of the

$225,000 SEC attributes to GFS and Mr. Cooper was paid to Mr. Lewis as a finder's fee.  Most notably, SEC has itself highlighted the dearth of evidence with respect to Mr. Cooper.[13]  *Id.* at 1 ("In fact, out of 92 documents produced by Cooper and GFS in response to the Commission's document request, only a handful even come from Cooper, most of them in the form of emails responding to emails from defendant Frank Pavlico, a/k/a Frank Lorenzo ('Pavlico').").

In contrast to the written record regarding Mr. Lewis, who offered conflicting explanations and inculpatory documents, the record precludes summary judgment against Mr. Cooper.  Default judgment has already been entered against GFS, and SEC offers no evidence or argument that would allow it to pierce the corporate veil and treat Mr. Cooper as the corporate entity.  Mr. Cooper's description of his efforts to obtain a bank guarantee *if* Milan could produce an undertaking letter does not, *per se*, demonstrate fraudulent conduct or that GFS did not earn the monies paid as per the contract.

### E.  Relief Defendant Mia Baldassari

Mia C. Baldassari does not dispute that she was Frank Pavlico's girlfriend from 2006 until sometime around his November 30, 2011 arrest on criminal charges arising from these same events.[14]  SEC uncovered records of payments from Milan to Ms. Baldassari in 2010 and

---

[13] Mr. Cooper has been difficult for SEC to track down.  SEC filed an application to enforce compliance with subpoenas *duces tecum* and *ad testificandum* against Mr. Cooper in connection with a related securities enforcement action involving Mr. Cooper and various associated business entities. *See generally SEC v. Cooper*, Misc. No. 13-7 (RMC) (D.D.C. filed Jan. 3, 2013).  With active court intervention, he finally appeared in person in court and ascribed the absence of records to an alleged computer meltdown and/or seizure by SEC.  Mr. Cooper insisted that SEC already had every document he could produce because he had turned over every relevant item in connection with the Pavlico/Milan investigation.  SEC was unhappy but satisfied.

[14] Ms. Baldassari testified at her May 3, 2012 deposition that she and Mr. Pavlico were no longer dating, although she and her son were still living in his home for economic reasons.  Baldassari Dep., Br. Supp. Baldassari MSJ & Release of Funds (Baldassari MSJ Mem.) [Dkt. 85], Ex. A, at

2011 in the amount of $64,156.25.[15]  Those payments are not contested by Ms. Baldassari.  As a

result, SEC argues that Ms. Baldassari received $64,156.25 from Milan during the fraudulent

scheme and should be ordered to disgorge it to the benefit of victims.  *See Cavanagh*, 155 F.3d at

136 (permitting equitable relief "against a person who is not accused of wrongdoing in a

securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does

not have a legitimate claim to those funds").

In November and December of 2011, Ms. Baldassari told SEC that all of these

funds were loans or gifts from Mr. Pavlico, as a trail of emails appears to demonstrate.  *See* SEC

Facts Opp. Baldassari MSJ [Dkt. 87-1] ¶ 8; *see, e.g.*, *id.* ¶ 8, first bullet (Ms. Baldassari's request

to "make arrangements to escrow loan money I received from the Milan Group in 2010 which

total $19,000.00 {this amount does not include check numbers 1319 ($1500.00) & 1322

($4000.00} Which were Christmas gifts from Mr. Pavlico to me to buy my son a gift from him

and the other was to me; I chose money instead of a traditional Christmas gift" (formatting as in

original)).

Ms. Baldassari's explanations for the Milan disbursements later changed.  At her

May 3, 2012 deposition, Ms. Baldassari admitted that she frequently wrote checks to herself

from Milan accounts at Bank of America, where she had signatory authority, and that she had

---

12–13, 17.  She also stated that their relationship ended around the time of Mr. Pavlico's arrest,
although the two were not causally linked.  *Id.* at 15, 17.

[15] Payments from Milan to Ms. Baldassari occurred on September 3, 2010, $7,000; October 8,
2010, $1,000; October 21, 2010, $1,500; October 29, 2010, $4,500; December 6, 2010, $3,000;
December 14, 2010, $1,500; December 18, 2010, $4,000; and January 1, 2011, $2,000, for a total
of $24,500.  SEC Facts Opp. Baldassari MSJ [Dkt. 87-1] ¶ 3.  Further, Ms. Baldassari identified
"Loans to Mia 2011" as of January 7, 2011, $1,000; January 20, 2011, $2,000; March 10, 2011,
$1,000; February 2, [2]011, $2,500; February 23, 2011, $2,500; June 13, 2011, $1,500; June 16,
2011, $3,000; June 17, 2011, $1,500; July 18, 2011, $3,000; September 14, 2011, $6,000;
October 12, 2011, $9,000; and November 16, 2011, $4,456.25, for a total of $39,656.25.  *Id.*

never informed SEC she earned any of funds she received from Milan. SEC Opp. Baldassari MSJ [Dkt. 87], Kidney Decl. [Dkt. 87-2] ¶ 13; *see* Kidney Decl., Ex. 4, Baldassari Dep., at 53–54. She also admitted that she "did not disclose a lot of things" to SEC "out of concern for incriminating Frank." Baldassari Dep. at 58. According to her deposition testimony, one such hidden fact was that she had worked at a spa owned by Mr. Pavlico and thereby earned some of the payments she received from Milan, which paid her because the spa was not doing well financially. *Id.* at 48; *see* Baldassari MSJ Mem. [Dkt. 85] at 2 ("[S]he received approximately $20,000.00 in 2010 and $33,000 in 2011, as compensation for her work at the In-Touch Day Spa."). To support this testimony, Ms. Baldassari later submitted two Internal Revenue Service Forms 1099, which report nonemployee compensation paid to Ms. Baldassari by Au Natural & Company LLC in the amounts of $19,000 in 2010 and $32,000 in 2011. *See* Baldassari MSJ [Dkt. 84], Exs. E & F.

SEC obtained a temporary restraining order and preliminary injunction freezing Defendants' assets when this litigation began. *See* TRO [Dkt. 4]. At that time, Ms. Baldassari was about to sell her house, purchased long before the Milan fraud began, and its closing was imperiled by the asset freeze. SEC and Ms. Baldassari agreed that she could close on the house sale as long as she deposited the proceeds into the Court Registry Investment System (CRIS) account to be held in escrow and available for victims if ordered. She thereafter deposited $39,656.25 into the CRIS account.[16] Months later, Ms. Baldassari moved for summary judgment and immediate release of her funds, arguing that she earned the monies she was paid by Milan due to her work for Au Natural and that her deposited funds should be released. Ms. Baldassari

---

[16] As reflected by the Court's docket: "DEPOSIT of Funds into registry of the Court on December 8, 2011 in the amount of $ 39,656.25, Receipt Number CQ12461600015 received from MIA C. BALDASSARI. (rdj) (Entered: 12/14/2011)."

also claimed a right to recover two other deposits made into the Court registry: (1) $10,000.00 deposited by Jeremy Fry, Mr. Pavlico's former counsel, whom Ms. Baldassari asserts she paid to represent Mr. Pavlico after his arrest in the related criminal case;[17] and (2) $20,000 deposited by Elmo Baldassari, brother of Mia Baldassari, which Ms. Baldassari avers to be "proceeds of [the] sale of a property she owned with her brother."[18] Baldassari MSJ Mem. at 1–2. SEC opposed her motion. The Court deferred consideration of Ms. Baldassari's motion for summary judgment to address it simultaneously with SEC's motion for summary judgment. *See* Minute Order dated Feb. 1, 2013. Ms. Baldassari's opposition to SEC's motion for summary judgment, Dkt. 127, incorporates her own motion for summary judgment and adds no new arguments or facts.

To summarize: SEC has demonstrated that Milan violated securities laws with its fraudulent scheme and that, during the course of that scheme, $64,156.25 from Milan was transferred to Ms. Baldassari. Ms. Baldassari seeks to recoup $69,656.25 now on deposit in the CRIS account: $39,656.25 from the sale of her house, which Ms. Baldassari argues was not related to any securities fraud; $10,000 that Ms. Baldassari sent to attorney Jeremy Fry, which Ms. Baldassari argues came from her personal account and not Milan's; and $20,000 paid by Milan to Elmo Baldassari to repay on her behalf a brotherly loan, which Ms. Baldassari claims because she has now repaid her brother with a transfer of property.

---

[17] As reflected on the docket, "DEPOSIT of Funds into registry of the Court on December 14, 2011 in the amount of $10,000, Receipt Number CQ12461600021. (dr) (Entered: 12/23/2011)." Knowing that the accounts of Milan and Mr. Pavlico had been subject to an asset freeze, Mr. Fry had asked SEC counsel how to proceed.

[18] As reflected on the docket, "DEPOSIT of Funds into registry of the Court on December 6, 2011 in the amount of $20,000.00, Receipt Number CQ12461600014 received from ELMO BALDASSARI. (rdj) (Entered: 12/09/2011)." Elmo Baldassari was a named Relief Defendant until he deposited the $20,000 he had received from Milan into the court; he was thereafter dismissed from the case.

The Court's analysis begins with the simplest question and proceeds to the more difficult. First, pursuant to an agreement with SEC, Ms. Baldassari deposited $39,656.25 in the CRIS account from the proceeds from the sale of her house. Her deposit was then and is now insufficient to cover the entirety of the $64,156.25 that SEC alleges she received from Pavlico/Milan as proceeds of the fraud in 2010 and 2011, including the "Loans to Mia 2011." Ms. Baldassari argues that she owned her house long before the Milan/Pavlico/Baylor fraud and money from its sale was not an "ill-gotten gain" from that scheme; therefore, she argues, she has a right to recover it. While quite shining in its logic, this argument fails. If, as she once admitted, Ms. Baldassari received funds that were fruits of the securities fraud, she is liable to disgorge the amount of such funds unless she earned them. Ms. Baldassari has already agreed under oath. *See* SEC Motion to Lift Freeze, [Dkt. 6] Ex., Baldassari Decl. ¶ 10 ("The funds may be provided to the SEC, distributed to defrauded investors or returned to me, depending on resolution of the lawsuit."); *see also id.* ¶ 1 ("The Complaint alleges that I received funds . . . [that] were obtained by Pavlico by defrauding investors. The Complaint demands that these funds be frozen and then returned to defrauded investors in the event the case is resolved in favor of the SEC.").[19] The fact that the *specific* dollars she received have long since been spent and she would be forced to disgorge her own dollars from another source does not absolve her of the obligation to return an equivalent sum for distribution to victims of the fraud because she had "no ownership interest" in the ill-gotten gains. *See George*, 426 F.3d at 798; *see also SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) ("[A]n order to disgorge establishes a personal liability, which the defendant must satisfy regardless whether he retains the selfsame

_____

[19] Ms. Baldassari, who is now represented by counsel, was not represented when she signed the declaration, but she "decided not to retain counsel" in connection with her original dealings with SEC. Baldassari Decl. ¶ 5.

proceeds of his wrongdoing.").  Moreover, the Court's original order permitting the sale of Ms.

Baldassari's property, to which Ms. Baldassari made no objection, made clear that the funds

would be "held in escrow *pending resolution of the entire matter*."  Dec. 5, 2011 Order [Dkt. 9]

at 1 (emphasis added).

Second, Ms. Baldassari asserts ownership to the $10,000 paid to Attorney Fry that

is now in the CRIS account because it went to Mr. Fry from her personal bank account.  *See*

Baldassari MSJ Mem. at 1 (asserting that "the funds were maintained in Baldassari's personal

checking account with no ties to the Defendants").  SEC does not contest this fact.  It points out,

however, that Ms. Baldassari admitted that the funds originated in one of Mr. Pavlico's accounts

to which she had signature authority.  *See* Baldassari Dep. at 87 ("There was the initial $10,000,

the joint account that Mr. Pavlico and I was [sic] on that I sent to Attorney Jeremy Frey two days

prior to the SEC contacting myself.  And that $10,000 was supposed to be used for legal

terms . . . . .").  She used this authority on November 30, 2011 to transfer $10,000 to her own

account.[20]  On the next day, December 1, she then transferred $10,000 from her account to Mr.

Fry.  Ms. Baldasssari argues here that the retention fee to Attorney Fry came from her own

account but she does so only by totally ignoring—and not answering—SEC's evidence of its

provenance.   Whether it was appropriate for Ms. Baldassari to use Mr. Pavlico's own money to

retain a criminal lawyer to represent Mr. Pavlico (except for the inconvenient freeze on accounts

imposed by this Court) is not the question.  It is enough to say that the fact that the money's brief

visit to Ms. Baldassari's own account did not make the money hers.  Having failed to respond to

SEC's argument, Ms. Baldassari cannot be heard further.  *See Kone v. District of Columbia*, 808

---

[20]  A wire transfer record that Ms. Baldasssari gave to SEC on December 9, 2011 showed that
$10,000 was transferred from Mr. Pavlico's account into her account on November 30, 2011.
*See* Kidney Decl., Ex. 15 (E-mails & Bank Records).

F. Supp. 2d 80, 83 (D.D.C. 2011) ("[A]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded." (quoting *Rosenblatt v. Fenty*, 734 F. Supp. 2d 21, 22 (D.D.C. 2010)); LCvR 7(b).

Third, the tale of the sibling loan provides certain clarity: Elmo Baldassari loaned his sister, Mia, $20,000; on her behalf, Milan repaid the full $20,000 to Elmo Baldassari during the course of the securities fraud; to avoid involvement in this lawsuit, Elmo Baldassari deposited $20,000 into the CRIS account with the Court; to pay off her debt, Mia Baldassari transferred some real property to Elmo Baldassari. Ms. Baldassari now contends that $20,000 should be dispersed from the CRIS account to her because it represented repayment of a loan to Elmo Baldassari that she repaid another way.[21] Her logic again fails. Milan engaged in a long securities fraud and the money in its accounts were (part of) the ill-gotten gains. When Milan paid off Mia Baldassari's debt, it did so with money that belonged to the victims. Ms. Baldassari has no claim to that money.

The Court thus concludes that Ms. Baldassari has no claim to the retainer paid to Mr. Fry or the debt paid to her brother with Milan money. Accordingly, she is not entitled to receive that $30,000 from the CRIS account. Whether Ms. Baldassari is entitled to release of the $39,656.25 she deposited depends on the fourth question: has SEC proved that it is entitled to disgorgement because Ms. Baldassari did not earn the $64,156.25 that she first identified as gifts and loans from Mr. Pavlico? Before wading into that marsh, the Court notes that Ms. Baldassari claims to have earned $19,000 in 2010, but the records undeniably show that she received $22,500 from Milan in that year; even crediting *arguendo* her earnings, $3,500 was unearned and

---

[21] Having transferred the real property to Elmo Baldassari to repay her loan, it is risible that Mia Baldassari claims a right to $20,000 in the CRIS account as derived from her "sale of an additional parcel of real estate." Baldassari MSJ [Dkt. 84] ¶ 10.

subject to disgorgement. Further, Ms. Baldassari claims to have earned $32,000 in 2011, but she received $41,656.25 from Milan in that calendar year, leaving $9,656.25 in unearned receipts that are subject to disgorgement. At a minimum, Ms. Baldassari must disgorge $13,156.25 in unearned monies to SEC.[22]

What remains are the total of $51,000 asserted earnings from Au Natural & Company in 2010 and 2011. For evidence of those earnings, Ms. Baldassari has submitted the two Forms 1099 discussed earlier, which her counsel asserts are "true and correct cop[ies] of 2010 and 2011 1099 statements." Baldassari Reply [Dkt. 89] at 6. SEC tells another story. When Ms. Baldassari testified at deposition in May 2012 that she had worked for a spa owned by Frank Pavlico, she also testified that she had "boxes" of documents to back up her testimony and IRS records. Thereafter, she submitted only the two Forms 1099 and ignored all SEC requests for the "boxes" of supporting documents from the business she supposedly managed. SEC then subpoenaed her accountants and discovered that she had reported adjusted gross income of $3,036 to the IRS in 2010 from investments, claiming no wage, salary or business income or loss. *See* Kidney Decl., Ex. 13 [Dkt. 87-3] (Baldassari 2010 IRS Form 1040). Her accountant produced an email from Ms. Baldassari to him dated March 2, 2012, in which Ms. Baldassari asked the accountant to prepare "1099s for 2010 and 2011 for earned income" from Au Natural & Company, Mr. Pavlico's holding company for the spa. Kidney Decl., Ex. 14 [Dkt. 87-3] (E-mail from Mia Baldassari to "julian196969@gmail.com"). Ms. Baldassari wrote: "My attorney is requesting that I have [the Forms 1099] in my possession for the hearing." *Id.* The amount to

---

[22] As stated above, Ms. Baldassari has already admitted that $5500.00 she received from Milan were gifts: check number 1319, dated 12/14/2010, for $1500.00 (Kidney Decl., Ex. 1 at ECF pages 14–15) and check number 1322, dated 12/18/2010, for $4000.00 (*id.* at ECF pages 16–17). Because that total is less than the $13,156.25 total received from Milan that is undisputedly *not* earnings, the Court does not apportion those amounts to 2010 or 2011 at this time.

be reported for 2011 was changed by hand from $39,656.00—*i.e.*, the exact amount, minus 25 cents, that Ms. Baldassari deposited into the CRIS—to $33,000. *Id.*

Ultimately, the Court cannot make credibility determinations from the written record. Ms. Baldassari has testified under oath that she earned some monies in 2010 and 2011 managing a spa owned by Mr. Pavlico. If true, that could support a claim that she earned some funds legitimately and should not be required to forfeit them. *See Cavanagh*, 155 F.3d at 136. Notably, however, although she says she received payments for that work from Milan, her Forms 1099 reflect income from Au Natural & Company. The Forms 1099 were prepared at Ms. Baldassari's request in conspicuously convenient amounts apparently in preparation for this litigation. In addition, Ms. Baldassari communicated openly with SEC in late 2011 and told SEC that all monies received from Milan were either gifts or loans, although she now says she did not tell the truth at that time. Ms. Baldassari's evidence is extremely weak, but a finder of fact must reach its own conclusion.

Ms. Baldassari's motion for summary judgment and release of funds will be denied. SEC's motion for summary judgment with respect to Ms. Baldassari will be granted in part and denied in part. SEC's motion will be granted with respect to the $13,156.25 that Ms. Baldassari received from Milan and admittedly did not earn in 2010 or 2011. SEC's motion will be denied without prejudice to the remaining $51,000 that SEC asks the Court to order Ms. Baldassari to disgorge. No release from the CRIS account will be ordered.

## IV. CONCLUSION

For the reasons stated above, SEC's motion for summary judgment will be granted with respect to Principal Defendants the Estate of Frank Pavlico, the Milan Group, Baylor & Jackson, and Brynee K. Baylor, as well as Relief Defendants Patrick Lewis and The Julian Estate. SEC's motion for summary judgment will be denied as to Relief Defendant Brett

Cooper.  SEC's motion will be granted in part and denied in part as to Relief Defendant Mia

Baldassari, and Relief Defendant Mia Baldassari's motion for summary judgment and release of

funds will be denied.

A memorializing Order accompanies this Opinion.

DATE: August 26, 2013

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge